# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| PACIFIC INPATIENT MEDICAL GROUP, INC.,<br><br>Plaintiff,<br><br>v.<br><br>MULTIPLAN, INC., AETNA, INC., ELEVANCE HEALTH, INC., THE CIGNA GROUP, and HUMANA, INC. | Case No. _____ |
| This Document Relates To All Cases:<br><br>IN RE MULTIPLAN HEALTH INSURANCE<br><br>PROVIDER LITIGATION, Case No. 24 C 6795;<br><br>MDL No. 3121 | **CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

## <u>TABLE OF CONTENTS</u>

I.   NATURE OF THE ACTION ................................................................................ 1

II.  PARTIES ............................................................................................................ 6

III. JURISDICTION AND VENUE .................................................................... 10

IV. MULTIPLAN'S CO-CONSPIRATORS ....................................................... 11

V.   THE MULTIPLAN CARTEL COLLUSIVELY SUPPRESSED PRICES PAID TO
PIMG AND THE CLASS MEMBERS FOR OON SERVICES. .......................... 13

   A. The Relevant Geographic and Product Markets ................................................. 13

   B. MultiPlan and the Insurer Co-Conspirators Have Fixed and Artificially Suppressed
      Prices for Out-of-Network Healthcare Services ............................................... 23

   C. The Prices Fixed by MultiPlan and Its Co-Conspirators Are for of Out-of-Network
      Healthcare Services .......................................................................................... 26

   D. Even if Out-of-Network Healthcare Services Are Considered Reasonably Interchangeable
      with In-Network Services, Or That Out-of-Network Healthcare Services Are Not Subject
      to Price Fixing (Which They Are), Out-of-Network Healthcare Services Are Part of a
      Broader Insurer-Provider Pricing Environment, Which *Is* Subject to Price-Fixing and
      Collusive Suppression ....................................................................................... 33

VI. FACTUAL ALLEGATIONS SUPPORTING CLAIMS FOR ANTITRUST
VIOLATIONS ............................................................................................... 36

   A.  MultiPlan *Simultaneously* Serves Two Roles in The Healthcare Industry .................... 36

      1. By Its Own Disclosures And Admissions, MultiPlan Is a Directly Competing,
          Horizontally-Positioned PPO Network Operator ........................................... 36

      2. Despite Its Protestations Otherwise, MultiPlan Is a "Payor" -- Just Like Its Repricing
          Customers ....................................................................................................... 43

      3. MultiPlan Also Serves As a Conspiring "Repricer" to The Detriment of
          Providers ........................................................................................................ 44

   B.  Pre-Conspiracy Processing of Out-of-Network Claims – Independent Negotiation
      of OON Healthcare Services ............................................................................. 47

   C.  MultiPlan 2.0 and MultiPlan's Serial Acquisitions of Technology Firms ..................... 49

   D.  Payors and MultiPlan Have Shared Confidential, Proprietary, and Competitively-
      Sensitive Information, Including Pricing And Claims Information ............................... 49

      1. The Exchange of Competitively Sensitive Information Occurred Pursuant to an
          Express or Tacit Agreement to Fix, Stabilize, and Suppress Prices in Violation of
          Section 1 of the Sherman Act ......................................................................... 49

i

2. The Exchange of Competitively-Sensitive Information Here Is A *Per Se* Violation As It Has Occurred Between And Among Horizontally-Positioned PPO Network Operators ........................................................................... 53

3. Payors Shared Confidential, "Proprietary," And Competitively-Sensitive Information, Including Their Claims and Pricing Information, with A Direct, PPO Network Competitor, MultiPlan ........................................................ 54

4. Payors Shared Competitively-Sensitive Information, Including Claims Approval Data, through MultiPlan to Other Payors ............................................. 57

5. MultiPlan Shared Competitively Sensitive Information, Including Repricing Service Use, Claims Approval Methodologies and Payment Amount Override Information, with Payors ....................................................................................... 63

6. Directly Competing Payors Shared Confidential, Proprietary, and Competitively-Sensitive Information With  Each Other (The "Rim" of the Hub-And-Spoke Conspiracy) ......................................................................................... 73

E. MultiPlan Has Reached Information Sharing/Repricing Agreements with Nearly The Entirety of The PPO Network Payor Industry ................................................. 73

F. As MultiPlan's Repricing Compensation Is Based on The Percentage The Payor Saves, MultiPlan Is Incentivized To Reduce Payment Amounts And Has A Strong Motive To Preserve The Conspiracy ........................................................................... 76

G. Payors' Sharing of Pricing Information with MultiPlan and Using Its Algorithm To Set Prices While Knowing That Competitors Are Doing the Same *Is* Price Fixing .............. 76

H. The Widespread Adoption and Application of MultiPlan's Repricing Services by Payors Has Precluded Meaningful Competitive Alternatives and Harmed Competition ............. 78

I. As a Participant in the PPO Network Market, MultiPlan Competes with Payors, Making This Repricing Conspiracy A *Per Se* Violation of the Antitrust Laws .............................. 78

J. This Conspiracy Is Supported by Direct Evidence of Written Agreements between MultiPlan and the Other Payors ...................................................................................... 80

K. MultiPlan and the Other Members of the MultiPlan Cartel Have Formed and Executed a Horizontal Price-Fixing Conspiracy ................................................................................ 81

1. The Insurer Co-Conspirators Have Unlawfully Delegated Pricing and Negotiation Authority to a Horizontal Competitor ...................................................... 81

2. MultiPlan Acknowledges That It Bundles Its PPO Network Offerings with Repricing Services for Combined Use ........................................................................ 83

3. MultiPlan Applies Its Repricing Tools to The Detriment of Providers ...................... 83

L. MultiPlan's Repriced Payment Amounts Are Neither Recommendations Nor Starting Points to a Negotiation; As Demonstrated by Astronomically High "Acceptance Rates," Healthcare Providers Have No Practical Competitive Alternatives for Out-of-Network Claims Payments ....................................................................................... 85

M. In the Event That a Healthcare Provider Attempts to Re-Negotiate a Payment Amount, the Negotiation Is Collusive, One-Sided, Time-Pressured, And Can Result in an Even Smaller Payment; MultiPlan Even Hopes to Control the Post-Offer Adjudication Process at Arbitration ....................................................................................... 89

N. The Efforts, Conduct, Statements And Omissions of Members of The MultiPlan Cartel Have Directly And Proximately Caused Harm And Damages to PIMG And Other Members of The Class; PIMG and Those Similarly Situated Have Article III and Antitrust Standing ....................................................................................... 90

O. In Addition to the Direct Evidence of the MultiPlan Cartel, There Is Abundant Circumstantial Evidence Supporting Its Existence ............................................... 97

VII. MULTIPLAN AND ITS CARTEL MEMBERS HAVE ENGAGED IN CONTINUING ANTITRUST VIOLATIONS AND HAVE FRAUDULENTLY CONCEALED THEIR CONDUCT TO TOLL THE STATUTE OF LIMITATIONS ............................................... 108

A. MultiPlan and the Other Payors Are Engaging in A Continuing Antitrust Violation by Renewing Their Conspiracy with New and Independent Acts .................. 108

B. MultiPlan And The Insurer Co-Conspirators Committed Fraudulent Concealment by Engaging in Efforts To Conceal The Conspiracy To Artificially Suppress Payments for Out-of-Network Healthcare Services, Which Have Tolled The Statute of Limitations ....................................................................................... 109

VIII. EFFECTS ON INTERSTATE COMMERCE ............................................... 124

IX. CLASS ACTION ALLEGATIONS ............................................... 126

X. CAUSES OF ACTION ............................................... 128

XI. REQUEST FOR RELIEF ............................................... 132

XII. JURY TRIAL DEMANDED ............................................... 133

iii

Plaintiff Pacific Inpatient Medical Group, Inc. ("PIMG"), on behalf of itself and a class of all others similarly situated, brings this action seeking a judgment against Defendant MultiPlan, Inc. ("MultiPlan") of joint and several *per se* liability for damages resulting from continuing violations of section 1 of the Sherman Act. Based on direct and indirect evidence, facts revealed by counsel's investigation, and, where specified, information and belief, PIMG alleges as follows:

## I.   NATURE OF THE ACTION

> *"We will continue to collaborate with companies that share our goal of protecting consumers and their employers from high out-of-network rates and offer solutions that reduce the cost of health care while also achieving high customer satisfaction."*

Email from UnitedHealthcare spokesperson to *The Capitol Forum,* as reported on March 1, 2022.

1.      This case takes aim at one segment of the labyrinthine healthcare system in the United States: an insurance product commonly known as the preferred provider organization (PPO). PPOs, operated by MultiPlan and virtually every other commercial health insurance company, primarily furnish coverage for medical services provided to patients by "preferred providers." These physicians, clinics, hospitals, and other personnel that provide medical or healthcare services ("Providers") contract with health insurers to become part of a "network" of providers that agree to accept less than the full amount they normally bill for medical services. Patients insured by PPOs receive specified coverage for this "in-network" treatment at predetermined costs, most commonly in the form of premiums, deductibles and co-pays.

2.      Our healthcare system encompasses several types of relationships and their related markets: (1) the relationship between insureds and insurers; (2) the relationship insurers and insureds have with an insured's employer; (3) the relationship between insurer and employer; (4) the relationship between an insured and a Provider; and (5) the relationship

between an insurer and a Provider. For PPOs specifically, this fifth relationship has two Provider subtypes: Providers providing "in-network" healthcare services, and Providers providing OON healthcare services.

3.     For various reasons —emergencies, unavailability of timely or convenient in-network care, preexisting provider-patient relationships, etc.—PPO policyholders are sometimes treated by Providers outside of the PPO's Provider network. PPOs do not specify how much insurers pay Providers for this "out-of-network" ("OON") care.

4.     The absence of any contractual relationship between Payors and OON Providers prompts an obvious question: why would a Payor pay anything at all to an OON Provider?  As with most aspects of the U.S. healthcare system, the answer lies in economic self-interest.  As reflected in peer-reviewed social science concerning the U.S. healthcare industry, the broader and more expansive a PPO network of medical providers, the higher the premiums the Payors can charge for subscriptions to that network. As one industry paper reported, PPO "[p]lans with larger networks have premiums between 6% and 13% higher than those with smaller networks in ACA marketplaces." Because Payors have a substantial economic interest in expanding their in-network directories of medical practitioners, they are motivated to pay medical practitioners providing patients OON care.

5.     Historically, in the absence of a network contract between the PPO insurer and the Provider, the two freely negotiated the price paid for OON healthcare. The OON prices they agreed on reflected competition between Payors, who are horizontally situated as buyers in the market for OON services. Payors leveraged those negotiations to attract OON Providers to join their PPO networks, thus making them more desirable to potential PPO subscribers.

6.     That incentive bred direct competition among Payors, the purchasers in this market for medical services delivered by Providers, the sellers. This healthy competition among

MultiPlan and other PPO Payors benefitted OON Providers by generating a market price they received for their OON healthcare services.

7.      Unhappy with the effects of that competition on the profits of its own PPOs, MultiPlan took action to snuff it out. MultiPlan began by acquiring, developing and using algorithms to calculate lower prices it would pay OON Providers. This pricing method sowed the seeds of conspiracy. Recognizing that it could not implement its new pricing method alone, MultiPlan envisioned an alliance of PPO Payors that all adopted its pricing technology to set uniform industry-wide prices.

8.      MultiPlan gradually recruited more and more PPO Payors to use its pricing methodology. By July 1, 2017, MultiPlan's scheme had come to fruition. Virtually all commercial health insurance companies had entered into written agreements with MultiPlan to use its algorithms to establish their OON pricing. But the Payors did not autonomously use MultiPlan's innovation, with each independently setting prices. Instead, they agreed to conspire by openly sharing their competitively sensitive claims data and adopting MultiPlan's algorithmic pricing. MultiPlan and the Payors refer to the new method as "repricing," a transparent euphemism for illegally fixing and suppressing the amounts they pay OON Providers for OON medical services. Over the course of MultiPlan's long-term relationships with the Payors, has been successful in "saving" Payors – at the expense of Providers like PIMG -- over $19 billion per year, by Multiplan' own calculations.

9.      In addition to the "repricing" services that MultiPlan sells to other PPO Payors, MultiPlan manages its own PPO networks.  Because MultiPlan acts simultaneously as both a manager of PPO networks and a "repricer," whenever a competing Payor shares its claims or pricing information with MultiPlan for any reason—in particular, for the purpose of obtaining MultiPlan's repricing services—it shares confidential information with a direct competitor.

10. Once a Payor submits its own claims and pricing data to MultiPlan, no further sharing of that data is necessary for a violation of the Sherman Act. Because MultiPlan and all other Payors are direct competitors, the violation occurs at the moment a Payor shares competitively sensitive information with MultiPlan or any other Payor.

11. Starting no later than July 1, 2017, MultiPlan has continuously conspired with virtually every other significant healthcare insurance company that operates PPO networks in the United States. At the heart of this unlawful conspiracy (the "MultiPlan Cartel") are horizontal agreements between MultiPlan and the other insurers to fix the amount of payments they issue to thousands of OON Providers.

12. MultiPlan and its co-conspirator Payors, including those Payors named as Defendants and those included within the category of Insurer Co-Conspirators, while ostensibly remaining in competition, secretly agreed to eliminate competition by limiting their OON Provider payments to specific amounts or ranges as determined by proprietary analytical tools owned and operated by MultiPlan or through pricing override directions issued by MultiPlan.

13. From approximately 2010 through at least last year (2023), MultiPlan has acquired a series of companies that had developed software tools to price OON claims or to otherwise suppress, constrain, review payment information. Although these tools could calculate MultiPlan's payment amounts, MultiPlan realized that it could not effectively use them alone. If it unilaterally attempted to discount prices computed by applying its analytical tools, then OON Providers would refuse to treat patients covered by MultiPlan's PPOs where possible. To prevent that defection, MultiPlan solicited its direct competitors to conspire with it to pay reduced prices for OON healthcare services. Over time, MultiPlan's direct competitors joined the conspiracy until mid-2017, when all major Payors joined the MultiPlan Cartel, and agreed both to provide information for and to benefit from the collusive OON healthcare services pricing scheme.

14.     Predictably, the payment amounts generated by MultiPlan's algorithms are steeply discounted from the claim amounts and far below what PPO Payors would pay if they had not surrendered their autonomy to MultiPlan's "price resetting" or "repricing" methodologies.

15.     Moreover, MultiPlan performed its payment "repricing" wizardry by feeding its analytical tools not only its own pricing and claims data but also otherwise confidential, proprietary, and competitively-sensitive pricing and claims data submitted by its co-conspirators, often in real time. Predictably—and as intended—the payment amounts generated by MultiPlan are steeply discounted from the original amounts claimed and far below what Payors would otherwise pay.  Again, although MultiPlan provides other PPO network managers its repricing services, MultiPlan simultaneously serves as a PPO network manager.  As such, at the moment claims or pricing information is shared between MultiPlan and its insurer-customer(s), such proprietary, confidential, and competitively-sensitive information is also shared between or among **directly competing** PPO network managers.  Such information sharing is a *per se* violation of the nation's antitrust laws.

16.     Abundant facts demonstrate the formation and operation of the MultiPlan Cartel. Rare for price-fixing cases, in addition to indirect evidence, there is undisputed direct evidence proving its existence and operations. Most probative are written agreements between MultiPlan and insurers expressly providing for the sharing of otherwise confidential and proprietary information, including claims and pricing information, and for the application of MultiPlan-based methodologies in order to obtain "re-priced" claim amounts.

17.     To remedy the harm caused by MultiPlan's illegal conduct, PIMG—on behalf of itself and a class of all others similarly situated—brings this action alleging that MultiPlan and

the other Payors (not joined as defendants for now) have violated and continue to violate Section 1 of the Sherman Act.

## II.   PARTIES

18.     Plaintiff PIMG, a California corporation having its principal place of business in San Francisco, California, is a group of physicians, known as hospitalists, who practice medicine in hospitals and skilled nursing homes. Its team of some 100 doctors and other healthcare professionals includes internal medicine physicians, doctors of osteopathy, nurse practitioners, and physician assistants. They provide a wide variety of medical care in a number of California locations, including the Van Ness, Davies, and Mission Bernal campuses of the California Pacific Medical Center ("CPMC") in San Francisco; the Novato Community Hospital, the Santa Rosa Hospital), and Marin General Hospital in Kentfield. They also provide medical care in Pacific Community Healthcare's skilled nursing facilities in San Francisco, Marin, and Sonoma counties. PIMG's practices include general medical care, specialty consultation, surgical co-management and related services in internal medicine, pediatrics, geriatrics, palliative care, anesthesiology, nephrology, hematology, oncology, infectious diseases, emergency medicine, critical care, and specialized surgical care. In nursing homes, they also manage post-acute care and assist in transitioning patients through different phases of illness. Staff members of PIMG have provided out-of-network healthcare services to patients and have submitted claims to commercial insurance company payors for payment. Such claims were repriced by MultiPlan and/or one or more of its repricing subsidiaries. PIMG suffered harm in the form of collusively-suppressed payments from such repricing efforts.

19.     **Defendant MultiPlan and Related Corporate Entities.** Unless otherwise specified, this Complaint refers to MultiPlan, Inc., MultiPlan Corporation, Churchill Capital

Corporation III, Viant Holdings, Inc., Viant Payment Systems, Inc., National Care Network, LP, and National Care Network, LLC, as collectively, "MultiPlan." MultiPlan, Inc. is a New York corporation with its principal place of business located in New York, New York. MultiPlan is wholly owned by the MultiPlan Holding Corporation. which is the publicly traded MultiPlan Corporation. MultiPlan and MultiPlan Corporation own or control a number wholly owned subsidiaries, including Viant, Inc., an Illinois-based firm that used algorithms to recommend claim payments.

20.     As part of MultiPlan's corporate history, Churchill Capital Corp. III and its related entities acquired MultiPlan and its related entities in October 2020. Churchill Capital Corp. III was at the time a special purpose acquisition company ("SPAC") created to raise funds to assist in converting a private company into a public one, accomplished by acquiring or merging a privately-held company into an already publicly-held company, sometimes referred to as a "shell" company. Churchill Capital Corp. III was incorporated in Delaware for the purpose of accomplishing a merger in order eventually to take MultiPlan public. Following the completion of the acquisition, Churchill Capital Corp. III changed its name to MultiPlan Corporation.

21.     MultiPlan is liable not only for its own conduct and omissions, but also for acts performed or omitted in furtherance of the alleged conspiracy by MultiPlan's affiliates, agents, employees, directors, officers, partners, representatives, subsidiaries, and companies acquired through mergers and/or acquisitions.

22.     MultiPlan operates as a single, integrated business with a single board and executive team, a single set of financial statements, and a single corporate entity overseeing its PPO networks and its data analytics and claims repricing (downwards adjusting) business. In addition to MultiPlan, Inc. and those described in the paragraph immediately above, the alleged

conspiracy includes at all relevant times other known and unknown corporations, limited liability companies, partnerships, individuals, and/or entities who willingly conspired with MultiPlan in its unlawful and illegal conduct. Some of those co-conspirators, including the Defendants listed below and other co-conspirators, as listed above and which are also discussed in greater detail below. Numerous individuals and entities have participated actively during and to further the alleged conspiracy and scheme described within this complaint. Such individuals and entities have acted in concert with MultiPlan by and through, among other things and ways, joint ventures and the agency-principal relationship in order to advance the objectives and profitability of the scheme to benefit MultiPlan, its co-conspirators, and those individuals and entities themselves by and through information exchange, as well as the use of MultiPlan's repricing tools, resulting in the artificial suppression of OON payment amounts and rates.

23. MultiPlan is jointly and severally liable for all acts or omissions of the co-conspirators, including both Defendants and non-Defendant co-conspirators.

24. Defendant **Aetna, Inc.** ("Aetna"), is a Delaware Corporation with its headquarters located in Hartford, Connecticut. Aetna is a subsidiary of CVS Health Corporation. One of the largest Payors in the U.S., Aetna has a commercial insurance network that pays both in-network and OON claims from Providers in the District of Columbia and all 50 states. Aetna is the parent company to, or is otherwise affiliated with or related to numerous commercial health insurance plans and prescription drug plans that operate and serve patients and Providers in the U.S. Aetna-related plans issue insurance and/or provide administrative services concerning healthcare claims under fully insured commercial health insurance plans, self-funded administrative service only health plans, PPOs, hybrid-funded health plans, Medicare Advantage plans, and Medicaid plans.

8

25.     Defendant **Elevance Health, Inc.** ("Elevance" or "Anthem Blue Cross"), formerly Anthem, Inc., is an Indiana Corporation having its principal place of business located in Indianapolis, Indiana. Elevance is a member of the Blue Cross and Blue Shield Association, which is a joint venture of insurance companies that, together, offer members access to a nationwide network of Providers. As part of its member relationship, Elevance licenses certain trademarks and service marks from the Blue Cross and Blue Shield Association for use in 14 states. Elevance is the parent company or is otherwise affiliated with or related to various commercial health insurance plans and prescription drug plans that operate in the U.S. Elevance's plans issue insurance or provide administrative services concerning healthcare claims regarding fully insured commercial health insurance plans, self-funded administrative service only health plans, PPOs, hybrid-funded health plans, Medicare Advantage plans, and Medicaid plans.

26.     Defendant **The Cigna Group** ("Cigna") is a Delaware corporation with its principal place of business located in Bloomfield, Connecticut. Cigna is a parent company to or is otherwise related to various commercial health insurance plans and prescription drug plans that operate in the U.S. Cigna's plans issue insurance or provide administrative services concerning healthcare claims regarding fully insured commercial health insurance plans, self-funded administrative service only health plans, PPOs, hybrid-funded health plans, Medicare Advantage plans, and Medicaid plans.

27.     Defendant **Humana, Inc.** ("Humana") is a Delaware corporation having its principal place of business located in Louisville, Kentucky. Humana is the parent company of or is otherwise affiliated with or related to several commercial health insurance plans and prescription drug plans that operate in the U.S. Humana's plans issue insurance or provide administrative services concerning healthcare claims regarding fully insured commercial health

insurance plans, PPOs, hybrid-funded health plans, Medicare Advantage plans, and Medicaid plans.

28.     For purposes of this complaint, Defendants Aetna, Elevance/Anthem Blue Cross, Cigna, and Humana are collectively referred to herein as Defendant Payors.  Each of the Defendant Payors have entered into one or more OON repricing agreements with MultiPlan, have participated in the conspiracy, have performed acts, omitted to perform acts, and/or have made statements in furtherance of the conspiracy at issue in this matter, and is a member of the MultiPlan Cartel.

## III.   JURISDICTION AND VENUE

29.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337, as this action presents federal questions concerning Section 1 of the Sherman Act (15 U.S.C. § 1); and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§15(a), 26).

30.     In addition, this Court has jurisdiction pursuant to 28 U.S.C. § 1332(d), as this is a class action with an aggregate amount in controversy exceeding $5,000,000.00, exclusive of interests and costs. Further, at least one member of the putative Class is a citizen of a state different from MultiPlan's state of citizenship. As alleged above, PIMG is a citizen of California and MultiPlan is a citizen of New York.

31.     This Court has personal jurisdiction over MultiPlan based on its activities within Illinois, including in this District.  During the Class Period, from July 1, 2017 to the present, MultiPlan and the other PPO Payors each paid Providers for OON services provided in Illinois, including in this District.  Further, MultiPlan's analytical tools have been used by MultiPlan and some or all the other PPO Payors to determine or assist in determining payment amounts for claims submitted by OON providers and settled in this District. In addition, in order to facilitate the operation of these tools, some or all of the PPO Payors have shared information with

MultiPlan and with each other, which facilitated payment of artificially suppressed payment amounts in this District. Further, under 15 U.S.C. § 22, MultiPlan "may be found or transacts business" in this District.

32.     Venue is proper in this District under Section 12 of the Clayton Act (15 U.S.C. § 22) and under the federal venue statute (28 U.S.C. § 1391) as MultiPlan maintains an office in Naperville, Illinois, and as certain unlawful acts alleged in this action were performed in this District, and caused harm to interstate commerce and to competition in this District.

## IV.    MULTIPLAN'S CO-CONSPIRATORS

33.     Members of the MultiPlan Cartel include MultiPlan (including its related corporate entities), Defendant Payors, as well as all or nearly all of the major Payors of or in the United States, including the Payors listed below.

34.     Co-Conspirator Centene Corporation ("Centene") is a Delaware corporation with its principal place of business located in St. Louis, Missouri. Centene is a parent company to several commercial health insurance plans and prescription drug plans that operate in the U.S. Centene's plans issue insurance or provide administrative services concerning healthcare claims regarding fully insured commercial health insurance plans, self-funded administrative service only health plans, PPOs, hybrid-funded health plans, Medicare Advantage plans, and Medicaid plans.

35.     Co-Conspirator Health Care Service Corporation ("HCSC") is organized as a mutual reserve company under Illinois law and maintains its principal place of business in Chicago, IL. HCSC is the parent company of or is otherwise affiliated with or related to several commercial health insurance plans and prescription drug plans that operate in the United States, including Illinois. HCSC's plans issue insurance or provide administrative services concerning

healthcare claims regarding fully insured commercial health insurance plans, PPOs, hybrid-funded health plans, Medicare Advantage plans, and Medicaid plans.

36.     Co-Conspirator UnitedHealthcare Group Inc. ("UHG" or "UnitedHealthcare") is a Delaware corporation having its principal place of business located in Minnetonka, Minnesota. UHG maintains two divisions.  First, UHG provides health benefits plans.  Second, UHG owns and runs Optum, which provides certain health services, most notably, pharmacy benefit manager services.   Vertically integrated and oriented, UHG wholly owns or manages a multitude of subsidiaries comprising enormous healthcare and medical ecosystem.  UHG maintains a commercial insurance network that pays both in-network and OON claims from Providers in all fifty states and the District of Columbia.  UHG's insurance plans issue insurance or provide administrative services concerning healthcare claims regarding fully insured commercial health insurance plans, self-funded administrative service health plans, PPOs, hybrid-funded health plans, Medicare Advantage plans, and Medicaid plans.

37.     Centene, HCSC, UHG, and other healthcare insurance payors (collectively, the "Insurer Co-Conspirators") have each entered into one or more OON repricing agreements with MultiPlan, have each participated in the conspiracy, have each performed acts, omitted to perform acts, and/or have made statements in furtherance of the conspiracy at issue in this matter, and is each a member of the MultiPlan Cartel.  Collectively, MultiPlan (and its related corporate entities), the Defendant Payors, and the Insurer Co-Conspirators comprise membership of the MultiPlan Cartel.

38.     MultiPlan is jointly and severally liable for all unlawful acts and omissions of all of its co-conspirators, including its Defendant Payors, its Insurer Co-Conspirators, and all members of the MultiPlan Cartel, whether or not named as defendants within this or any subsequently amended complaint.

V.   **THE MULTIPLAN CARTEL COLLUSIVELY SUPPRESSED PRICES PAID TO PIMG AND THE CLASS MEMBERS FOR OON SERVICES.**

A.   **The Relevant Geographic and Product Markets**

39.   As the MultiPlan Cartel is a nationwide scheme, the relevant geographic market here is composed of all U.S. states, U.S. districts, and U.S. territories, including all fifty states, the District of Columbia, American Samoa, Guam, the Northern Mariana Islands, Puerto Rico, and the U.S. Virgin Islands.

40.   As discussed in *Sharif Pharm., Inc. v. Prime Therapeutics, LLC,* 950 F. 3d 911(7th Cir. 2020), *United States v. Grinnell Corp.*, 384 U.S. 563 (1966), *Brown Shoe Co. v. U.S.,* 370 U.S. 294 (1962), and *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377 (1956), a relevant product market under the Sherman Act is comprised of commodities, including services, that are reasonably interchangeable by consumers for the same purposes. A properly defined market excludes other potential suppliers (1) whose product is too different (product dimension) or too far away (geographic dimension) and (2) who are not likely to shift promptly to offer a defendant's customers a suitably proximate (in both product and geographic terms) alternative. Also, the outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it. As the Seventh Circuit has specifically determined, "[a] cluster of products can comprise a relevant product market 'if the cluster is itself an object of consumer demand.'" *Sharif Pharm,* 950 F.3d at 918 (quoting *Green Country Food Market, Inc. v. Bottling Group, LLC,* 371 F.3d 127501283-85 (10th Cir. 2004)). The Seventh Circuit explained that "[a] cluster of products can comprise a relevant product market 'if the cluster is itself an object of consumer demand.'" *Sharif Pharm.,* 950 F.3d at 918 (quoting *Federal Trade Comm'n v. Advocate Health*

*Care Network*, 841 F.3d 460, 467 (7th Cir. 2016)).  Also, "the Supreme Court has recognized

such 'cluster' markets," noting in *Grinnell Corp.* that "'[w]e see no barrier to combining in a

single market a number of different products or services where that combination reflects

commercial realities.'" *Sharif Pharm.*, 950 F. 3d at 918 (quoting *United States v. Grinnell Corp.*

384 U.S. 563, 572-73 (1966)).

41.    The overall relevant product market at issue is the commercial healthcare

insurance market that encompasses the relationship between Payors and Providers concerning

the payment by healthcare insurance companies to Providers for healthcare services.   As noted

above, clusters of products or services can be considered an appropriate relevant product market

under the Sherman Act.  Here, the cluster of healthcare services, as paid by commercial

healthcare insurance company payors, is the overall relevant product market.  However, for

reasons discussed below, this *overall* relevant product market does not describe the actual

markets functioning here.  As devoting better consideration to the economic practicalities at

issue, this lawsuit focuses on a sub-market to this "overall" relevant product market, described

*infra*.

42.    The overall relevant product market can be further broken out into two sub-

markets:  the market for payments made by commercial healthcare insurance companies for in-

network healthcare services; and the market for payments made by commercial healthcare

insurance companies for OON healthcare services.  This matter mostly concerns the efforts and

activities that have occurred to control, fix, and suppress prices concerning OON healthcare

services.  However, to the extent that such efforts have impacted payments for both OON and in-

network healthcare services, then both sub-markets are at issue in this matter (as well as the

entire commercial healthcare insurance company – healthcare service provider market).

14

43.     With respect to the relationship that exists between Payors (purchasers of OON services) and OON Providers (sellers of OON services), and the associated market for the payment for and provision of services of OON Providers that exists (the "OON market"), both MultiPlan and others have treated the OON market as or otherwise regard this to be a separate, standalone market.

44.     The OON market is a separate, standalone market that satisfies relevant product market considerations.  The OON market is comprised of a "bundle" of products, here, OON healthcare services.  Further, in-network healthcare services are not reasonably interchangeable with OON healthcare services.  For example, for a healthcare service to convert from out-of-network to in-network, at least the following have to occur:  (1) that practitioner providing the OON healthcare service must agree to perform the service for a particular PPO network; (2) that PPO network must accept that Provider into the network; (3) that PPO network must cover that procedure; and (4) there must be a patient willing to undergo that procedure (emergencies notwithstanding) within the confines and constraints involved with an in-network procedure.

45.     Supporting the separate, standalone nature of the OON market, a patient's decision to use OON healthcare services is often based on ***unavailability*** of the procedure within that patient's PPO network.  As patients are usually better off financially when using in-network services, a patient deciding to "go out-of-network" is often rooted in her or his PPO network not providing access to the Provider or the service at issue.

46.     For example, as discussed in a March 31, 2024 MedCentral nationwide survey of 713 commercial plan enrollees, the top three reasons why patients "used an out-of-network provider in the past year" were "1. convenient location   2. higher quality   3. Affordability."  Moreover, for "General Health Care" patients (as opposed to "Metal Health Care" patients), 24% of patients cited the reason that "Providers were not taking new patients," and 22% of patients

cited the reason of "Inaccurate in-network provider directories" for why they sought out-of-network healthcare services.  In other words, nearly 50% of "General Health Care" patients cited reasons that indicate that such services or Providers were simply not provided by the in-network option.  *See* https://www.medcentral.com/biz-policy/top-reasons-patients-go-out-of-network (visited August 23, 2024).  This was similarly summarized in *Psychiatry Online*, which emphasized the even higher citation of reasons for going out-of-network by patients seeking mental health-related services versus those seeking general medical healthcare, noting that 34% versus 24% cited the reason for seeking out-of-network care that "in-network providers were not taking new patients"; and 30% versus 22% cited the reason for seeking out-of-network care that the "in-network provider directories" were "inaccurate."  *See* https://psychiatryonline.org/doi/10.1176/appi.ps.20230212 (last visited August 23, 2024).  In other words, they were not reasonably interchangeable, as they were not interchangeable at all.

47.     As listed by the Patient Advocate Forum, there are various circumstances where a patient might seek out-of-network healthcare services, including for "Emergencies, "Distance Issues," "Specialist Care," and "Out-of-Town Care.  PAF noted specifically that "[i]f you have a rare condition, specialists can be limited, so out-of-network care may be your only option.  Or if your treating specialist leaves your insurance network, you may choose to continue that care by going out-of-network."  https://www.patientadvocate.org/cardio-it-matters-sheets/the-ins-and-outs-of-seeking-out-of-network-care/#:~:text=Specialist%20Care%3A%20If%20you%20have,going%20out%2Dof%2Dnetwork (last visited August 23, 2024).

48.     Because practical access to a certain Provider or medical procedure is often simply unavailable within a particular PPO network, in-network, and OON healthcare services cannot be considered reasonably interchangeable.

16

49.     Moreover, MultiPlan, the Defendant Payors, and the Insurer Co-Conspirators have treated the out-of-network healthcare services market as a separate, standalone market.

50.     For example, as reported by Chris Hamby and the *New York Times,* "[f]or decades, MultiPlan determined payments [for "'out-of-network costs'"] primarily through negotiations.  The discounts were modest but came with an agreement not to collect more from patients."[1]

51.     As described by MultiPlan in a November 19, 2020 investor presentation, "MultiPlan delivers mission critical services, identified as ***$19B in potential savings for our customers on $106B+ of medical charges*** processed in 2019 alone[.]" (Emphasis added).  This same presentation noted that "[i]n 2019, we processed 360K+ claims daily, ***totaling $106B of health charges and identified $19B in potential savings*** for our customers[.]" (Emphasis added).

52.     Furthermore, MultiPlan in its public disclosures stated that "we estimate ***the total addressable market ('TAM') for out-of-network cost management and out-of-network payment integrity solutions*** is approximately $6 to $8 billion." (Emphasis added).

53.     Other examples of Multiplan touting its services and standing in the market include:

- "Our Competitive Advantage:  Unique products and capabilities, including:  • ***Broad range of out-of-network solutions*** – We believe no single competitor currently offers ***the same breadth of out-of-network cost management services*** that we provide.  Our ability to offer flexible packages of solutions ***to all***

---

[1] What appears to be a kind gesture to patients, the detail regarding an "agreement not to collect more from patients" later becomes a key part of MultiPlan's, the Defendant Payors', and the Insurer Co-Conspirators' efforts to conceal the repricing conspiracy from the public.

***segments of the market*** . . . enables us to meet the diverse needs of our customers, who serve plan sponsors with widely varying health plan sizes and health benefit needs." (Emphasis added).

- "Our Services:  . . . .  *Reference-Based Pricing ('RBP')*.  RBP provides Payors with a recommended payment amount ***for out-of-network claims based on a reference point***.  ***Most RBP programs in the market*** use Medicare as the reference point.  We also offer this option, but most customers elect to use our Data iSight program which uses facility cost as the facility reference point and median reimbursed[2] amounts as the professional reference point."  (Emphasis added).

- "We intend to continue this growth strategy in 2024 and beyond to, among other things, reduce the concentration of our revenues and reduce our dependence on the commercial market as well as ***reduce our dependence on out-of-network claims within the commercial market.***" (Emphasis added).

- "Our Competitors:  We compete with other companies ***in our markets*** on the basis of the effectiveness of our cost-savings solutions, the quality of our customer service, and the prices of our services.  We believe no single competitor currently offers the same breadth of services we provide. . . .  Our competitors vary by service, as follows:  . . . .  ***Analytics-Based Services.***  MultiPlan competes with a variety of medical cost management companies for negotiation, reference-based pricing and surprise billing services.  We compete for these services on the

---

[2] Multiplan and other insurers often refer to payments to OON providers as "reimbursements." This is a misnomer because these payments are not reimbursements at all. Rather, they are compensation for services rendered by the provider.

basis of savings effectiveness, provider acceptance, and plan member satisfaction. Our workflow and claim processing technology, user interaction and data and analytic tools are key competitive advantages. MultiPlan's competitors for these services typically are reference-based pricing services. They include 6Degrees, AMPS, ELAP Services, Payer Compass, Zelis, ClearHealth Strategies and Naviguard." (Emphases added).

54. Beyond financial disclosures, MultiPlan executives informed investors and potential investors that "[p]ut simply, we believe that MultiPlan's healthcare affordability products are among the very best in the industry, and its strategy is to work with payers to deploy MultiPlan's products well beyond ***the $6 billion to $8 billion out-of-network market TAM*** that it participates in today . . . ." (Emphasis added).

55. As noted in another MultiPlan investor presentation, "[o]ur Total Addressable Markets: Doubling our TAM to >$30B: ***Existing Markets ($B):*** • Provider Networks  $3; ***OON Cost Management  $3***; Payment Integrity $7-8B[.]" (Emphases added). "Competitive Advantages:  Broadest range of ***OON solutions in the market***[.]" (Emphasis added).

56. In addition, by referring to the "***in-network***" aspect of the Payor-Provider relationship as a "market," MultiPlan, by implication, confirms the existence of separate, standalone OON healthcare insurance company - Provider market.  For example:  "Today, MultiPlan is a leader in out-of-network cost management and is bringing its capabilities ***to the in-network market*** through its Payment Integrity capability[.]" (Emphasis added).

57. In another analyst presentation on August 18, 2020, MultiPlan made these statements:

- "Today, MultiPlan continues to lead in out-of-network cost management and is brining those capabilities *to the in-network market* through its Payment Integrity services." (Emphasis added).

- "We have multiple avenues of growth.  As I just articulated, that also includes *in-network*, as well as international, along with government and property/casualty."

- "We have multiple avenues of growth.  As I just articulated, that also includes *in-network*, as well as international, along with government and property/casualty." (Emphasis added).

- "Payment Integrity Revenues:  . . . .  Pre-payment integrity offering has allowed MultiPlan to test *new markets strategy:  •In-Network* . . . ." (Emphasis added).

58.     MultiPlan similarly recognized the existence of the OON standalone market by referring to the "in-network" market in its Form 10-K:  "We estimate *the TAM [Total Addressable Market] for our in-network* payment and revenue integrity solutions is approximately $4 to $5 billion." (Emphases added).

59.     Others have recognized the relationship between Payors and OON Providers as a "market."  For example, David C. Lewis, Principal of Milliman, the "independent risk management, benefits and technology firm" of "actuaries, technologists, clinicians, economists, climate and data scientists and compensation experts" authored a "white paper," titled, "The changing landscape of out-of-network reimbursement."  This "Milliman white paper" repeatedly emphasized the relationship between Payors and OON Providers as a "market."

60.     For example, Mr. Lewis noted that "[c]ommercial out-of-network (OON) provider reimbursement is a topic of great debate in healthcare.  Changes on both the payer and provider sides have produced a large disparity in the OON payment levels pursued by each.

Payers seek ways to limit growth in OON costs while providers look to maintain revenue ***in a market*** with increasing pressure to accept lower payments." (Emphasis added).

61.     Additional evidence of OON payments as a discrete market includes these statements by Mr. Lewis:

    a.  "For many years, ***the market standard for OON provider reimbursement*** was to determine a usual and customer (U&C) level to pay based on the market. U&C amounts were typically calculated by looking at the distribution of provider billed charge levels and picking a percentile of those charges . . . ." (Emphasis added).

    b.  "Pay At A Percentage of Medicare:  ***Many payers are redefining OON reimbursement*** as a multiple of Medicare allowable reimbursement.  This practice is already common in commercial contracting and benchmarking, and has the advantages of:  Removing billed charges from consideration; ***Setting the reimbursement relationship between services more consistently with the market***; Simplifying the schedule by using percentages by service category (or overall) rather than a detailed schedule where amounts are separately calculated for each code."  (Emphases added).

    c.  "Pay At In-Network Levels:  This approach sets OON reimbursement at a payer's in-network ***reimbursement levels for a market***, where the in-network levels may be determined as an average for providers ***in the market***, or as a standard base schedule."  (Emphases added).

    d.  "Whatever form of OON reimbursement approach is used, it is recommended that a payer benchmark its reimbursement levels ***to the market*** to assess its position.  Milliman has multiple benchmark databases, internally developed

and externally leased, which have de-identified group commercial reimbursement information." (Emphasis added).

e. "To develop a U&C schedule, data must be available to determine the distributions. If the schedule is based on billed amounts, this can be a payer's internal data *if it covers enough of the market*, or external data sources like Medicare FFS data. Although based on Medicare services, Medicare FFS data contains billed charge levels with a reasonable representation of the distribution of providers *in a market*. Alternatively, third-party data may be purchased directly that has billed charge information *for the market* already at the percentile level." (Emphases added).

f. "Providers should determine how their billed charges compare to other providers *in their markets* to ensure they are not being disadvantaged." (Emphasis added).

g. "Payers and providers should evaluate their current OON reimbursement policies, or, if none is in place, establish one. *The OON reimbursement space is in flux, and there could be payers overpaying or providers being underpaid. Evaluating where you are in relation to your market* is critical for current financial success and positioning yourself moving forward." (Emphases added).

62. MultiPlan, in a presentation to potential investors, described the market as worth "sav[ings] [of] over *$19 billion annually*" to healthcare insurance participants (Emphasis added).

63. MultiPlan subsequently disclosed to the SEC that "[f]or the year ended December 2023, we used our core services to identify *$22.9 billion* in potential savings on $168.6 billion in claim charges." (Emphasis added).

64.     Although the OON market might be considered a sub-market to the overall commercial healthcare insurance payment market (involving payments made to both in-network and OON Providers), decisions to seek out-of-network healthcare services are rooted in the practical unavailability of OON healthcare services on an in-network basis.  Further, MultiPlan and others have acted and analyzed the OON market, not as a substitute for in-network care, but as a separate, standalone market with unique characteristics and a substantial economic size.

65.     As MultiPlan, the Defendant Payors, and the Insurer Co-Conspirators have treated and benefited from the OON market as an appropriate, separate, and standalone market, the same market should be available to Plaintiff for purposes of pleading an antitrust violation.

**B.      MultiPlan, the Defendant Payors, and the Insurer Co-Conspirators Have Fixed and Artificially Suppressed Prices for Out-of-Network Healthcare Services**

66.     The members of the MultiPlan Cartel, including MultiPlan, the Defendant Payors, and the Insurer Co-Conspirators, have fixed and artificially suppressed payments made for OON healthcare services in one or both of two ways.

67.     First, according to methodology white papers that MultiPlan shared with its competitors/clients (the Payors), MultiPlan's repricing methodologies are comprised of various "benchmark[ing]" efforts that are used to populate a database of practitioner and facility OON payment information.

68.     Secondly, rather than simply applying such benchmarking in determining payment amounts for OON healthcare services (which still involve improper data sharing, methodology sharing, and use of the same methodologies in setting prices), MultiPlan applies "[s]tandard overrides" to establish a "lower limit" and an "upper limit" as to OON payment amounts."  July 2018 "MultiPlan Data iSight Facility Methodology" white paper.  Similarly, rather than simply "build[ing] the benchmark group of hospitals" for purposes of determining

OON payment amounts, according to MultiPlan's June 2019 "Data iSight Product and Methodology Inpatient module," Data iSight applies "proxy value[s]" when data is "missing"; applies client-selected "margin factor[s]" (but which default to 125%), and allow for "standard" overrides that set a payment amount floor of "the amount at which 75% of hospitals in the benchmark group would make a profit"; and client "elected" overrides, which include "Don't pay more than x% of the claim's Medicare reimbursement," but which also "defaults to 250% . . . ."

69.     Further, rather than providing such overrides without direction for its competitors/clients, MultiPlan specifically shares with its competitors/clients "[t]ypical[]" overrides.  For example, for a facility's "Inpatient" OON claims, "[t]ypically clients apply an override to never pay more than 250% of Medicare."  For a facility's "Outpatient" OON claims, "the typical client-elected override is to never pay more than 400% of Medicare."

70.     Third, MultiPlan's competitors/clients are empowered by MultiPlan to limit payments for OON claims by applying ***both*** benchmarking methodology and by applying the "typical" client-applied override.  Of course, by applying the override, it does not matter what kind of benchmarking occurs if that benchmarking results in a price greater than the amount allowed by the override.  The result is a price for OON healthcare services fixed by a group of direct competitors based on a particular (and "typical") percentage of what Medicare pays.  Further, if the repricing methodology results in a price lower than the override, then the override serves as a collusively-derived ceiling to any such OON payment.

71.     The Centers for Medicare & Medicaid Services ("CMS") has established baseline prices for healthcare services, as listed within its "Physician Fee Schedule."  These are sometimes herein referred to as "Medicare payments," "Medicare amounts," "Medicare rates," or, as express above, "what Medicare pays."

72.     These payment amounts, which are presumptively owed to healthcare practitioners serving Medicare patients, are determined by the federal government (CMS), based on rate recommendations by the American Medical Association/Specialty Society Relative Value Scale Update Committee ("AMA/RUC"), and are not determined through the usual operation of a competitive or market-driven process. Instead of letting market forces set prices, CMS uses the "Resource-Based Relative Value Scale," which establishes relative values based on resource costs. Based on over 10,000 healthcare services, each of which has an assigned Current Procedural Terminology ("CPT") code, CMS decides what services to cover and sets associated reimbursement rates. Such Medicare payment amounts are not derived from any negotiation entered into between a patient and a healthcare provider. Instead, rates as recommended by the AMS/RUC are based on various "Relative Value Units," or "RVUs", including "PW" (addressing the time a procedure takes, the skill and effort it requires, and the stress experienced by the Provider when performing it); "PE" (addressing the cost of medical personnel, equipment, supplies, and overhead, which are different depending on site where procedure is performed); and "PLI" (addressing costs associated with medical malpractice insurance). In addition, the CMS divides the U.S. into 112 zones and each locality is given a designated Geographic Practice Cost Index ("GPCI"). After adjusting the various RVUs by locality cost indexing, the final step converts the RVUs into a corresponding reimbursement rate. This is performed by assigning a value to the RVUs and then multiplying it by an annually-updated conversion factor. With respect to Medicare Part B, the resulting fee figure is the locality-adjusted maximum allowable amount, or the highest price that Medicare will pay a Provider for performing that particular healthcare service. Finally, these Medicare amounts are not necessarily paid by the patients themselves. Most Providers accept Medicare either as full payment ("participating" Providers) or accept Medicare as partial payment ("nonparticipating" Providers). Providers considered as

"nonparticipating" receive 95% of the allowed amount from Medicare, but can seek an additional amount not to exceed 15% from patients. Providers can also opt out entirely from Medicare. With respect to "participating" or "nonparticipating" Providers, in either situation, Medicare pays the lion's share of the cost of healthcare for Medicare patients. Thus, the paramount relationship at issue in the Medicare context is between the federal government as purchaser and the healthcare practitioner as seller.

73. Similarly, in the commercial insurance context at issue in this matter, the insurer most often pays most of the charge issued by the OON Provider, with the patient most often paying nothing or a minor percentage of the amount billed. Thus, similar to the Medicare context, the paramount relationship at issue in the commercial insurance context is the one existing between the commercial insurance company as purchaser and the OON Provider as seller.

74. As part of the conspiracy concerning sharing information relating to and applying percentages of Medicare when "repricing" payment amounts for OON healthcare services, MultiPlan, the Defendant Payors, and the Insurer Co-Conspirators have shared and have applied collusively-determined amounts for healthcare procedures based on a percentage of the amounts determined by CMS and as listed in its Physician Fee Schedule.

75. Because MultiPlan, the Defendant Payors, and the Insurer Co-Conspirators have paid and continue to pay Providers for OON healthcare services based on a price-fixed and collusively-determined percentage of what Medicare pays, prices for OON healthcare services can be, have been, and continue to be price-fixed and collusively and artificially suppressed.

**C.    The Prices Fixed by MultiPlan, the Defendant Payors, and the Insurer Co-Conspirators Are for of Out-of-Network Healthcare Services**

76. As discussed above, with respect to the OON market, the healthcare insurance companies are payors that purchase healthcare services from OON Providers. On the other side

of the transaction, Providers are healthcare practitioners who sell the provision of OON healthcare services. It may be the situation that a Payor is not paying for *its own use of or benefit from* the provided healthcare service. But that is of no moment. The healthcare insurance company is interested in gaining additional medical practitioners in order to increase the value of, and therefore the price of, premiums for access to its PPO network(s). Paying Providers for OON care is one way to entice such practitioners to join those PPO networks.

77.     On the other side of the transaction, doctors enter into the practice of medicine after years of extensive and expensive training to obtain a delayed financial reward. That is, they have devoted years of study, training, and the incursion of both real and opportunity costs to enter a possibly lucrative market that concerns the provision of sophisticated healthcare services *for payment*, as purchased, for the most part, by healthcare insurance companies.

78.     MultiPlan and the other Payors seek to minimize payments associated with the service side of the healthcare equation and to pocket the difference.

79.     As noted above, the prices that have been fixed and artificially suppressed on a coordinated basis concern prices for OON healthcare services, as those services are described by the Centers for Medicare & Medicaid Services ("CMS") as part of its "Physician Fee Schedule."

80.     MultiPlan has given significant "focus" to the price of OON healthcare, as described by then-CEO Mark Tabak: "MultiPlan is mission critical, driving fair reimbursement and healthcare affordability. Since our inception 40 years ago, we've been a customer-centric company. We identified a major area of concern for our customers many years ago, *a pain point if you will, and that was OON expense*. [¶] We built the set of solutions *to address this financial concern* and become the industry-leader in OON cost management for the more than 700-plus customers we serve today." (Emphases added). MultiPlan's then-Chief Revenue Officer, Dale White, agreed: "Yeah, again, as you heard, all of us say we started out historically

as a *company that focused on OON claims, because that was the biggest pain point for our customers*."  (Emphasis added).

81.    MultiPlan itself recognizes the product at issue, and it describes the payment for OON healthcare provision in financial terms:  MultiPlan's "mission" is "accomplished with a single product.  *That product being affordability* which is supported by 3 distinct offerings.  Network-Based Services . . . .  *The Analytics-Based Services* . . . .  *And the Payment Integrity Services* . . . ."  (Emphases added).

82.    Characterizing its set of offered cost management "product[s]" as "affordability," MultiPlan acknowledges that its repricing tools directly address the "affordability" of payments for OON healthcare services, and try to influence such prices by downwards adjusting such payments on a coordinated basis.  Such tools and data processing capabilities have resulted in MultiPlan managing a database of 3.5 petabytes of data; a database of 1 billion claims; proprietary IP and algorithms; and a network of 1.2 million Providers.  MultiPlan's data ingestion and data management capabilities allow for the processing of 370,000 medical claims per day, which "save the industry over *$19 billion annually* . . . ." (Emphasis added).  Although MultiPlan has plans to move into "new markets" (which include the next frontier of "repricing" *in-network* costs), at the moment, the pronounced focus and "core" of its business is suppressing the amounts paid for healthcare services as provided by OON Providers.

83.    Payments made to OON Providers have a place within the overall healthcare insurance system and are subject to price-fixing and collusive suppression in violation of the Sherman Act.  MultiPlan has devoted significant attention to and has developed and/or acquired technology specifically designed to address one aspect of the overall commercial healthcare insurance market worth by MultiPlan's own estimates (as of August 2020) approximately $19 billion per year in savings to the healthcare insurance industry (on $106 billion in claims).  As of

the end of 2023, MultiPlan "identified $22.9 billion in potential savings on $168.6 billion in claim charges."

84.     Defendant MultiPlan is attentive to this sub-market and treats that market's associated OON healthcare services as separate, standalone, and not reasonably interchangeable services that can be collusively and suppressively "repriced." In violation of the Sherman Act, the price of OON healthcare services is subject to price-fixing efforts and collusive suppression, as discussed herein. In engaging in such "repricing" efforts, MultiPlan has designed and acquired technologies specifically to apply downward pressure to the pricing of OON healthcare services. MultiPlan explains that its "current technology capabilities" can "[i]ngest" various claims/pricing data sources, "[s]tore & [a]nalyze" such data, and "[d]eliver . . . $19B in [p]otential [s]avings [o]pportunities [i]dentified for [c]ustomers[.]"

85.     As described below, MultiPlan has spent somewhere from ***$365 million to over $600 million*** (unadjusted) in an effort to be able to suppress the price of healthcare services provided by OON Providers, as well as to negate the threat posed to MultiPlan by the emergence of repricing competitors.

86.     For example, in 2010, MultiPlan "merge[d]" with "its former competitor," Viant, Inc. ("Viant") in an all-stock deal. MultiPlan characterized its merger with Viant as "expanding negotiation and network solutions and adding re-pricing solutions[.]" *The New York Times* reported that "[i]n 2010, [MultiPlan] bought Viant, an Illinois-based firm that used algorithms to recommend payment amounts. But for some types of care, Viant's calculations used a database of billed amounts. So if medical providers charged more over time, the recommended payments were also likely to rise."

87.     In 2011, MultiPlan acquired National Care Network ("NCN"), a company that had previously developed a payment management platform. MultiPlan explained that its

acquisition of NCN allowed MultiPlan to "add[] Data iSight to [MultiPlan's] offerings[.]"

MultiPlan further described its Data iSight technology as "[r]ecommend[ing] fair reimbursement

using data and analytics in lieu of a contract or agreement[.]"  Then-CEO, Mark Tabak,

explained that MultiPlan "acquired a small company for *$50 million* that became the foundation

of our analytics business, NCN's Data iSight product." (Emphasis added).   Dale White, then

MultiPlan's Chief Revenue Officer, further explained that "we acquired NCN, National Care

Network in 2011 to help fuel our analytics growth."  As explained by *The New York Times*:

> A small firm in Grapevine, Texas, had developed an alternative strategy.  Rather than
> start with a bill and negotiate it down, Tom Galas, a former insurance executive, wanted
> to calculate the cost of care and negotiate it up.  [¶] Mr. Galas bought an analytics firm
> called Data Advantage in 2005 and assigned a team at his company, National Care
> Network, to execute his vision.  The result was Data iSight.  [¶] It drew on data that
> medical facilities submitted to the federal government and techniques developed by
> Medicate to estimate treatment costs.  It then threw in some extra money, meant to allow
> a fair profit.  The goal was to save insurers and employers money without paying so little
> that providers would sue them or go after patients for the balance. [¶]  In 2011, Mr. Galas
> sold to MultiPlan.

April 7, 2024, *The New York Times,* "In Battle Over Health Care Costs, Private Equity Plays

Both Sides" by Chris Hamby.

     88.     In 2014, MultiPlan acquired Medical Audit & Review Solutions, LLC ("MARS"),

which had developed a technology designed to identify wasteful billing.  MultiPlan noted that its

acquisition of MARS allowed MultiPlan to "add[] payment integrity to its offerings[.]"

MultiPlan further described its acquisition of MARS as allowing MultiPlan to "[u]s[e] analytics

and clinician/coder reviews to find and resolve wasteful/abusive billing before payment[.]"  *Id.* at

20.  Then-CEO, Mark Tabak explained that "in 2014, we acquired a small company for *$15*

*million*, Medical Audit & Review Solutions, which became the foundation for our payment

integrity program." (Emphasis added).

     89.     In 2020, MultiPlan acquired HST for *$140 million*, which MultiPlan described as

"[a]dd[ing] a next-generation reference-based pricing *capability* to the MultiPlan solution

suite[.]" (Emphasis in original). MultiPlan further described this "[s]trategic acquisition" that allows MultiPlan to "penetrat[e] into TPA and Regional Plans." MultiPlan described the acquisition of HST as "[p]revent[ing] consumer **balance billing** by engaging member and provider before service is rendered," where "[t]raditional RBP services engage consumer only **after balance bill is received**[.]" (Emphasis in original).

90. In 2021, MultiPlan "[a]cquired Discovery Health Partners ("DHP") for $155 million, which MultiPlan describes as providing a "[f]ull suite of payment and revenue integrity products' and "[p]rovid[ing] a gateway into Medicare Advantage, Medicaid and in-network claims[.]"

91. In 2023, MultiPlan acquired Benefits Science LLC, also known as "Benefits Science Technologies" or "BST" for "consideration of **$160 million**, comprised of $140.8 million in cash and 21.6 million MultiPlan shares," which MultiPlan describes as "a next generation data and advanced analytics company that combines modern data science, including machine learning and artificial intelligence ('AI'), with deep expertise in healthcare to deliver solutions that reduce the cost of care and improve health outcomes." (Emphasis added). MultiPlan characterized its acquisition of BST as "unit[ing] MultiPlan's 40+ years of experience and institutional knowledge in healthcare cost management and payment accuracy and its rich and expansive claims data with BST's cutting-edge analytics and AI capabilities." Fitting right into its other "cost containment" acquisitions, MultiPlan describes BST's capabilities as "provid[ing] prescriptive analytics and applications to help customers benchmark network performance, optimize network design, and improve competitive positioning," and which can "apply[] interpretable risk models, risk scoring, and prescriptive analytics for commercial and government health plans. Among other services, risk scoring can seamlessly attach to MultiPlan's prepayment claims flows to help identify emergent risks by individual, group, or

condition, and prescribe financial and clinical program enhancements across a plan sponsor's organization."

92.     Resulting from MultiPlan's acquisition of BST, MultiPlan announced the "groundbreaking platform – called PlanOptix," which is "designed as a seamless and intuitive web application where users can not only find and extract the price transparency data they want, but more importantly can leverage sophisticated algorithms and machine learning to transform the raw data into actionable insights.  PlanOptix enables users to prepare and execute strategic contract negotiations with providers, understand competitive positioning to drive sales and retention strategies; improve stop-loss premiums, optimize provider networks, and more." Further, MultiPlan describes PlanOptix as "empower[ing] stakeholders to drive down costs, enhance the quality of care, and improve patient outcomes by leveraging the power of data-driven insights."

93.     Not counting the merger with Viant or the $155 million acquisition of DHP, MultiPlan has spent approximately ***$365 million*** (unadjusted) in order to exploit the opportunities provided by the OON healthcare services sub-market, and their corresponding ability to "reprice" prices for OON healthcare services as suppressed on a coordinated basis. MultiPlan would not be interested in spending such large amounts without an ability to influence the prices of such OON healthcare services.

94.     Also, as stated by Jim Head, MultiPlan's then-Executive Vice President and CFO explained at the 42nd Annual J.P. Morgan healthcare Conference on January 9, 2024, held at the Westin St. Francis in San Francisco, California, "Dale talked about this business that we've built over 40 years, which was a giant transaction processing platform, which ingested tons of claims in the prepayment environment.  We'd invested ***over $500 million*** into it . . . ." (Emphasis added).

95.     Also, as MultiPlan asserted to the SEC in its Form 10-K for the year ended December 31, 2023, MultiPlan has made "over $600 million in capitalized software development cumulatively" related to "cost management . . . and payment accuracy services."  MultiPlan further declared that its investment of "significant capital in . . . data and technology assets" led it "to become a leading independent provider of OON cost management . . .  services."

96.     These technology firm mergers and/or acquisitions, as well as its own "organic" technological developments, were designed to expand MultiPlan's service offerings beyond PPO networks and exploit the opportunities available with respect to influencing and downwards adjusting the prices charged by Providers, including for OON healthcare services.   As explained by then-Chief Revenue Officer Dale White:  "Earlier you had Mark describe our evolution from network company to a diversified cost management and Payment Integrity Services company. Much of this evolution to MultiPlan 2.0 was accelerated by acquiring businesses that could expand our service offerings. . . . [¶] We have started [*sic*] to build our analytics-based business organically.  But Mark recognized the shift could be accelerated and the execution risk better managed through strategic use of acquisitions.  ***One of the key factors that make us successful with acquisitions is the ability to leverage the power of our payer distribution.***" (Emphasis added).

97.     Based in part on the attention paid to such payments by MultiPlan, the related efforts made by MultiPlan, and the hundreds of millions of dollars MultiPlan spent to influence the amount of such payments, payments for OON healthcare services can be considered as a standalone service subject to price-fixing, subject to collusive suppression, and within the reach of the Sherman Act.

   **D.     Even if Out-of-Network Healthcare Services Are Considered Reasonably Interchangeable with In-Network Services, Or That Out-of-Network Healthcare Services Are Not Subject to Price Fixing (Which They Are), Out-of-Network Healthcare Services Are Part of a Broader Insurer-Provider**

**Pricing Environment, Which *Is* Subject to Price-Fixing and Collusive Suppression**

98. Pricing for OON healthcare services is part of the submarket concerning payments made by healthcare insurance companies for the services of OON Providers.

99. However, the ***overall*** commercial healthcare insurance company payor – healthcare provider market, involving payments made by healthcare insurance companies (as purchasers) of the services of Providers (as sellers), is made up of both payments for OON Provider services and payments for in-network Provider services.

100. Together, payments made by Payors for services provided by both in-network and OON Providers can be considered to encompass the prices for all private healthcare services that are eligible for payment by Payors.

101. Prices that are ultimately paid to in-network Providers by healthcare insurance companies for the exact same service as that provided by OON Providers often differ.

102. This difference in price for the exact same healthcare service is due, in part, to the notion that the in-network Provider foregoes a somewhat higher price for the stability provided by ease or speed of payment, as well as the possibility of higher patient demand for the practitioner's services.

103. Alternatively, Providers who remain OON often do so, at least in part, precisely in order to charge a higher fee for a given healthcare service. The healthcare practitioner who opts to remain OON might practice in a location convenient to patients having that particular need or might be known as possessing a certain level of skill in high demand, such that the practitioner is less worried about ease or speed of payment or patient demand for the practitioner's services.

104. As reflected between the two paragraphs immediately above, there is a direct tension between the benefits involved with becoming an in-network Provider and the benefits for remaining OON. As such, there is a competitive dynamic operating within the decision of

34

whether to opt in-network or remain OON. The collusive efforts of MultiPlan, the Defendant Payors, and the Insurer Co-Conspirators operate in part to deny Providers the economic advantage associated with this competitive dynamic. The collusive efforts of MultiPlan, the Defendant Payors, and the Insurer Co-Conspirators harm competition.

105. By working collusively to artificially suppress OON payments otherwise available to Providers who have elected to remain OON, such efforts by MultiPlan, the Defendant Payors, and the Insurer Co-Conspirators make in-network participation artificially more attractive to Providers (and without any associated increase in payment or improvement in service for the Provider).

106. Furthermore, by clandestinely working collusively to artificially suppress OON payments, MultiPlan, the Defendant Payors, and the Insurer Co-Conspirators have deprived the Provider the opportunity to seek greater payment for services it renders for those entities with whom the practitioner has an in-network relationship. In other words, by secretively suppressing payments for OON healthcare services, MultiPlan, the Defendant Payors, and the Insurer Co-Conspirators have deprived the Provider the opportunity to seek to obtain an overall amount of payment (say, an aggregate payment level) for the same healthcare service across all of the providers' in-network and OON relationships.[3]

107. By working together to collusively suppress payment for OON healthcare services, MultiPlan, the Defendant Payors, and the Insurer Co-Conspirators have artificially

---

[3] If a Provider knows that she or he will receive artificially suppressed payment for OON healthcare services, it stands to reason that that Provider will negotiate at the next opportunity better payment for the same services from those entities with whom the practitioner has an in-network relationship (unless, of course, the healthcare insurance company Payors have also colluded on the in-network side).

suppressed the overall price for a particular healthcare service as described by CMS as part of its Physician Fee Schedule to the detriment of Providers.

108. By working together to collusively suppress payment for all OON healthcare services, MultiPlan, the Defendant Payors, and the Insurer Co-Conspirators have artificially suppressed the overall amount of payment for all healthcare services described by CMS as part of its Physician Fee Schedule to the detriment of Providers.

109. By working together to collusively suppress payment for all OON healthcare services, MultiPlan, the Defendant Payors, and the Insurer Co-Conspirators have denied Providers an overall level of payment for healthcare services while simultaneously avoiding what it might otherwise have to pay or the services it would have to provide in order to make in-network participation more appealing or attractive for practitioners.

110. Even if a Court does not regard payment for OON healthcare services as a standalone service that can be subject to price-fixing or collusive suppression, because MultiPlan's, the Defendant Payors', and the Insurer Co-Conspirators' collusive efforts have artificially suppressed prices for the OON aspect of the healthcare services they have provided, they have also artificially suppressed prices on an overall and aggregate basis for all such healthcare services.

## VI. FACTUAL ALLEGATIONS SUPPORTING CLAIMS FOR ANTITRUST VIOLATIONS

### A. MultiPlan *Simultaneously* Serves Two Roles in The Healthcare Industry

#### 1. By Its Own Disclosures And Admissions, MultiPlan Is a Directly Competing, Horizontally-Positioned PPO Network Operator

111. As described on April 28, 2022 by *The Capitol Forum,* "MultiPlan's products for health plans fall under two umbrellas – a preferred provider organization (PPO) and products related to payment editing, negotiating, and repricing of healthcare claims."

36

112.     MultiPlan owns and operates several PPO networks, made up of networks of "preferred" Providers.  As part of this business, MultiPlan recruits Providers, negotiates payment rates with them, and sets certain quality and credentialing expectations for those Providers and healthcare facilities that participate within its network.  MultiPlan then markets its PPO networks as part of selling access to its own various healthcare insurance plans.

113.     MultiPlan sells both access to "primary" PPO networks and to its "complementary" PPO networks.  These "complementary" PPO networks afford otherwise rival PPO network operators the opportunity to claim an overall PPO network directory of Providers, subscribers, and patients greater than what it could claim otherwise.

114.     As it disclosed to the SEC, "MultiPlan . . . over time leveraged its position to pursue a consolidation strategy that established the Company as a leading independent national preferred provider organization ('PPO')."  In an investor presentation, MultiPlan described its "PPO consolidation strategy" as one of the "[p]illars of our [h]istorical [s]trategy."  MultiPlan has also stated that it has "the oldest and largest independent Preferred Provider Organization (PPO) network" in the U.S.  Even as part of MultiPlan's business pivoted into data analytics, MultiPlan continued to operate its "oldest and largest" PPO networks.  As of 2022, MultiPlan claimed that it operates "the largest primary PPO in the nation."

115.     As of May 4, 2023, MultiPlan's PHCS PPO network was comprised of over 1.4 million Providers under contract, which include "920,000 practitioners, 4,800 acute care hospitals and 87,000 ancillary facilities."  As of July 12, 2022, MultiPlan described its PHCS PPO network as allowing plan members to have "seamless access to healthcare services across the country, with more than 1,000,000 participating practitioners, 4,800 acute care facilities and 92,000 ancillaries."

116.     MultiPlan further asserted in its SEC disclosures that:

> W**e compete directly with other independent PPO networks**, which are primarily regional, and with PPO network aggregators on the basis of network discounts, access, quality and price. PPO aggregators offer national access by patching together third-party networks, in some cases including MultiPlan's network. . . . **We also compete with PPO networks owned by our large Payor customers**, primarily on the basis of independence and flexibility. Our nationwide Primary PPO Network has held NCQA accreditation since 2001, which we believe provides assurances to Payors and consumers regarding the quality of the providers in our network.

(Emphasis added). By MultiPlan's own admission to the SEC, as of December 31, 2023, MultiPlan competes "directly" with both regional and independent PPO networks, as well as with "large" Payors. By its own disclosures to the Securities and Exchange Commission, MultiPlan competes on the same horizontal, PPO network-based plane as its "Payor customers," to which it also offers its OON "repricing" services.

117. In a presentation to investors, MultiPlan acknowledged that it "competes with a number of regional PPO networks as well as network aggregators."

118. MultiPlan has averred its status as an operator of PPO networks that reaches agreements with Providers for the benefit of clients of MultiPlan. Specifically, Margorie G. Wilde, Senior Counsel for MultiPlan declared in *Jonathan Hott, M.D. v. MultiPlan, Inc.,* No. 1:21-cv-02421-LLS (S.D.N.Y. Aug. 15, 2022) (ECF No. 38-2):

> MultiPlan provides healthcare cost management services **and operates a network-only preferred provider organization ("PPO")** that does business nationwide by contracting, on the one hand, with Providers, such as hospitals, physicians, physician groups and ancillary providers ("Network Agreements"). These contracted providers agree to give discount off of medical services rendered to the beneficiaries of clients of MultiPlan. . . . On the other hand, MultiPlan also contracts with its clients, which include health insurance carriers, health maintenance organizations, self-funded health plans, third party administrators, and other third-party payors that have members and beneficiaries who receive medical services from the provider network assembled by MultiPlan.

*Id.* ¶¶ 3–4 (emphasis added).

119. Other testimony under oath confirms MultiPlan's status as an owner of PPO networks that compete with other PPO network owners. For example, John Haben, a former

Vice President of Networks at UHG, testified that "MultiPlan has the largest network in the country . . . . They have a broad network. Broader than [UHG]."

120.     While acting as a PPO network operator, supposedly competing with other PPO Payors for policyholders,[4] it simultaneously partners with the very same PPO Payors to eliminate competition for indemnification of OON claims.

121.     Listed under "[o]ur network brands," as of 2024, MultiPlan owns and operates at least one nationwide, "primary" PPO network, called "PHCS Network," which MultiPlan describes as "MultiPlan's national PPO network." MultiPlan characterizes its PHCS Network as the country's "largest independent, nationwide primary preferred provider organization."

122.     Also listed there, as of 2024, MultiPlan owns and operates the following regional, "primary" PPO networks, including:

- HealthEOS and HealthEOS Plus Networks – "MultiPlan's regional PPO networks in Wisconsin, with some coverage in bordering Michigan, Minnesota and Illinois.";

- Beech Street Network – "MultiPlan's regional PPO network in Alaska, Nevada and Utah."; and

- AMN/HMN/RAN Network – "MultiPlan's regional commercial PPO networks in Arizona and Hawaii."

123.     As also listed under "[o]ur network brands, as of 2024, MultiPlan owns and operates the following "complementary" PPO networks, including:

- MultiPlan Network;

- Beech Street Network; and

---

[4] *See* April 28, 2022 The Capital Forum, *MultiPlan's 'Maybe You're In-Network' PPO Product May Violation No Surprises Act, Experts Say'* ("For its PPO product, MultiPlan contracts with Providers to set agreed-upon payment rates for the providers' services . . . .  Separately, MultiPlan contracts with health plans so the plan members can receive services from MultiPlan PPO providers at the rates agreed to in the contracts between MultiPlan and the providers").

- IHP Network

With the listings above providing insight as to the meaning behind its corporate name, MultiPlan owns and operates "multiple" PPO network "plans," including nationwide, regional, primary, and complementary PPO networks. Moreover, MultiPlan describes its PPO networks as those "used by our clients to provide access for their members to a variety of commercial . . . health care programs."

124. Whether on a nationwide or a regional basis, MultiPlan operates PPO networks just as its repricing customers/healthcare insurance company payors do.

125. MultiPlan has real, actual subscribing entities/employers to its PPO Network plans. For example, as of January 2021, Central States Southeast and Southwest Areas Health & Welfare Fund; the Marsh and McLennan Agency, LLC; and The Container Store, Inc. are among the subscribers to its PPO network services.

126. Just like the Defendant Payors' PPO networks and the Insurer Co-Conspirators' PPO networks, all of MultiPlan's PPO networks, regardless of how they are specifically marketed (*i.e.,* primary versus complementary; nationwide versus regional), compete with other health insurance company payors to reach agreements with Providers and attract subscribers. Other Payors, including members of the MultiPlan Cartel, like Aetna, Blue Cross Blue Shield of Alabama, Blue Cross Blue Shield of Massachusetts, Blue Cross Blue Shield of North Carolina, Blue Cross Blue Shield of Michigan, Bright Health, CareFirst, Centene, Cigna, Elevance, Guidewell, HCSC, Highmark, Horizon Blue Cross, Independence Health Group, Humana, Molina, Regence, and UHG, operate their own PPO networks in direct competition with MultiPlan. For example, Aetna offers and operates Aetna Open Choice PPO plans; Cigna offers and operates its Cigna Healthcare PPO plans; Elevance offers and operates, along with other

Blue Cross Blue Shield entities, the Blue Choice PPO plans; and UHG offers and operates its UnitedHealthcare Options PPO plans.

127.    These "plans," un-exhaustively listed above, operate PPO networks that directly and currently compete with MultiPlan's various PPO networks.

128.    Even with respect to MultiPlan's "complementary" PPO network offerings, the Defendant Payors and Insurer Co-Conspirators compete with MultiPlan. For example, Aetna operates First Health Group Corporation, which is a wrapped or "rental" PPO network provider. Cigna operates the Cigna PPO network, Elevance operates HealthLink, Inc., and Humana operates ChoiceCare PPO.  Again, at least as to the Defendant Payors listed within this paragraph, MultiPlan competes on a horizontal basis against certain Defendant Payors in the wrapped or rental PPO network market.

129.    Beyond its SEC disclosures and subscriber data, MultiPlan's own executives admit its position as a PPO network competitor.  For example, during an August 2020 investor presentation, MultiPlan's then-Chief Revenue Officer, Dale White, explained that MultiPlan "compete[s] with regional PPOs . . . and network aggregators offering compl[e]mentary network access."

130.    Further, there is no meaningful difference between the way MultiPlan operates its PPO networks and the ways other PPO Payors operate theirs.  In particular, all participating physician groups sign Participating Professional Group Agreements with MultiPlan, and all participating hospitals, clinics, and surgical centers sign Participating Facility Agreements with MultiPlan. Those agreements ensure that participating Providers, among other responsibilities, meet credentialing requirements issue administrative handbooks to participating Providers, audit the billing and medical records of participating Providers, and conduct on-site reviews of participating Providers' offices to ensure that they are complying with the terms of the

agreements. In addition, MultiPlan maintains a website with functionality that enables patients and subscribers to search for in-network Providers, including its "[f]ind a doctor or facility" website search tool.

131. Various states recognize MultiPlan as a PPO network operator.

132. As expressed by certain publicly granted licenses held by MultiPlan, it is licensed to operate PPO networks in various states. For example, in New Jersey, MultiPlan and certain of its subsidiaries, including Private Healthcare Systems, Inc. (PHCS) and Beech Street Corporation are certified to operate as an Organized Delivery System ("ODS"), which is a designation applicable to operators of PPO networks. Similarly, South Dakota lists MultiPlan, Private Healthcare Systems, Inc., and Beech Street Corporation as managed care contractors. Also, MultiPlan is registered in the State of Washington as a Healthcare Benefit Plan Manager, which is an entity that provides services or acts on behalf of a health carrier or employee benefits program. MultiPlan is also registered with the Maine Bureau of Insurance as a "Preferred Provider Arrangement."

133. Since 2001, MultiPlan has held a certification for credentialing and recredentialing from the National Committee for Quality Assurance ("NCQA"), which is an industry association that provides independent health plan accreditations. As of July 12, 2022, MultiPlan's PHCS Network, the largest primary PPO in the nation, received its 11th consecutive Accreditation in Credentialing from the NCQA. MultiPlan has also received an accreditation for its healthcare insurance network from the Utilization Review Accreditation Commission ("URAC"), an organization that credentials health plans, pharmacies, and provider organizations.

134. To the extent that MultiPlan sees itself as a third-party administrator ("TPA") that does not bear any claims risk or pay any claims (whether true or not), such TPAs function similarly, if not identically, to the country's large national health plans, including PPO networks

unaffiliated with MultiPlan. Even when considered a TPA, MultiPlan remains a direct competitor to other TPAs, other PPO network owners, and other PPO network operators.

### 2. Despite Its Protestations Otherwise, MultiPlan Is a "Payor" -- Just Like Its Repricing Customers

135. Notwithstanding its public claims to the contrary, MultiPlan *is* an owner and operator of PPO networks and a health insurance company payor that contracts with and pays in-network providers, as well as pays healthcare providers that perform out-of-network healthcare services.[5]

136. In its annual disclosures, MultiPlan admits that it "negotiates discounted payment rates for health care services with the providers *in its network.* Participating providers agree, through the provider agreement, to accept the negotiated discounted payment rates for health care services provided to enrollees and bill enrollees only for applicable copay, deductible and/or co-insurance." (Emphasis added).

---

[5] The very first line of MultiPlan's landing page misleadingly states: "Did you receive an inquiry about buying MultiPlan insurance? **We are not an insurance company. Learn more >**[.]" *See* https://www.multiplan.us (visited August 23, 2024) (emphasis in original). When the viewer clicks through to "learn more," the viewer is directed to MultiPlan's "Solicitations FAQ" page, which explains that "MultiPlan is not a health insurance company and does not sell insurance *directly or indirectly through agents or brokers.*" *See* https://www.multiplan.us/members/solicitations-faqs/ (visited August 23, 2024) (emphasis added). This same page then notes that "[t]he MultiPlan Network is a nationwide complementary PPO network. Your health plan is most likely utilizing the MultiPlan Network to give you access to an additional choice of providers that have agreed to offer a discount for services. Primary PPO and selection of a MultiPlan Network provider will lead to the lowest out-of-pocket costs to you." *Id.* In other words, MultiPlan *is* a health insurance company, or, at minimum, an owner and operator of PPO networks, which allow access to a "choice of providers that have agreed to offer a discount for services," just as other health insurance company payors who operate their own PPO networks do. To the extent that MultiPlan does not provide health insurance on an individual basis, on a retail level, or through agents or brokers does not mean that MultiPlan is not an insurer or an owner/operator of PPO networks. Whether or not MultiPlan can be considered "an insurance company," that changes nothing about its status as an owner and operator of PPO networks, which compete directly with those of its repricing customers.

137.    As discussed above, the Participating Professional Group Agreements and Participating Facility Agreements concern the amounts that Providers are to be paid for providing in-network healthcare services.  Like other Payors, MultiPlan's PPO networks accept claims from Providers in both paper and electronic form.

138.    Also, Hospital systems, such as Mountain States Health Alliance and Wellmont Health Systems, expressly refer to MultiPlan as a "[p]ayor[]" or a "[p]ayer[]" of health insurance claims in public filings.  For example, the Virginia Department of Health's Staff Analysis Report and Recommendation to Mountain States' and Wellmont's "Application for a Letter Authorizing a Cooperative Agreement," as submitted to the Commonwealth of Virginia, explains: "several *Payers* may only constitute one network, because they use a common fee schedule.  An example would be *PHCS MultiPlan*." (Emphases added).

139.    Moreover, MultiPlan's website represents that MultiPlan offers the "MultiPlan Payments" service, in which MultiPlan pays Providers on behalf of other Payors, acknowledging that it "manages the payment process from start to finish," and that it has paid claims for "350" different "payers."  Providing such a payment service, yet again, places MultiPlan in direct competition with other Payors.

### 3. MultiPlan Also Serves As a Conspiring "Repricer" to The Detriment of Providers

140.    In addition to its status as an owner and operator of PPO networks, MultiPlan simultaneously sells and provides "repricing" services to its PPO network competitors who also function as Payors and who make payments to Providers performing OON healthcare services.

141.    MultiPlan places these services at least in part under its "Analytics-Based Services" business line.  According to MultiPlan's SEC disclosures, this business line "reduce[s] medical cost through data-driven algorithms and insights that detect claims over-charges and

44

either negotiate or recommend fair reimbursement for out-of-network medical costs using a variety of data sources and pricing algorithms." It appears that MultiPlan's repricing services are also sold as part of its "Payment and Revenue Integrity Services" business line, which MultiPlan describes as providing "reduce[d] medical cost through data, technology, and clinical expertise deployed to identify and remove improper and unnecessary charges before or after claims are paid . . . ."

142. As disclosed to the SEC, MultiPlan refers to the "out-of-network repricing" aspect of its business as a "*core*" part of its business "activities." (Emphasis added). These services focus to a significant degree on "Commercial Health Plans" and are used to "generate savings through repricing . . . ." Further, these repricing tools and applications "are generally priced" and generate associated revenue for MultiPlan "based on a percentage of savings identified."

143. MultiPlan further disclosed that "the majority of our contracts contain payment terms that are based on a percentage of savings to the customer . . . ."

144. As of the end of 2023, MultiPlan disclosed to public investors and the SEC that "our core services . . . identif[ied] $22.9 billion in potential savings on $168.6 billion in claim charges."

145. MultiPlan describes this service as based on a "proprietary network repricing application . . . capable of returning approximately 99% of repriced claims to our Payor customers on the same day."

146. Emphasizing repricing's "core" part of its business, MultiPlan disclosed to the SEC that it had revenues of $625,754,000 for Analytics-Based Services for the year ending December 31, 2023. Further, its "Payment and Revenue Integrity Services" had revenues of $112,376,000 for the same period. Out of total revenues of $961,524,000 for 2023, approximately $738,130,000 were related to or provided by MultiPlan's repricing services. In

2023 alone, MultiPlan's repricing services were connected in some way to nearly three-quarters of a billion dollars in revenue.

147.     As described herein, over the years, MultiPlan has merged with or acquired various claims pricing technology entities at least in part to expand its repricing-related services and to negate any existing or emerging competitive threats.

148.     MultiPlan's repricing services are based on both anticompetitive inputs and anticompetitive outputs.  On the input side, MultiPlan's PPO network competitors who also purchase MultiPlan's repricing services provide confidential, proprietary, and competitively-sensitive claims data to MultiPlan, often in real-time.  Upon information and belief, MultiPlan's customers agree to provide claims and pricing-related information to MutliPlan.  On the output side, MultiPlan's customers receive MultiPlan "recommendations" as to what the Payor should pay the Provider for OON healthcare services.  These "recommendations," accepted between 96% and 99% of the time, are sometimes based in algorithmic data management and calculation.  They are also sometimes based simply in MultiPlan sharing with its competitors/customers "[t]ypical" percentage-of-Medicare-based prices for OON healthcare services.  No matter the legality of using a third-party to generate proposed prices based on data corralled from competitors, sharing proposed override-related information based on "typical" percentage-of-Medicare pricing used by competitors is not based in any third-party algorithm and is *per se* illegal.

149.     The acceptance percentages, as further described below, are not due to the generosity of MultiPlan's "recommended" payments.  With consolidation in the commercial healthcare insurance payor industry resulting in 4 major players, and with MultiPlan having multi-decade relationships with all of them, Providers have no powerful competitor to balance out this unfair payment system.  Moreover, MultiPlan has similar repricing relationships with the

top ten Payors, the top 15 Payors, and with over 700 Payors.  There is simply no practical alternative where the Providers can turn within the market for payment for OON healthcare services.

150.     The buyer-side conspiracy was organized, orchestrated, and enabled by MultiPlan and is supported in part by a series of written and unwritten agreements between MultiPlan and virtually every other significant health insurance payor in the United States.

151.     The collusive scheme hatched by MultiPlan and the other PPO Payors supplanted the competitive system of claim payments negotiated independently between a Payor and a Provider. This seismic change slashed payments for medical care administered by PIMG and the other OON Providers, leaving only small percentage of the amounts they previously received under the displaced practice of competitive claim adjustment. Confronted by a stone wall of interlocked Payors, PIMG and other OON Providers faced on a practical basis the Hobson's choice of accepting the Payors' offer of a mere fraction of the submitted claim or taking nothing at all.

**B.      Pre-Conspiracy Processing of Out-of-Network Claims – Independent Negotiation of OON Healthcare Services**

152.     Before formation of the MultiPlan Cartel, MultiPlan and the other PPO Payors independently negotiated directly with OON Providers to agree on a mutually acceptable amount to pay these providers for their services.

153.     This process was competitive, with MultiPlan and the other Payors autonomously making independent decisions about payment amounts they would pay. These amounts were often based on evolving "usual and customary" and "reasonable and customary" rates. The independent nature of these payment amounts stood as an effective mechanism to maintain a competitive market for determining OON payment amounts. All PPO Payors were guided by a competitive incentive to keep their OON payment rates at reasonable levels to ensure that

Providers would remain willing to provide such OON services, thus creating the potential to add OON providers to their PPO networks.

154.    In part relying on their own independently-created rate benchmarking database, which aggregated historical payment information and their own respective views of the competitive marketplace, such health insurance payors traditionally determined their own "usual and customary" and/or "reasonable and customary," which became known as "UCR," payment rates.

### C.    MultiPlan 2.0 and MultiPlan's Serial Acquisitions of Technology Firms

155.    Over time, PPO Payors bristled against this historical (and competitively-based) pricing method. They began to perceive the competitive prices as a "major area of concern" or a "pain point" that was eating into their profits. In particular, Multiplan resolved to remedy these complaints by using analytical tools to replace *ad hoc* pricing with automated pricing.

156.    After private equity owners assumed ownership of MultiPlan in 2006, the company began by developing a business approach that came to be known as "MultiPlan 2.0."

157.    As part of or as an extension of that initiative, by 2011 MultiPlan had acquired two data analytics companies that had developed alternative price-setting technology: Viant in 2010 and National Care Network in 2011. MultiPlan subsequently acquired Medical Audit & Review Solutions ("MARS") in 2014. MultiPlan's interest in acquiring technology firms in order to maintain and solidify its grip on the repricing industry has continued until at least last year, with MultiPlan acquiring Benefit Science Technologies ("BST") on or around May 9, 2023.

158.    While the word "reprice" suggests that the payment amount could be adjusted either upwards or downwards, the word is a euphemism because the technological tools are used to always, or very nearly always, adjust the Providers' submitted claim *downwards*. Not only do MultiPlan and the other PPO Payors adjust the submitted claims downwards, but these tools are designed to calculate and have been successful in calculating payments for OON services in amounts *far less* than what the Providers submit for payment. In some cases, these calculations

are specifically designed to disallow a practitioner's or a facility's opportunity to profit from a particular healthcare service.

159.    Operating in the context of Payors making independent decisions, MultiPlan initially used its "repricing" (downwards adjusting) tools to underpay OON claims submitted by Providers to its PPO network.  That is, it used its repricing tools to downward adjust OON claims submitted to its own network.  However, recognizing the competitive threat that Providers would stop treating patients who were covered by MultiPlan's PPO, but where the Provider was OON, MultiPlan set out to persuade and was effective in persuading the rest of the Payor industry to use its repricing methodologies and technologies in order to suppress payments for OON claims submitted to all or nearly all Payors.  Over 700 Payors now use or subscribe to MultiPlan's repricing services.

160.    In other words, through strategies of both technological acquisition and of persuading conspiratorial participation of nearly or actually the entire PPO Payor industry, MultiPlan sought to and accomplished its goal of thwarting the emergence of any competitive alternative method for obtaining payment for OON healthcare services outside of that provided by MultiPlan.

161.    In the arena of OON healthcare payment, MultiPlan sought to harm competition itself.

**D.     Payors and MultiPlan Have Shared Confidential, Proprietary, and Competitively-Sensitive Information, Including Pricing And Claims Information**

**1.     The Exchange of Competitively Sensitive Information Occurred Pursuant to an Express or Tacit Agreement to Fix, Stabilize, and Suppress Prices in Violation of Section 1 of the Sherman Act**

162.    The proprietary, confidential, and competitively-sensitive information that has been shared between and among Payors and MultiPlan concern, in general, two methods of information-sharing.  First, MultiPlan shared various kinds of competitively-sensitive

information, including methodology, claims, and pricing-related information during oral and written presentations that occurred at "Client Advisory Board" meetings and during "road shows." Secondly, the Payors shared its proprietary, confidential, and competitively-sensitive information through near-instantaneous, electronic means, including through electronic data interchanges ("EDI") and through web portals.

163.    As discussed above, there is direct evidence that MultiPlan entered into price-fixing and information-sharing agreements with its direct competitors who similarly manage PPO networks, including Payors.

164.    Further, these agreements directly concern the price-fixing, stabilization, and coordinated price suppression of claims submitted to Payors for payment by OON Providers.

165.    For example, MultiPlan has disclosed to the SEC that the most significant aspect of its business is its "core OON repricing activities." MultiPlan Form 10K for the year ended December 31, 2023. Further, MultiPlan disclosed that in 2023, as part of "our core services, we introduced Pro Pricer™ product, which leverages machine learning technology *to dynamically route claims to our various repricing solutions for each individual customer* . . . ." *Id.* (emphasis added). Further, MultiPlan disclosed to the SEC that "[w]e group our claims charges into . . . categories that correspond to differing characteristics of identified savings performance [, including] Commercial Health Plans: This category represents our Network-Based Services and Analytics-Based Service claims. These claims are pre-payment in nature, *generate savings through repricing*, and are characterized by a higher percentage of potential medical cost savings as a percentage of medical charges processed. For the year ended December 31, 2023, this category represented approximately 89% of our revenues." *Id.* (emphasis added).

166.    Even if the evidence is not direct, the Court may accept as true both properly pleaded allegations of material fact, as well as those facts which may be implied or reasonably inferred from those allegations.

167.    Here, there is evidence of information-sharing agreements between MultiPlan and Payors, which a Court might regard as true for purposes of pleading that can be implied or reasonably inferred from properly pleaded facts.

168.    As stated in its disclosures to the SEC, MultiPlan "operate[s] within an ecosystem that consists of over 700+ customers . . . that actively use our services through these Payors . . . ."  MultiPlan Form 10-K for the year ended December 31, 2023.  Further, MultiPlan stated that "[o]ver many decades, we have cultivated *relationships* with over 700+ Payors.  Our relationships with many of our larger customers span decades and are characterized by strategic collaboration to advance these customers' performance objectives and competitive positioning.  This *collaboration* produces knowledge about our competitors' most pressing challenges and opportunities, which in turn informs our product development priorities and facilitates cross-selling that enables us to more quickly scale revenues from new products and generate returns on our product investments.  ***The services we provide are often governed by contracts with multi-year terms in the case of our larger customers, or one-year terms with automatic renewals in the case of most of our smaller customers***.  As a result, our revenues are typically recurring, allowing us to engage and invest in longer-term strategic, operational, and financial relationships that benefits both our customers and the Company."  *Id.* (emphases added).

169.    In addition to customer collaboration and long-term relationships, MultiPlan discloses to the SEC that "[o]**ur platform is deeply integrated with our customers' IT environments** --  Developed over time from our industry-leading provider network and over $600 million of cumulative capitalized software development, our platform is deeply integrated

with many of our customers' information technology environments in a highly customized manner and occupies a differentiated position in our customers' workflow ***by accessing and processing claims*** prior to payment of those claims to providers ('pre-payment')."  MultiPlan Form 10-K for the year ended December 31, 2023 (first emphasis in original; second emphasis added).

170.    As MultiPlan disclosed to the SEC, that (1) MultiPlan maintains relationships with over 700 Payors; (2) that these relationships are long-term, renewing, collaborative, and are mutually beneficial; (3) that such collaboration with its Payor customers "produces knowledge about our competitors' most pressing challenges and opportunities"; (4) that MultiPlan's platform is "deeply integrated with our customers' IT environments" and (5) that MultiPlan occupies a "differentiated" position with respect to its customers' "workflow" and can "access[] and process[]" its customers' "claims prior to payment[,]" it can be implied or reasonably inferred that Payors have entered into "claims" and/or pricing-related information-sharing agreements with MultiPlan.

171.    A Court may regard as true the summary allegation, as it is implied or reasonably inferred from the above, properly-pleaded allegations, that Payors have entered into "claims" and pricing-related information-sharing agreements with MultiPlan.

172.    Further, based on MultiPlan's own description that the "core" aspect of its business relates to the "repricing" of OON claims (responsible for 89% of MultiPlan's revenue), it can be implied and reasonably inferred that those information sharing agreements concern "repricing," which is to say, the collusive suppression of the pricing of claims for payment for healthcare services submitted to Payors by OON Providers.

173.    In addition, there does not appear to be any support for the notion that Payors have given their claims and pricing related information away to MultiPlan without any

associated protections or limitations. Further, there does not appear to be any reported issue of "hacking" or information-stealing from the insurers by MultiPlan. As such, it is reasonable to conclude that the "contracts" mentioned in MultiPlan's 2023 Form 10-K concern, at least in part, agreements to share confidential and competitively sensitive claims and pricing-related information without any pro-competitive justifications and in violation of Section 1 of the Sherman Act.

2. **The Exchange of Competitively-Sensitive Information Here Is A *Per Se* Violation As It Has Occurred Between And Among Horizontally-Positioned PPO Network Operators**

174. As discussed above, MultiPlan was, is, and remains an owner, operator, and lessor /licensor of PPO networks. Further, it even markets itself as being able to "tier" its PPO network offering with its repricing services. As such, MultiPlan is a direct competitor to Payors, all of whom manage and operate one or more of their own PPO networks.

175. At the moment that one of the Payors shares claims or pricing-related information with MultiPlan, a violation of the Sherman Act has occurred.

176. A violation of the Sherman Act occurs as of the moment when such claims or pricing-related information is shared as, upon a particular healthcare insurance company exchanging such pricing or claims-related information with MultiPlan (assuming that the two actually act competitively with each other), MultiPlan could use that information for its own economic advantage and adjust its approved claims payments to be slightly more lucrative to Providers and to the detriment of the market share of the information-sharing Payor.

177. As the Payors and MultiPlan are direct competitors, there is no additional requirement that MultiPlan further share that information with any other Payor.

178. The Payors shared through electronic means, including through EDI and web portals, their confidential, proprietary, and competitively-sensitive information, including their respective claims and pricing-related information for OON healthcare services.

179. By sharing confidential, proprietary, and competitively-sensitive information relating to pricing and claims-related information concerning OON healthcare servcies, including electronically through EDI or through a web portal, Payors have violated Section 1 of the Sherman Act.

### 3. Payors Shared Confidential, "Proprietary," And Competitively-Sensitive Information, Including Their Claims and Pricing Information, with A Direct, PPO Network Competitor, MultiPlan

180. As strongly implied by MultiPlan's own disclosures to the SEC (*see supra*), it is reasonable to conclude that the Payors have shared (and have agreed to share) competitively-sensitive information with MultiPlan, which is both a direct competitor and an entity that also happens to sell repricing services.

181. As discussed above, Payors have agreed to provide claims and pricing-related information to MultiPlan, as shared electronically and in "real-time" through an Electronic Data Interchange ("EDI") system, through a web "portal," or through other electronic means. The Defendant Payors and the Insurer Co-Conspirators have shared their electronic pricing and claim-related information with a direct competitor who also owns and operates PPO networks.

182. In a presentation to investors and potential investors, MultiPlan noted that its "Common Platform Integrates Multiple Products[, including] Hard-to-replicate pipes with customers and easy-to-add product functionality: Customers: EDI (FTP), Web (Portal), Web Service: ***Claim Intake/Return*** . . . ." (Emphasis added).

183. MultiPlan's then-Chief Revenue Officer confirmed that it received such claims-related information, explaining to investors and potential investors that "[o]ur customers don't

view us as a technology or a services vendor, but as an important partner. Our mission is not only to reduce medical costs and generate savings, but also, perhaps more importantly, to help them improve their competitive position in the market. [¶] We have an ongoing cadence of collaboration, *where we perform a deep-dive on their claims mix* and savings performance, present opportunities to enhance their cost management programs, and then work with them on selection and implementation of those opportunities." (Emphasis added).

184.    In that same presentation Dale White doubled-down on MultiPlan's access to its competitors' claims-related information: "From an operational standpoint, as a mission-critical component of our payers' day-to-day business, we are electronically connected and deeply embedded in their processes and their claims' processing platforms."

185.    With respect to MultiPlan's embeddedness and connectivity to Payors, Dale White explained that "[t]he industry today has consolidated to four major commercial insurers, and we have long-going, longstanding relationship with all four. In fact, *we* have 25-plus relationships with three of the four, and *are deeply embedded through* both *connectivity* and service value to all four." (Emphases added).

186.    This same embeddedness was recently echoed by MultiPlan in a June 2023 investor presentation: "Our Leading Position with Healthcare Payors: Large base of 700+ payor customers, including all of the top 15 insurers: Long-term relationships: Top customers average 25 years *Deeply embedded in customers' operations* . . . ." (Emphasis added).

187.    With respect to MultiPlan's claims-related, data-ingestion capabilities, the company's Chief Information Officer, Michael Kim, shared with investors and potential investors that "[t]he first [of the set of MultiPlan's capabilities] is the ability to ingest data from our customers. *Today, this data is in the form of a claim*." (Emphasis added).

188.     Confirming that the claims-related information is shared by the Payor to MultiPlan, Mr. Kim noted that "[o]nce the claim hits our front door, all the pipes and infrastructure exist for the eligible claims to be processed within 5 seconds and *delivered back to the customer*."  (Emphasis added).

189.     Then-CEO Mark Tabak confirmed its receipt of such confidential, claims-related information:  "MultiPlan is not a traditional healthcare company.  It's a tech-enabled data analytics company *that receives claims*."  (Emphasis added).

190.     Tabak also described MultiPlan's database as "our incomparable database from *700-plus payers' claims* in charge *data*."  (Emphases added).

191.     MultiPlan describes its "Current Technology Capabilities" as "[c]reat[ing] [v]alue for [a]ll [s]takeholders, as:  "*Ingest => 700+ Payers => 135M+ Claims* and $106B Charges . . . ."  (Emphasis added).

192.     MultiPlan recently described to investors the data that it receives from its Payor competitors/customers as a "[c]ompetitive advantage[]" based on "[*p*]*roprietary data* and algorithms – *derived from700+ payers* and over 40 years of claims flow[.]" (Emphases added).

193.     In addition, to claims-related information, MultiPlan confirmed that it received "client-elected override"-related pricing information, from competing Payor-clients when it stated on its July 2018 "Data iSight Facility Methodology" white paper that "[t]ypically, clients apply an override to never pay more than 250% of Medicare" and "the typical client-elected override is to never pay more than 400% of Medicare."

194.     Because MultiPlan is a direct competitor to Payors, all of whom operate or manage PPO networks, *there is no need for MultiPlan to further share* this confidential, proprietary, and competitively-sensitive information with other Payors for a violation of the

56

Sherman Act to occur.  However, as described below, ***MultiPlan has further shared such***

***information***.

### 4.    Payors Shared Competitively-Sensitive Information, Including Claims Approval Data, through MultiPlan to Other Payors

195.    Because MultiPlan operates, manages, and leases PPO networks, MultiPlan is a direct competitor to the Payors who also operate and manage PPO networks.  As such, once proprietary, confidential, and competitively-sensitive claims and pricing-related information is shared by those Payors with MultiPlan, a violation of the Sherman Act does not require that MultiPlan further share that information with other Payors.  As described in the previous section, the violation has already occurred.

196.    However, acting as an information hub and conduit, MultiPlan has taken such confidential, proprietary, and competitively-sensitive claims and pricing-related information from Payors and further shared such information with other Payors.

197.    MultiPlan acknowledges that the "claims flow" information that is "derived from 700+ payors" concerns "[*p*]*roprietary* data[.]"  (Emphasis added).  As such, there is no rationale for a particular Payor to share its claims and proprietary information with a direct PPO network competitor, in this case, MultiPlan.  Doing so places the sharing Payor at the mercy of MultiPlan who could easily and readily use the claims and pricing information to its own economic or other advantage and place the information-sharing Payor at an economic or other disadvantage. Absent a conspiracy, there is no rationale for a Payor's independent sharing.

198.    However, as is the case here, in the event that the Payor is assured that others will also share such "proprietary" information and, even more, that the Payor will benefit from the sharing of such information, then that Payor has an incentive to share collusively such

"proprietary" information, confident in the knowledge that it will obtain and benefit from other industry participants' pricing and claims-related information.

199.    Though it need not do so for a violation to occur as a direct PPO network competitor with respect to information sharing, MultiPlan nonetheless served the Payor industry as a "hub" and "conduit" through which it shared confidential, proprietary, and competitively-sensitive claims and pricing-related information with other Payors.

200.    MultiPlan shared such confidential, proprietary, and competitively-sensitive claims and pricing-related information, whether in summary or in granular terms, "derived from 700+ payors" through itself and onto other Payor customers.

201.    As detailed below, MultiPlan shared such confidential, proprietary, and competitively-sensitive claims and pricing-related information with other Payors during customer meetings, "Client Advisory Board" meetings, "road shows," analyst presentations, customer emails, summary customer reports, and through joint projects.

### *Customer Meetings*

202.    MultiPlan's Dale White acknowledged MultiPlan personnel's participation in customer meetings: "We are . . . often invited to learn more about their strategic initiatives, so that we can align our service roadmaps accordingly."

203.    As reported in *The Capitol Forum*, "antitrust concerns" regarding MultiPlan's conduct include "court testimony showing that Multiplan shared information with UnitedHealth Group . . . ***about competing insurers' rate caps*** . . . ."  (Emphasis added).

204.    As also explained by *The Capitol Forum,* "[i]n 2016, when UnitedHealth was in talks with Multiplan about how to best implement Multiplan's repricing services, Multiplan told UnitedHealth that seven of its top 10 competitors were using Data iSight . . . ."

205.    This information about competitors' use of MultiPlan's repricing service was persuasive.  As UnitedHealth's Vice President of out of network payment strategy testified, "[a] key factor in UnitedHealth's decision to move forward with Multiplan's claim repricing tools was hearing from Multiplan that its Data iSight tool 'was widely used by our competitors[.]'"

206.    As reported in *The Capitol Forum,* "John Haben, the retired UnitedHealth executive, testified that it was not usual for White and Multiplan to provide feedback about what others in the market were doing.  ***By reducing United's OON payment threshold to 350% of Medicare [prices], UnitedHealth knew it would 'be in line with another competitor . . . leading the pack along with another competitor***[.]'"  (Emphasis added).

207.    UnitedHealth's Scott Ziemer similarly discussed how MultiPlan shared percentage-of-Medicare competitive information with UnitedHealth:  "Multiplan, according to Ziemer, recommended United Health would be ***more competitive*** if it approved a specific price override be programmed into Data iSight so that the prices the database spit out would never exceed a predetermined amount.  '***The recommendation at that point from Multiplan was to go to 350%" of Medicare's rates***."  (Emphasis added).

208.    In its investigation, *The New York Times* reviewed thousands of pages of documents and learned "that MultiPlan . . . sometimes ***told insurers <u>how</u> their unnamed competitors were using the firm's pricing tools***.  In a 2017 presentation to UnitedHealthcare, MultiPlan shared 'Recent Client Strategies to Improve Results,' which included techniques that could reduce payments to providers."  May 1, 2024 *The New York Times,* "Collusion in Health Care Pricing?  Regulators Are Asked to Investigate" by Chris Hamby (emphasis added).

209.    Reporting by *The New York Times* further indicated that when Payors met with MultiPlan, MultiPlan might not name particular customers, but would provide enough information about other customers that the meeting attendees understood the specific identities of

59

the competitors that had previously implemented MultiPlan's repricing services: Referring to MultiPlan's executive vice president, Dale White, "[a]fter a 2019 meeting, a UnitedHealthcare senior vice president reported to her colleague that a MultiPlan executive 'did not specifically name competitors **but from what he did say we were able to glean who was who**.' She then described how Cigna, Aetna and some Blue Cross Blue Shield plans were apparently using MultiPlan." May 1, 2024 *The New York Times,* "Collusion in Health Care Pricing? Regulators Are Asked to Investigate" by Chris Hamby (emphasis added).

210.     In a letter to the antitrust division of the Department of Justice and the Federal Trade Commission, Senator Klobuchar stated that "*The New York Times* even reported that MultiPlan sometimes 'told insurers what unnamed competitors were doing.'" April 29, 2024 Senator Klobuchar Letter to DOJ's Jonathan Kanter and FTC's Lina Khan.

### *Annual "Client Advisory Board" Meetings*

211.     MultiPlan passed along the claims and pricing-related information it obtained from Payors during "Client Advisory Board" meetings held annually at various resorts and that include senior executives from such Payors.

212.     As reported by *The Capitol Forum,* "[t]estimony during the trial . . . revealed that Multiplan hosted annual Client Advisory Board meetings where executives of competing health insurance companies gathered to discuss their successes with using Multiplan."

213.     According to reporting by *The Capitol Forum,* Rebecca "Paradise, the UnitedHealth vice president of out of network payment strategy, testified about the CAB meetings saying, '[t]ypically [attendees at the Client Advisory Board meetings] talk about things they've implemented, other things they're looking at, providing other industry new information.'"

214.    These "Client Advisory Board" meetings often took place in resorts, which allowed for several industry participants to meet simultaneously.  For example, "[s]ince at least 2015, Multiplan senior sales executives have hosted Client Advisory Board (CAB) meetings attended by executives of competing insurance companies.  Multiplan invited active and prospective clients to CAB meetings held at luxury spa resorts such as the Montage Laguna Beach . . . ."  March 7, 2022 *The Capitol Forum,* "Multiplan:  Company's Information Sharing, Meetings Practices Could Raise Antitrust Concerns, Experts Say."

215.    Client Advisory Board attendees included executives from direct competitors at some of the largest Payors.  For example, "[t]he attendee list for the 2019 CAB meeting included executives from UnitedHealth, Aetna Inc. . . . , Cigna Corp. . . , Humana Inc. . . , and several other insurers, according to trial testimony of two UnitedHealth executives."

216.    The senior executives attending these Client Advisory Board meetings were part of companies that represented a significant share of MultiPlan's revenues.  As noted by Michael Klein, a chair and CEO of MultiPlan-investor, Churchill Capital Corp. III, "I had the good fortune of speaking to the senior executives, at customers that represent about 65% of the revenue base of MultiPlan."

217.    *The Capitol Forum* noted that "[t]estimony during trial . . . revealed that Multiplan hosted annual Client Advisory Board meetings where executives of competing health insurance companies gathered to discuss their successes with using Multiplan."

218.    Further reporting by *The Capitol Forum* indicates that UnitedHealth's Rebecca Paradise testified about "a slide that was part of a Multiplan PowerPoint presentation [MultiPlan's Dale] White gave at the 2019 meeting.  According to a discussion between Paradise and an attorney representing UnitedHealth, the slide showcased years' worth of medical costs and the medical cost reduction Multiplan achieved for insurers.  Multiplan's services . . . include

61

allowing insurers to set their own 'meet or beat' prices and slashing certain treatment codes off of medical claims before pricing the claim, a process Multiplan refers to as payment integrity edits . . . ."  March 7, 2022 *The Capitol Forum,* "Multiplan:  Company's Information Sharing, Meetings Practices Could Raise Antitrust Concerns, Experts Say."

219.    UnitedHealth's Rebecca "Paradise [also] testified about the CAB meetings saying, '[t]ypically they talk about things they've implemented, other things they're looking at, providing other industry new information.'"  March 7, 2022 *The Capitol Forum,* "Multiplan: Company's Information Sharing, Meetings Practices Could Raise Antitrust Concerns, Experts Say."

### *Email Communication*

220.    MultiPlan was not shy about using email to inform its direct PPO network competitors/Payors about what it took to be competitive as to OON healthcare service payment levels.  As reported by *The Capitol Forum,* "'[i]mplementing these initiatives will go a long way *to bringing UnitedHealth back into alignment with its primary competitor group* . . . on managing OON costs,' MultiPlan sales executive Dale White wrote in a 2016 email to now retired United vice president of OON programs John Haben, according to trial testimony." March 7, 2022 *The Capitol Forum,* "Multiplan:  Company's Information Sharing, Meetings Practices Could Raise Antitrust Concerns, Experts Say" (emphasis added).

### *Joint Projects And New Products*

221.    Representing both an opportunity for and a resulting product enabling direct competitors to share information through MultiPlan, acting as a hub and conduit, in April 2018 MultiPlan announced that "[f]ive leading health care organizations – Humana . . . , MultiPlan, Quest Diagnostics . . . , and UnitedHealth Group's . . . Optum and UnitedHealthcare – today . . . are launching a pilot program applying blockchain technology to improve data quality and

reduce administrative costs associated with changes to health are provider demographic data, a critical, complex and difficult issue facing organizations across the health care system."

222. Not only did this "pilot program" involve direct PPO network competitors, including Humana, MultiPlan, and UnitedHealthcare, it also provided direct access to provider-related information, presumably shared by these same entities. As specified in the announcement, "[t]he pilot will also address the high cost of health care provider data management, testing the premise that administrative costs and data quality can be improved *by sharing provider data inputs and changes made by different parties across a blockchain,* potentially reducing operational costs while improving data quality." (Emphasis added).

223. MultiPlan's PlanOptix product, announced on March 12, 2024 provides similar access to provider information and allows direct competitors the ability to "[c]ompare other health payors' specific provider contracted rates for streamlined analysis" and to "[u]nderstand your competition and benchmark market position[.]"

> **5. MultiPlan Shared Competitively Sensitive Information, Including Repricing Service Use, Claims Approval Methodologies and Payment Amount Override Information, with Payors**

224. In addition to the actions taken by MultiPlan in acting as a hub and conduit, as described above, which discuss sharing information provided by a certain originating Payor with other Payors, MultiPlan also directly shared repricing information and methodologies, whether or not such information originally came from competing Payors.

225. For example, trial testimony strongly suggests if not outright indicates that MultiPlan personnel shared with its direct competitors (PPO network operators/Payors) specific and otherwise secret "methodolog[ies]" used by its OON healthcare service payment repricing tools.

226. The methodologies discussed in MultiPlan's secret "white papers" outline, for example, the processes and procedures for how MultiPlan's Data iSight repricing tool operates to artificially suppress OON healthcare service payments.

227. MultiPlan's "methodology" white papers serve, essentially, as user manuals that inform and instruct MultiPlan's direct competitor customers as to how the repricing tools functioned, as well as how to implement the artificial and coordinated pricing suppression scheme.

228. As further described below, just in case the methodologies themselves do not produce adequate "savings," these methodology "white papers" explain that the tools also include pricing-related "overrides" that ensure that the Payor, knowing the pricing thresholds that are "[t]ypically" applied by competitors, can generate the savings that it seeks.

229. First, testimony from the Court Reporter (Recorder's Transcript of Day 12 of the Jury Trial of *Fremont Emergency Servs., et al. v. United Healthcare Ins. Co.*, No. 1:19-793978-B) indicates that direct competitors attended MultiPlan-organized meetings:

> Q: There you are, John Haben, right?
> A: Yeah.
> Q: Okay. And we see there are representatives at these meetings from Cox HealthPlans, Cigna, Blue Cross, Kaiser, Aetna, Meritain Health, Trustmark and many others, right?
> A: Correct:
> Q: And there's Ms. Paradise.
> . . .
> Q: There she is, right?
> A: Yeah.
> Q: And you all – these insurance companies and MutliPlan, the umpire was getting paid. What are you all talking about at these meetings?
> A: They have presenters about the industry, what's happening in the marketplace. They have medical individuals coming. They talk about the trend in the market.

Recorder's Transcript of Jury Trial of *Fremont Emergency Servs., et al. v. United Healthcare ins. Co.*, No. 1:19-793978-B – Day 12, at 90:17-91:10.[6]

230. Further, testimony from this same trial indicates that "methodology" information was provided to these direct competitors:

> Q: What information that they provided you with, was most important to the company's decision to proceed?
>
> A: I think it was a combination of things. The fact that it was widely used by our competitors. The fact that it was widely accepted by providers, ***and they provided, also, information with respect to the methodology*** that we were able to evaluate and do our due diligence.

Recorder's Transcript of Jury Trial of *Fremont Emergency Servs., et al. v. United Healthcare Ins. Co.*, No. 1:19-793978-B – Day 12) at 104:4-9 (emphasis added).

231. An example of such secret, MultiPlan-authored methodology "white papers" is the "Data iSight Facility Methodology" white paper, dated July 2018. MultiPlan describes this document as "MultiPlan proprietary and confidential," and instructs: "[d]o not distribute without permission." MultiPlan describes its June 2019 white paper, "Data iSight Product and Methodology Inpatient Module," similarly: "Confidential & Proprietary: Do Not Redistribute Without Permission[.]"

232. MultiPlan describes in general the capabilities of Data iSight, noting that "Data iSight determines a fair price for facility claims using a patented methodology based on median costs from a benchmark group of like claims." July 2018 MultiPlan Data iSight Facility Methodology at 1.

---

[6] As yet another reminder, these attending healthcare insurance company payors are also, upon information and belief, PPO network operators, and thus compete on the same horizontal plane as MultiPlan.

233.    MultiPlan's Data iSight Facility Methodology white paper also describes "[a]n overview of the process for" both "Inpatient Claims" and "Outpatient Claims[.]" July 2018 MultiPlan Data iSight Facility Methodology, at 1-3.  This document discusses how its Data iSight product engages in claims "edit[ing,]" determines a "benchmark group," determines a "claim's actual cost," how "comparison cases are then adjusted based on the hospital's wage index," and how "[s]tandard overrides are applied to set upper and lower limits to the price."  As noted above, all of this was provided to MultiPlan's competitors/customers so that they could "evaluate" the repricing tool and "do [their] due diligence."

234.    Making a mockery of the benchmarking methodology itself, this same July 2018 methodology white paper shares with MultiPlan's direct competition of PPO network operators both that the repricing methodology is subject to "client-elected overrides," and the "[t]ypical" "client-elected overrides" that are applied.   With respect to "Inpatient Claims," MultiPlan notes that after the benchmarking process is conducted, "[a]ny client-elected overrides are applied. ***Typically, clients apply an override to never pay more than 250% of Medicare***."  July 2018 MultiPlan Data iSight Facility Methodology, at 1 (emphasis added).  Further, in this July 2018 methodology white paper, MultiPlan explains that "[s]tandard overrides are applied to set upper and lower limits to the price.  The lower limit is the amount at which 75% of hospitals in the benchmark group would be profitable, and the upper limit is billed charges."  *Id.*  In other words, no matter the benchmarking process, there is a "[t]ypically" applied payment box where the lower end is where "75% of hospitals would be profitable" and an upper end of 250% of Medicare pricing.[7]

_____

[7] It should be lost on nobody the arrogance involved with this artificial price-suppression scheme, where MultiPlan and its co-conspirators take it upon themselves to apply a "defensible" payment limit of "the amount at which 75% of hospitals in the benchmark would be profitable," meaning, of course, that 25% of hospitals would ***not*** be profitable at such a payment level.  July

235.    Applying similar "benchmark[ing]" and claims "editing" to "Outpatient Claims," MultiPlan shared with its direct competition that for Outpatient Claims, "[t]here is only one standard override:  the upper limit of billed charges.  In addition, the typical client-elected override is ***to never pay more than 400% of Medicare***."  July 2018 MultiPlan Data iSight Facility Methodology at 2-3 (emphasis added).  As implied by the "Outpatient Claims" facility methodology, there is a "typical[ly] applied OON healthcare services box of 0% of Medicare prices at the lower limit to 400% of Medicare prices at the upper limit (and does not allow for any consideration of facility "profitability").

236.    Critical to the creation, maintenance, and enforcement of this conspiracy, Payors agreed to and in fact do provide and previously have provided MultiPlan confidential, proprietary, and competitively-sensitive claims and pricing related information.   This information exchange is critical to the continued operation of the conspiracy.  Further, upon information and belief, MultiPlan's analytics tools function by way of agreements reached between the entities and associated technological connections.  Again, these agreements and technological connections enabling the exchange of confidential and proprietary claims and pricing information are reached and configured between horizontally-positioned competitors. On information and belief, the documentary agreements work hand-in-hand with the enabling technology:  Pursuant to their respective agreements reached with MultiPlan (on information and belief), the competing insurance networks send their claims to MultiPlan via an electronic data interchange ("EDI").  The sent claims are then loaded onto MultiPlan's "Claims Savings

_____

2018 Data iSight Facility Methodology, at 1; MultiPlan Data iSight Methodology:  The most defensible, transparent way to value non-contracted medical claims, at 1.  *See also* June 2019 Data iSight Product and Methodology Inpatient Module, at 6 (discussing how the Data iSight methodology for in-patient OON claims sets a "standard" "lower limit[]" payment "override," where "75% of hospitals in the benchmark group would make a profit.").

Engine." On information and belief, pursuant to the agreements reached between MultiPlan and the Defendant Payors and between MultiPlan and the Insurer Co-Conspirators, MultiPlan's Claims Saving Engine routes a particular claim to one of several proprietary algorithms owned by MultiPlan, including Data iSight, MARS, Pro Pricer, or Viant. Then, those algorithms apply the claims suppression methodology – as agreed to by Defendant Payors and the Insurer Co-Conspirators and MultiPlan – to the claim at issue to determine the amount MultiPlan will offer to the Provider for the healthcare services and related goods in question such that the offer will in nearly all cases be accepted. Like the claims and pricing information that the Defendant Payors and the Insurer Co-Conspirators have agreed to send MultiPlan (as alleged on information and belief), the specific nature of how MultiPlan's methodologies and technologies suppress payment of OON healthcare services is non-public and proprietary. However, MultiPlan also authors "white papers" that describe relevant pricing processes used by MultiPlan's various tools to "reprice" (adjust downwards) payment amounts submitted for claims for OON healthcare services. Some, but not all, of MultiPlan's white papers have been made public in court filings or through Internet publication by one or more media entities.

237. Multiple MultiPlan "white papers" have been uploaded to the Internet (possibly by *The New York Times*), which describe in detail the Data iSight methodologies used to apply a common methodology to set prices, including maximum and minimum prices, and to limit the emergence of any incentives for the Defendant Payors or the Insurer Co-Conspirators to develop competing approaches and technologies in this space. For example, in MultiPlan's June 2019 "white paper," "Data iSight Product and Methodology Inpatient Module," MultiPlan explains the methodology used by Data iSight to reprice OON, "in-patient" (as in, in-hospital) claims. According to MultiPlan, its Data iSight tool compiles "a national benchmarking group that contains claim and cost data for cases of like severity in hospitals with characteristics that

match those of the hospital on the claim being analyzed."  Similarly, MultiPlan touts Data iSight on its website as "the right choice for healthcare payors," and that "[b]y applying national benchmarking, regional wage indexing and geographic adjustment among other methods, it allows for the optimal payment compared to Usual and Customary and Medicare-Based pricing."  *See* https://www.multiplan.us/services/analytics/data-isight/ (visited July 30, 2024) ("Data iSight Methodology:  The most defensible, transparent way to value non-contracted medical claims").  According to this same June 2019 Data iSight white paper, "Data iSight first applies industry standard claim editing for inpatient claims . . . ."  And:  "Next, Data iSight reviews the claims in accordance with the" following "methodology . . . ." According to this June 2019 white paper, once MultiPlan receives the claim, "[t]he first step in the Data iSight process is to group the claim to a severity adjusted Diagnosis Related Group (DRG)."  Then, as discussed in the June 2019 white paper, "[t]he next step in the process is for Data iSight to build the benchmark group of hospitals," noting in part that "[t]he comparison is performed at a national level as opposed to the regional approach," but (as asserted) "[s]ince the cost of services varies widely based on regional differences in wage and other cost factors, the costs in the national benchmark group are adjusted, based on the CMS wage index, to match the wage index for the geographic location of the specific claim being analyzed."

238.    According to this same June 2019 Data iSight white paper, "[t]he next step is to calculate the median benchmark cost of the services."  If applicable, according to the June 2019 white paper, "[a]ttempts will be made to try to secure any missing claim information related to pricing.  When information can't be acquired, a conservative proxy value may be derived."  "Once the median cost for the benchmark group is determined," according to the June 2019 white paper, "Data iSight can calculate the Data iSight Reimbursement amount per the client's requirements.  Our recommended methodology establishes a reimbursement amount

equal to the median benchmark cost plus an additional margin factor, which is selected by the client based on the client's needs. . . . [Para.] While Data iSight does not mandate a margin factor, the system is set to default to a 125% mark-up."

239.    Finally, "[a]fter the [above] methodology is applied, overrides can be used to adjust the resulting price.  Two standard overrides are always in place which establishes upper and lower limits for the Data iSight price," including:  • Never pay less than the amount at which 75% of hospitals in the benchmark group would make a profit"; and (obviously) "• Never pay more than billed charges[.]"  However, according to the June 2019 white paper, "[c]lients may elect . . . additional overrides, which include, among others:  "• Don't pay more than x% of the claim's Medicare reimbursement (*note:  defaults to 250% if client elected*)" (emphasis in original); "• Don't pay more than x% of the claim's cost"; and "• Don't pay more than x% of the claim's charge[.]"  As suggested by MultiPlan, the override applies to create the resulting adjusted payment to the Provider no matter what the Data iSight methodology calculates.  In addition, according to the June 2019 white paper, the client can bypass the calculation methodology altogether:  "if the client elects not to utilize the Data iSight methodology, at the client's option, one of the following methodologies may be utilized to calculate the reimbursement amount . . . • x% of cost; • x% of Medicare; • x% of charge; • xth percentile of billed charges; • Averaged billed charges; • Level at which x% of hospitals are profitable."  In accordance with the June 2019 Data iSight white paper, aside from whatever margin is allowed and whatever override is applied when customized and "selected by the client," MultiPlan applies its Data iSight methodologies in the same way for every Payor to the detriment of every Provider performing OON "inpatient" healthcare services.  Of course, in large part defeating such customization, MultiPlan's Data iSight tool includes a "default" value of "125%" margins and similarly "default[ed]" overrides of "250%."

240.     Another MultiPlan "white paper," authored in July 2018 and entitled, "Data iSight Facility Methodology" also "summarizes the methodologies used by the Data iSight product to price inpatient and outpatient claims."  This document describes Data iSight as "determin[ing] a fair price for facilty claims using a patented methodology based on median costs from a benchmark group of like claims.  For inpatient claims, the benchmark is comprised of claims from similar hospital types, and sizes, and with the same all-patient severity-adjusted Diagnosis Related Groups (APR-DRG); for outpatient claims the benchmark group is based on claims with the same HCPCS codes."

241.     This July 2018 White Paper indicates, in part, that for inpatient claims an effort to apply costs associated with a "benchmark group of at least 200 claims," that "[c]osts of all comparison cases are . . . adjusted based on the hospital's wage index," and that a "median wage-adjusted cost for the benchmark group is calculated, and a margin factor is applied.  The default mark-up is 125%, established based upon historic accepted amounts for OON claims among other considerations."

242.     Critically, this document specifically notes "standard" and "typical[]" client-applied overrides:

- "Any client-elected overrides to the methodology are applied.  Typically, clients apply an override to never pay more than 250% of Medicare";

- "Standard overrides are applied to set upper and lower limits to the price.  The lower limit is the amount at which 75% of hospitals in the benchmark group would be profitable, and the upper limit is billed charges."

243.     This same July 2018 White Paper indicates, in part, that for outpatient claims "[t]he benchmark group must contain at least 150 matching HCPCS claim lines"; that "[t]he benchmark group includes from the database all patients who had the same service performed

and all facilities nationwide, with geographical adjustments applied based upon the local wage index, as well as on local rent/lease factors"; and that "the outpatient module [also] accesses the national Outpatient Standard Analytical File to obtain outpatient charge data and Provider of Service files to obtain facility demographic information."

244.    As for outpatient overrides, this July 2018 White Paper notes that "[t]here is only one standard override:  the upper limit of billed charges.  In addition, the ***typical client-elected override is to never pay more than 400% of Medicare***." (Emphasis added).

245.    In other words, by sharing these Data iSight methodology "white papers" with competing Payors, such sharing makes the argument of whether using a third-party's pricing algorithm is or isn't price-fixing completely besides the point – MultiPlan shares with competitor Payors the exact "typical" and "standard" percent overrides to be applied to its "repricing" algorithm.

246.    A simple reference to the Physician Fee Schedule ("PFS"), as published by the Centers for Medicare & Medicaid Services ("CMS"), readily shows that healthcare services can be and are readily priced.  By applying a shared percentage-of-healthcare limit, both MultiPlan and its Payor customers have conspiratorially priced such healthcare services for OON Providers to the detriment of Providers who provide OON services.

247.    Based on the distribution of such white papers to its direct PPO network operator competitors (and as between and among directly competing Payors), MultiPlan provided "typically" applied maximum payment override information that translate into sharing, by MultiPlan's own description, of "proprietary and confidential" information concerning prices. *The Capitol Forum* described this process, noting:  "an insurer asks Multiplan to reduce rates for a certain service such as labs or behavioral health, Multiplan recommends certain overrides to achieve the client's goals, and the client approves the charges."  Whether considered pricing

guidance or pricing direction, MultiPlan provided its direct competitors with specific pricing limits to be paid to OON healthcare service providers  – separate from algorithmic calculations.

### 6. Directly Competing Payors Shared Confidential, Proprietary, and Competitively-Sensitive Information With  Each Other (The "Rim" of the Hub-And-Spoke Conspiracy)

248.     In addition to the conduct of MultiPlan as a hub and conduit, representatives of directly competing Payors were positioned to, had opportunities to, and shared confidential, proprietary, and competitively-sensitive information directly between and among each other.

249.     For example, with respect to attending "Client Advisory Board" meetings, discussed above, reporting from *The Capitol Forum* indicates that in order "[t]o promote Data iSight at CAB meetings, Multiplan sat prospective clients together with active clients as a sales strategy, according to a 2017 Multiplan document . . . that discussed a CAB meeting that had taken place two years prior.'"  That document quoted an email:  "'With the CAB [MultiPlan's Client Advisory Board] meeting coming up, the opportunity to promote Data iSight was excellent *and several active references were excited to share their success* (coincidentally the reference and prospective clients were to be seated together for dinner).'" (Emphasis added).  As part of the "rim" of a hub-and-spoke conspiracy, reporting by *The Capitol Forum* confirmed that personnel from Payors "were excited to share their success" in using MultiPlan's Data iSight repricing tool with other direct competitors.

### E. MultiPlan Has Reached Information Sharing/Repricing Agreements with Nearly The Entirety of The PPO Network Payor Industry

250.     MultiPlan's scheme to persuade its competitors to join the conspiracy and its efforts to thwart competition, including the emergence of competitive alternatives, has been (from MultiPlan's viewpoint) an unqualified success.  Reflecting its omnipresence, by 2017,

MultiPlan had reached agreements with nearly every (other) significant Payor in the United States, addressing, among other concerns, payment of OON claims.

251. From the Provider's perspective, this scheme has been an economic catastrophe and has harmed every Provider form July 1, 2017 who has performed out-of-network healthcare services and who has submitted a claim for payment to MultiPlan or to a Payor using MultiPlan's repricing services.

252. On information and belief, these agreements required Payors to use MultiPlan's repricing tools. Each of them agreed to use MultiPlan's algorithms to "reprice"—that is, reduce—the amount of payment for OON healthcare claims. These agreements require Payors who receive a claim for payment of OON healthcare services to immediately forward it to MultiPlan. MultiPlan then applies its repricing algorithms and other technologies to generate a real-time payment amount substantially less than what a PPO Payor would pay to individually negotiate reimbursement for the claim. MultiPlan and its co-conspirators must then impose these "re-priced" payments.

253. Based on this cooperation, the use of MultiPlan's repricing tools permeated OON pricing by MultiPlan and the other Payors, with the effect of locking in anticompetitive prices for all OON services. These artificially inflated prices are thus the product of a bureaucratic process having no transparency.

254. As a condition of accepting opaquely-based and downwardly-adjusted prices, OON Providers are precluded from "balance billing"; that is, seeking further payment from patients. MultiPlan acknowledges this approach: "In a statement, [MultiPlan] said it . . . recommend[s] a 'reimbursement that is fair and that providers are willing to accept in lieu of billing plan members for the balance.'" April 9, 2024 *The New York Times*, "Insurers Reap Hidden Fees by Slashing Payments. You May Get the Bill" by Chris Hamby. PIMG has

similarly and directly faced these payment restrictions. For example, on an August 8, 2024 payment memorandum, Anthem conditioned PIMG's receipt of the downwardly-adjusted payment (described alternatively as a "Negotiated Amount" and as an "Expedited Amount") on agreeing not to balance bill the patient: "By signing, Provider accepts this Expedited Amount and agrees to reduce the liability of the Patient and Payor. Provider agrees not to bill the Patient, or financially responsible party, for the difference between the Billed Charge and the Expedited Amount." By conditioning payment on a prohibition on balance billing, PIMG was simultaneously damaged and prevented from mitigating its damages.

255.     As reported by *The Capitol Forum*, "Providers [are] told that the adjusted price offer is a take-it-or-leave-it proposal. If the OON Provider accepts the adjusted price, then the provider agrees not to balance bill." *The Capitol Forum*, "Provider shows How Multiplan Incentivizes Him to Raise His Billing Rate; Multiplan Says It 'Does Not Encourage Providers to Overcharge," April 8, 2022. In the event that a Provider accepts MultiPlan's "repriced" payment amount, the Provider agrees to abandon the option to go after patients for the difference.

256.     By accepting artificially low prices mandated by the MultiPlan Cartel for OON healthcare services, PPO Providers are undercompensated. At the very least, they are damaged by the difference between the cartel prices and the prices that would prevail in a competitive market. These collusive discounts that PIMG and other OON Providers are compelled to accept constitute both Article III and antitrust injuries that confer standing for PIMG to bring this action.

257.     While ostensibly a consumer protection feature of the conspiracy, the proscription that prevents PPO Providers from "balance billing" patients serves as a way to conceal the MultiPlan Cartel's conspiracy.

**F.     As MultiPlan's Repricing Compensation Is Based on The Percentage The Payor Saves, MultiPlan Is Incentivized To Reduce Payment Amounts And Has A Strong Motive To Preserve The Conspiracy**

258.     MultiPlan, by agreement (on information and belief), receives a percentage of the money that the Payor is able to withhold from paying the Provider.

259.     MultiPlan's analytics business charges its horizontally-positioned PPO network customers a fee based on the difference between a Provider's initially-submitted claim and the amount the Provider receives following MultiPlan's repricing (downwards adjustment) of the claim.  This fee often equates to 5% to 7% of the "savings," but has been as high as 12% of the "savings."  In other words, MultiPlan is incentivized to recommend the lowest possible payment amount because the larger the difference between a PPO Provider's initial claim and the resulting collusively reduced payment amount, the greater the fee earned by MultiPlan.  Quite simply, the less money that goes to Providers, the more money MultiPlan receives.

260.     MultiPlan has developed a corporate culture and bonus structure tied to discouraging negotiations of reasonable rates with Providers.  For example, a *New York Times* article revealed that employee bonuses are tied to payment reductions.  Further, as characterized by former MultiPlan negotiator, Kajuana Young, "I knew they were not fair," as to the payment amounts generated by MultiPlan.

**G.     Payors' Sharing of Pricing Information with MultiPlan and Using Its Algorithm To Set Prices While Knowing That Competitors Are Doing the Same *Is* Price Fixing**

261.     As discussed above, to the extent that MultiPlan has shared its repricing "methodology" white papers with its competitor-customers, which include "typical" and "standard" override percent information, it makes the outcome of the debate about whether use of a third-party pricing algorithm is or isn't price-fixing a mere academic discussion.

262.    However, use of such third-party algorithms for setting prices is unquestionably price-fixing.

263.    *The New York Times* engaged in an investigation that interviewed about one hundred witnesses and reviewed thousands of pages of internal MultiPlan records, which supported the conclusion that MultiPlan is operating a "lucrative, little-known alliance" of Payors that functions to underpay Providers and undermine the value of commercial insurance.

264.    This "alliance" also serves as a flagrant disregard for the nation's antitrust laws.

265.    On April 9, 2024, the American Hospital Association separately called on the federal government to investigate MultiPlan's conduct.

266.    United States Senator Amy Klobuchar followed the AHA request with a letter on April 29, 2024 to Assistant Attorney General Jonathan Kanter and Federal Trade Commission Chair Lina Khan, asking them to investigate whether MultiPlan enables illegal collusion with other PPO Payors. Senator Klobuchar noted her concern that MultiPlan's "algorithmic tools are processing data gathered across numerous competitors to subvert competition among insurance companies."

267.    Two days later, *The New York Times* published another article focused on MultiPlan's price-fixing efforts: "Collusion in Health Care Pricing?  Regulators Are Asked to Investigate." That article observed that "[a] data analytics firm has helped big health insurers cut payments to doctors, raising concerns about possible price fixing."  It also quoted University of Arizona law professor Barak Orbach who concluded that "'[t]his should trigger an investigation by the agencies.  There seems to be a really strong case.'"

268.    Because MultiPlan's algorithmic pricing determinations are based on the improper, collusive, and secretive sharing of confidential, proprietary, and competitively-sensitive claims and/or pricing information with MultiPlan where such information is passed

77

through MultiPlan as a hub or a conduit and shared with competing Payors, MultiPlan's repricing methodologies, technologies, and implementations thereof constitute price-fixing and artificial and collusive price suppression in violation of the Sherman Act.

### H. The Widespread Adoption and Application of MultiPlan's Repricing Services by Payors Has Precluded Meaningful Competitive Alternatives and Harmed Competition

269. The harm to competition has already occurred as Providers have no alternative in which to turn. In the words of an industry analyst, MultiPlan acts "like a mafia enforcer for insurers" as virtually every Payor has agreed to use (and is required to use) MultiPlan's "repricing" methodologies and technologies. MultiPlan itself has estimated that Providers accept MultiPlan's payment amounts for OON, inpatient payment claims 99.4% of the time. MultiPlan brags about this acceptance rate, but this more likely shows that the widespread adoption of MultiPlan's repricing services by nearly or actually all Payors has resulted in the absence of meaningful competitive alternatives.

270. To the extent that MultiPlan offers to "negotiate" such payment amounts, the negotiation is one-sided and replete with bureaucratic obstacles designed to favor inertia to the benefit of MultiPlan and its Payors. For example, because MultiPlan serves Providers with a constant stream of repriced payments, it is practically impossible to dispute meaningfully and come to a mutually beneficial resolution as to any single "repriced" claim for payment (or limited set thereof). Further, as discussed, MultiPlan adds in a timing restriction for such reimbursement claim disputes. Accordingly, any allowed "negotiation" starts from the position of a collusively-arranged offer to underpay substantially the Provider for its services (where the Provider has no competitive alternatives) and ends with a capitulating Provider accepting the substantial underpayment.

271.     The pervasive use of MultiPlan's methodologies and technologies is astonishing. For example, by 2020, the Defendant Payors, the Insurer Co-Conspirators, and MultiPlan used its repricing tools to underpay 370,000 OON claims per day, involving over 700 health insurers, resulting in a total underpayment to Providers estimated as approximately $19 billion *per year*.

### I.     As a Participant in the PPO Network Market, MultiPlan Competes with Payors, Making This Repricing Conspiracy A *Per Se* Violation of the Antitrust Laws

272.     As previously discussed, as MultiPlan is both a horizontal competitor and an enabler of the conspiracy through, at least in part, requiring pricing and claims related information from competing Payors and providing pricing, claims, and repricing methodology related information to these same Payors.  Accordingly, this matter concerns *per se* violations of Section 1 of the Sherman Act.  The liability concerns conduct that is inherently wrong and the law contemplates no procompetitive excuse for such conduct.

273.     To the extent that MultiPlan and/or the Conspirators resort to the ruse that the approximate $19 billion per year in underpayments of Providers have resulted in the reduction of patients' healthcare costs, such a procompetitive justification is a legal nullity and shall be rejected both because procompetitive justification are not contemplated in the *per se* antitrust violation context, and because the assertion is untrue.

274.     Rather, since the outset of the alleged conspiracy, U.S. health insurance costs have risen and continue to do so.  Moreover, the money that has been unlawfully withheld from Providers has not been returned to patients, but has been retained by insurance companies, their investors, and their executives.  Further, as the agreements at issue compensate MultiPlan based on a percentage of the savings that would otherwise be paid to Providers, such money is also retained by MultiPlan.  The MultiPlan Cartel has resulted in the unjust enrichment of MultiPlan,

the Defendant Payorss, the Insurer Co-Conspirators, their respective investors, and their respective executives and other employees.

275.    MultiPlan's efforts have resulted in the creation, coordination, and the continued orchestration of an ongoing cartel whose members, including MultiPlan, the Defendant Payors, and the Insurer Co-conspirators, have agreed to artificially suppress – and thereby retain in part – payments made on claims for OON healthcare services worth billions of dollars per year.  The conduct of MultiPlan, the Defendant Payors, and the Insurer Co-Conspirators, and the agreements at issue, are all blatantly illegal, amounting to *per se* violations. These violations include sharing information upon which supply, customer, or pricing decisions are made, fixing prices they pay for OON services by agreeing generally, and fixing prices they pay for OON services by providing the percentage-of-Medicare overrides that are "[t]ypically" applied by Payors.

276.    Pacific Inpatient Medical Group, Inc. has, as a proximate result of this conspiracy and associated unlawful and coordinated conduct, suffered damages due to the efforts of the members of the MultiPlan Cartel.

277.    As the allegations herein concern *per se* violations, no procompetitive justification immunizes MultiPlan from the consequences stemming from the conspiracy.

### J.    This Conspiracy Is Supported by Direct Evidence of Written Agreements between MultiPlan and the Other Payors

278.    Direct evidence previously marshalled and which will be further revealed in discovery show that MultiPlan entered into the above-described agreements with its competitors, including its co-conspirators.  Moreover, this is not – or should not be – in dispute as MultiPlan admitted in its filings with the Securities and Exchange Commission and state insurance commissioners that it enters into agreements with competing Payors and that the "core" aspect of

80

its business concerns out-of-network healthcare service repricing. On information and belief, the agreements at issue concern repricing agreements as entered into between Payors and MultiPlan.

279. Further, other Payors have previously admitted in sworn testimony at trial and in written communications with Providers that they have entered into repricing agreements with fellow-healthcare insurer, MultiPlan. Direct evidence of agreements reached between horizontal competitors to unreasonably restrain trade in violation of federal and state antitrust law is present and self-evident in this matter.

280. Payors acknowledge that they have agreements with MultiPlan to reprice (downwards adjust) OON claims. UHG has indicated that a Provider may be offered "[a] rate recommended by [MultiPlan-owned] Viant, an independent third-party vendor that collects and maintains a database of health insurance claims for facilities, then applies proprietary logic to arrive at a recommended rate."

### K. MultiPlan and the Other Members of the MultiPlan Cartel Have Formed and Executed a Horizontal Price-Fixing Conspiracy

#### 1. The Defendant Payors and the Insurer Co-Conspirators Have Unlawfully Delegated Pricing and Negotiation Authority to a Horizontal Competitor

281. MultiPlan and the other PPO Payors are horizontal competitors that have agreed to join, enable, operate and preserve the MultiPlan Cartel based in part on commonly applied methodologies and technologies for the suppression of payments for claims submitted for OON healthcare services. Members of the MultiPlan Cartel have each entered into, participated in, served to enable, served to perpetuate, acted to conceal, and worked to enforce this conspiracy, which has unreasonably restrained trade concerning the payment of OON healthcare services.

282. MultiPlan has entered into numerous written agreements with hundreds of its horizontal Payor competitors in order to exchange confidential and proprietary claims data, to

suppress payments for claims submitted for OON healthcare services, and to fix the payment amounts for claims submitted for OON healthcare services. The agreements at issue require that these horizontal competitors agree to share their confidential claims data with MultiPlan so that it can use an agreed-upon repricing (downwards adjusting) methodology to suppress payments for OON healthcare services. Federal antitrust and competition regulators regard "replac[ing] once-independent pricing decisions with a shared algorithm" – just as members of The MultiPlan Cartel have accomplished -- constitutes illegal price-fixing. *See* Hannah Garden-Monheit & Ken Merber, *Price fixing by algorithm is still price fixing,* FTC Business Blog (March 1, 2024), https://www.ftc.gov/business-guidance/blog/2024/03/price-fixing-algorithm-still-price-fixing. *See also* Statement of Interest of the United States of America at 2-3, *Duffy v. Yardi Sys., Inc., et al.,* No. 2:23-cv01391 (W.D. Wash. Mar. 1, 2024) (ECF No. 149) (when "competitors jointly delegat[e] key aspects of their decision-making to a common algorithm," they "deprive the marketplace of independent centers of decision-making" and thereby violation Section 1 of the Sherman Act. Also, "[i]t is not necessary for conspirators always to adhere to pricing recommendations for a challenged price-fixing to be *per se* unlawful." Statement of Interest of the United States of America at 7, *Cornish-Adebiyi v. Caesars Entertainment, Inc., et al.,* No. 23-cv-02536 (D.N.J. Mar. 28, 2024) (ECF No. 96). The same is true in this case.

283. Members of the MultiPlan Cartel destroyed horizontal competition by delegating to MultiPlan industry-wide pricing and negotiation authority concerning the payment of claims for OON healthcare services. As just one problem posed by this industry-wide delegation of pricing authority, this makes independent, individualized negotiations impossible (or, at minimum, a hopeless exercise). Consequently, this delegation allows MultiPlan, the Defendant Payors, and the Insurer Co-Conspirators to suppress payments for OON healthcare service far below what they otherwise would be, but-for the MultiPlan Cartel.

### 2. MultiPlan Acknowledges That It Bundles Its PPO Network Offerings with Repricing Services for Combined Use

284. MultiPlan admits in public statements filed with the SEC that there is no organizational or other separation between its PPO network business and its data analytics business. In its Form 10-K for the year ended December 31, 2023, filed with the SEC, MultiPlan admitted: "The breadth of our service offerings allows our customers the flexibility to tailor solutions for a wide range of plan sponsors with varying plan sizes and benefit needs. At the same time, *our service offerings are delivered from our common platform and are often bundled together* to provide a comprehensive cost management solution for each customer. As such, we manage our service offerings *as integrated components of a holistic value proposition, rather than as distinct service lines*." (emphases added). MultiPlan itself denies the existence of any organizational walls or distinctions between its "service lines," and remains subject to *per se* application of Section 1 of the Sherman Act.

285. Doubling-down on its service integration, MultiPlan further stated in the same public filing with the SEC: "Our Analytics-Based Services reduce the per-unit cost of claims using data-driven negotiation and/or reference-based pricing methodologies. *These services* can be used standalone but *often are used in a solution hierarchy after MultiPlan's network services* to reduce claims with no available network contract." (Emphases added). MultiPlan acknowledges that its service offerings can be used in a tiered and integrated way to extract value from the OON Providers.

### 3. MultiPlan Applies Its Repricing Tools to The Detriment of Providers

286. On a simplified basis, the following summarizes how MultiPlan's "repricing" tools function.

287.    How MultiPlan's repricing tools work in the emergency room context:  A patient that is insured by one of MultiPlan's competitors receives emergency healthcare services from doctors employed by PIMG.  If PIMG does not have a pre-existing contract governing the cost of these emergency healthcare services with the insurer, that insurer remains obligated to pay for the emergency healthcare services rendered to the insured individual.  The PIMG doctors then treat the patient on that emergency basis, and PIMG then submits a claim to the insurer reflecting its charges.  However, instead of paying the PIMG's submitted claim directly, the insurer sends PIMG's claim to MultiPlan.  MultiPlan then applies its "analytics" tools to "reprice" (that is, downward adjust) PIMG's claim pursuant to MultiPlan's agreement with the insurer.  MultiPlan then presents PIMG's now-repriced (downwardly adjusted) claim on a take-it-or-leave-it basis. If PIMG does not accept MultiPlan's "repriced" payment amount for such emergency healthcare services, the best PIMG can hope to receive is engaging in time-pressured and one-sided "negotiations" with MultiPlan, likely resulting in an even greater underpayment and delay in payment of the originally-submitted claim for emergency healthcare services.

288.    A similar sequence exists for non-emergency OON healthcare services.  In this hypothetical circumstance, the patient is a subscriber to a particular health insurance plan, but seeks healthcare services from PIMG doctors who are not among those listed as providing in-network care for the patient.  That is, in this example, the patient receives OON, non-emergency care from one or more PIMG doctors.  Although in this non-emergency setting, the PIMG doctor has no obligation to treat the OON patient, such OON care routinely occurs, at least partly because of the understanding that the patient has health insurance and that PIMG has the ability to recoup at least some of the costs of healthcare services from that insurer on an OON basis. Further, the Provider understands that there remains the possibility of charging the patient in part for those OON services.  In this example, the OON PIMG doctors provide the healthcare

services to the patient and PIMG bills the patient's insurance company. Again, rather than processing the claim and paying PIMG, the insurance company sends the PIMG's non-emergency claim to MultiPlan. MultiPlan then (presumably) applies its repricing methodologies and technologies, and then reprices (downwardly adjusts) the claim using a formula agreed upon by the insurer. Finally, MultiPlan presents the repriced (downwardly adjusted) offer to PIMG on behalf of the patient's insurer for payment. Again, PIMG is forced either to accept the severely downwardly adjusted payment amount; or to engage in time-pressured and one-sided "negotiations" with MultiPlan, ultimately resulting in a substantial underpayment of PIMG's submitted claim.

      **L.**    **MultiPlan's Repriced Payment Amounts Are Neither Recommendations Nor Starting Points to a Negotiation; As Demonstrated by Astronomically High "Acceptance Rates," Healthcare Providers Have No Practical Competitive Alternatives for Out-of-Network Claims Payments.**

     289.    MultiPlan does not make mere recommendations on how otherwise competing payors are to pay OON claims.[8] Moreover, because the Defendant Payors, the Insurer Co-Conspirators, and MultiPlan have agreed on the repricing methodology to be used for "repricing" the submitted claims for payment of OON healthcare services, the repricing "recommendations" generated by MultiPlan's repricing tools are accepted by Payors and offered to Providers without alteration. In the vast number of cases, the Payor authorizes MultiPlan to make the repricing offer and negotiate the OON claim on the payor's behalf – in complete abdication of the payor's pricing authority to its horizontally-positioned competitor (MultiPlan).

---

[8] Even if MultiPlan was making a mere recommendation or a proposed "starting point" of a pricing negotiation, a price-fixed "starting point," based on the unlawful exchange of confidential and proprietary claims and pricing information, remains actionable price-fixing as a *per se* violation of Section 1 of the Sherman Act.

290.    Further, MultiPlan's, the Defendant Payors', and the Insurer Co-Conspirators' use of MultiPlan's repricing tools do not represent just a beginning of a pricing negotiation.  Rather, in by far and wide most circumstances, the repricing proposal, based in part on the unlawful exchange of confidential, proprietary, and competitively-sensitive claims and pricing information, becomes the payment amount.  MultiPlan admits on its website that Data iSight repricing is "accepted" 96% of the time by Providers, and 93% of the time by facilities, "making it a defensible methodology for payors."[9]  A March 21, 2018 report about "Reference-Based Pricing" and MultiPlan's Data iSight claimed even higher rates of adoption.  For example, the "Health Plan Alliance" claimed that 99.4% of all OON claims for inpatient treatment that are repriced by Data iSight are accepted by Providers.  This same report also claimed high acceptance rates for professional care services (94.5%) and for outpatient services (98.7%).  MultiPlan was not shy in sharing this information, with MultiPlan's CEO, Travis Dalton, informing news outlet Axios that 98% of its repriced claims are accepted by Providers.  With repricing acceptance rates approaching 100%, these are neither mere "recommendations" nor negotiation starting points.

291.    MultiPlan characterizes, in part, its downward-adjusted "repricing" as "Claim Accuracy" (prior to the repriced claim) and "Payment Accuracy" (following the repriced claim).  However, "accuracy" does not come close to capturing the truth of what is actually occurring.  What is occurring is the artificial, improper, and illegal suppression of payment amounts.  These high "acceptance" rates discussed in the paragraph immediately above do not result from the "accuracy" or validity of MultiPlan's repricing methodologies or technologies, but result instead

---

[9] Following antitrust jury verdict or substantial settlement, just ask executives or board members of entities like U.S. Tobacco Co., the Dow Chemical Company, Nippon Chemi-Con Corp., United Chemi-con Inc., and Matsuo Electric whether widespread adoption of products subject to violations of antitrust law makes the pricing of those products "defensible."

from the illegal, collusive, pervasive, and unreasonable restraint on trade caused by application of the price-fixing agreements reached between and among MultiPlan, the Defendant Payors, and the Insurer Co-Conspirators.

292.     Moreover, because of the widespread adoption of MultiPlan's tools pursuant to the agreements, Providers have no meaningful alternative but to accept MultiPlan's anticompetitively-based repricing of their healthcare services (or forgo payment entirely). Even in those rare instances when a Provider decides to try to negotiate MultiPlan's repricing (downwards-adjusted) offers, such negotiations can be conditioned on severe time limitations and are one-sided. Moreover, because all or nearly all of the major Payors have agreed to provide MultiPlan with confidential and proprietary claims and pricing data and because all or nearly all of the major Payors have agreed to use MultiPlan's methodologies and technologies, it is not whether a Provider providing OON care will be harmed by the MultiPlan Cartel, but, rather, by how much the Provider providing such care will be harmed. As discussed by Hannah Garden-Monheit and Ken Merber, to the extent that "co-conspirators retain some pricing discretion" or can "deviate" from the initially-set prices is not determinative. Hannah Garden-Monheit & Ken Merber, *Price fixing by algorithm is still price fixing,* FTC Business Blog (March 1, 2024), https://www.ftc.gov/business-guidance/blog/2024/03/price-fixing-algorithm-still-price-fixing.

293.     Even if MultiPlan's repricing was the beginning point of a payment negotiation (which clearly it is not), such a price-fixed starting point makes MultiPlan jointly and severally liable for the price-fixing efforts of all of the MultiPlan Cartel members. MultiPlan enjoys no immunity even if it can be demonstrated that price-fixing resulted only in a starting point to a pricing negotiation.

294.     With respect to abdication of the claims pricing role of the healthcare insurance company payor, as MultiPlan's 30(b)(6) witness testified in *LD, et al. v. United Behavioral Health, et al.,* No. 4:20-cv-02254-YGR (N.D. Cal.), she was unaware of any time when UHG rejected a MultiPlan-repriced claim amount for a particular type of claim.

295.     As another example of an Insurer Co-Conspirator abdicating its independent role in pricing, a UHG witness testified that UHG "leave[s] [the] role and responsibility up to [MultiPlan's] Viant and their team to support and defend how they've arrived at those allowed amounts."

296.     Making an absurd use of the word "typically," the same witness quoted in the paragraph immediately above testified that they "typically" do not reject MultiPlan's Viant-determined pricing:

> A.  It's a recommendation – you know, you may be referring to that as a recommendation on an individual claim, but all recommendations that you return we're using as our go-out pricing for any clients that have Viant R&C.
> Q.  Okay.  Doesn't [UHG] have the right to reject or use any of the Viant prices?
>
> A.  We can.  We ***typically*** do not.  There may be one-off situations where they may occur for various reasons.  But for the most part the volumes of claims that we send that do get priced with Viant pricing we're utilizing that pricing and payment.

(Emphasis added).  Recall that MultiPlan's CEO informed news outlet Axios that 98% of its repriced claims are accepted by Providers.  In this context, "typically" means nearly always. This is also to say that the insurance company payor nearly always has MultiPlan take responsibility for the insurance company payor's pricing responsibilities.

**M.** **In the Event That a Healthcare Provider Attempts to Re-Negotiate a Payment Amount, the Negotiation Is Collusive, One-Sided, Time-Pressured, And Can Result in an Even Smaller Payment; MultiPlan Even Hopes to Control the Post-Offer Adjudication Process at Arbitration**

297.     In interviewing medical practitioners, *The New York Times* confirmed Providers' inability to negotiate meaningfully over repricing amounts generated by MultiPlan.

298.     For example, as interviewed by *The New York Times*, Tammie Farkas, responsible for billing for her husband's New York-based practice concerning repairing blood vessels in the brain, explained that the process is "not a real negotiation." April 9, 2024 (Updated), *New York Times,* "Insurers Reap Hidden Fees by Slashing Payments.  You May Get the Bill" by Chris Hamby .

299.     As uncovered by *The New York Times,* MultiPlan's insurer-customers "can set negotiation parameters for MultiPlan, including not negotiating at all, records and interview show. . . . .  Multiple providers and billing specialists said that in recent years they had increasingly been told their claims weren't eligible for negotiation."  April 9, 2024 (Updated), *New York Times,* "Insurers Reap Hidden Fees by Slashing Payments.  You May Get the Bill" by Chris Hamby.  Because of the near universal adoption of MultiPlan's methodologies and technologies, Payors can remain undeterred by even the most stubborn and righteous Providers as these medical practitioners essentially or actually have nowhere to turn for better claims payment amounts.

300.     MultiPlan's pricing-related ambitions border on the fanatical, and the company seeks to maintain power over pricing even during a payment-amount-dispute arbitration.  Suggesting that MultiPlan expects to control the pricing even through any resulting (and rare) arbitral context, MultiPlan noted that at least with respect to "No Surprises Act" ("NSA") claims, MultiPlan acknowledges both that a small fraction of claims go into arbitration; and that, once there, the independent dispute resolution ("IDR") process is "clunky" and "inefficient," but that

89

even there MultiPlan has plans to exert control over it. For example, during the 42nd Annual J.P. Morgan Healthcare Conference, former MultiPlan CEO Dale White stated:

> The [repricing] process is relatively efficient and smooth, except for when it gets to the IDR stage. When it gets to the IDR stage, which is the smallest percentage of claims, of our no-surprises claims, the ones that end up in arbitration is a fraction of their overall NSA claim volume. Once it gets there, it's very clunky, very inefficient, ***and we've had to invest in it. We had to dedicate some expenses in '22 and '23, in support of just that IDR component. We'll continue to do so. We think there's opportunity for us.*** It's a complex process. As I said earlier, we've invested in it.

Whatever that "opportunity" is, it likely concerns further expansion of MultiPlan's repricing power over and into the arbitral process.

**N.     The Efforts, Conduct, Statements And Omissions of Members of The MultiPlan Cartel Have Directly And Proximately Caused Harm And Damages to PIMG And Other Members of The Class; PIMG and Those Similarly Situated Have Article III and Antitrust Standing**

301.     MultiPlan, the Defendant Payors, and the Insurer Co-Conspirators, as members of the MultiPlan Cartel, have caused both direct and proximate harm to Plaintiff PIMG, as well as other members of the Class.

302.     The efforts, conduct, statements, and omissions taken to further the conspiracy were performed in secret and PIMG had no knowledge of the conspiracy, constructive, actual, or otherwise until the March 1, 2022 publication of *The Capitol Forum* article "MultiPlan's 'Independent' Prices Can Be Set by Insurers, Sources Allege; Evidence in Nevada Jury Trial Corroborates Allegation." More realistically, because there was no suggestion of antitrust violations in that article, PIMG's and the Class members' constructive knowledge of the conspiracy could not have occurred until the March 7, 2022 publication of *The Capitol Forum* article, "Multplan: Company's Information Sharing, Meetings Practices Could Raise Antitrust Concerns, Experts Say."

303.     At possibly the very earliest, but with the article concealed behind a paywall, *Modern Healthcare* published an informatively incomplete headline on November 2, 2021, "Verity Health blames bankruptcy on MultiPlan price fixing." Different from this matter, however, the "Verity Health" antitrust matter is a bankruptcy action asserting a violation of California's Cartwright Act on a non-class action basis.

304.     Because the conspiracy was expansive, encompassing, and secret, there was no practical alternative for PIMG or members of the Class to turn to in order to obtain payment for out-of-network healthcare services.

305.     Even if PIMG and other members of the Class knew about the MultiPlan Cartel, because the conspiracy was so expansive and encompassing, including all four major healthcare insurance company payors, as well as the top ten Payors, the top 15 major Payors, and over 700 Payors, Plaintiff and members of the Class were foreclosed from benefitting from competitive alternatives.

306.     Such underpayments were not merely proposals or counter-offers; rather, Payors have acknowledged that they relied on MultiPlan's determinations, enforced MultiPlan's determinations, and evaded Providers' scrutiny by referring Providers back to MultiPlan. As *The New York Times* reported, "[i]nsurers can set negotiation parameters for MultiPlan, including not negotiating at all, records and interviews show. Multiple providers and billing specialists said that in recent years they had increasingly been told their claims weren't eligible for negotiation." April 9, 2024 *The New York Times,* "Insurers Reap Hidden Fees by Slashing Payments. You May Get the Bill" by Chris Hamby. Further, reflecting the Payors' reliance on MultiPlan as both a repricing service and as a way to avoid distraught Providers, the *Health Plan Alliance* explained in a March 21, 2018 article, "A Better Reference for Reference-Based Pricing,

MultiPlan Data iSight," that "clients [that is, Payors] choose to direct provider inquiries to MultiPlan . . . ."

307.    As reported by *The Capitol Forum*, "a provider sends a bill to the insurance plan, the plan routes the claim to Multiplan who offers an 'adjusted price' (or 'negotiated rate') as part of a negotiation.  Providers [are] told that the adjusted price offer is a take-it-or-leave-it proposal. If the provider accepts the adjusted price, then the provider agrees not to balance bill."  Further, "[i]f the provider rejects Multiplan's negotiated rate, the claim is paid much lower than the typical allowable rate . . . ."  A biller quoted by *The Capitol Forum* explained that "'[w]hen we reject a negotiation, it takes months to get any payment and we never get paid more than the amount on the negotiation offer.  Anytime we say no, we are stuck waiting for payment.'"   In other words, a Provider's rejection of the initial adjusted price and commencement of further "negotiation" only results in delay and, ultimately, either receipt of the same or an even lower payment.

308.    Moreover, MultiPlan-assigned "negotiators" do not actually have power to negotiate; rather they assert a price as take-it-or-leave-it.  As reported by *The Capitol Forum*, "[i]n voicemails left by a Multiplan negotiator, the biller said he was told, 'the claim is set at the same rate, as far as percentage goes.  I am not able to increase it due to the maximum allowed amount.'"  Such negotiators do not actually negotiate, but merely recount the price as calculated by MultiPlan, and as paid by the Payor.

309.    In addition, the repricing methodologies and related pricing "negotiation" process is kept opaque, so that Providers cannot anticipate pricing conduct by the MultiPlan Cartel.  As reported by *The Capitol Forum*, "the Multiplan representatives only allow [a Provider's biller] to ask five questions per call whether they can answer the questions or not."  A biller quoted by *The Capitol Forum* noted that "'[w]e have asked on multiple occasions how [Multiplan and Viant]

determine what gets sent out for pricing,' she said. 'They will not divulge what their methodology is. Typically, we get a representative who says they have no control over what gets sent out for Multiplan pricing.'"

310.    Further, as reported, Providers remain in the dark about MultiPlan's ownership of its various repricing subsidiaries, including Viant, Medical Audit & Review Services ("MARS"), and Data iSight.

311.    After submitting claims for out-of-network healthcare services and cashing or depositing payments that were for amounts less than the amounts originally invoiced, PIMG and the other members of the Class were harmed and thereby suffered damages, including by way of artificially suppressed payments for OON healthcare services.

312.    The amounts that MultiPlan and the members of the MultiPlan Cartel paid to PIMG for OON healthcare services, as based on collusive, coordinated, and suppressive conduct engaged in by MultiPlan and the other members of the MultiPlan Cartel, including but not limited to instructions and related sharing of confidential, proprietary and competitively-sensitive claims and pricing-related information, as well as instructions and related sharing of confidential, proprietary, and competitively-sensitive methodology, margin, and override information, were less than what those payment amounts would have been absent the conspiracy.

313.    Others have been similarly damages. For example, a "biller" for a Provider that "works in a western state with surgeons and surgery centers" specializing in areas like "neurosurgery bariatrics, and gynecology" submitted a bill for $32,000 in May 2020. In response, the Payor, Anthem, Inc. sent the biller a MultiPlan-determined payment amount of $3,538.80, along with the condition that the Provider "agreed to accept that rate as full payment and promised not to balance bill, as is required when providers accept a negotiated rate offered by Multiplan." Off a submitted invoice of $32,000, the Provider received payment in the

amount of $3,538.80, or a $28,461.20 discount. Through Anthem's use of the MultiPlan Cartel, Anthem paid 11.06% of the amount originally invoiced.

314. The following screenshot of a Payor's response to a Provider's OON healthcare services invoice reflects the above paragraph:



315. In another example, the "biller" for this Provider submitted a bill for $24,000, in which Payor, Anthem, Inc., using MultiPlan, responded with a payment for $3,096.00, representing a difference of $20,904.00; or a 12.90% of the originally-submitted out-of-network healthcare service invoice of 12.90%.

316. The following screenshot of a Payor's response to a Provider's OON healthcare services invoice reflects the above paragraph:



317. In another example, the biller submitted an invoice for $4,500.00 to a Payor for OON healthcare services, whereupon the Payor responded with a payment amount of $673.65, representing a difference of $3,826.42; or 14.977% of the initial invoice. Note that the Provider, anticipating that MultiPlan/Anthem would propose an amount of $3,538 based on past

experience, wrote: "Please adjust . . . @ $3,538," but MultiPlan/Anthem adjusted the amount to $673.65 anyway.

318.    The following screenshot of a Payor's response to a Provider's OON healthcare services invoice reflects the above paragraph:



319.    By way of the experience of a Provider in addiction treatment, the biller submitted an OON healthcare service invoice to UHG in the amount of $3,700.00.  In response, the biller for the addiction treatment center received an "adjusted price" of $323.58 directly from Viant, an entity that became part of MultiPlan following a merger, as discussed herein.  Showing the direct participation of the repricer and its own characterization of the occurrence not as a proposed price or a counter-offer, but as the actual "adjusted price," the addiction treatment center was paid for OON healthcare services in an amount $3,376.42 less than the submitted amount; or 8.75% of the submitted OON service invoice.

320.    The following screenshot of a Payor's response to a Provider's OON healthcare services invoice reflects the above paragraph:



321.     The repricing services performed by MutliPlan, the Defendant Payors, and the Insurer Co-Conspirators leave Providers in a take-it-or-leave-it situation, where sometimes Providers are not paid anything more than the initially-adjusted price or, sometimes, anything at all for their services.

322.     As one example of Providers left "on the hook" for the costs associated with performing OON healthcare services, as reported by *The New York Times,* a surgeon received a MultiPlan-adjusted payment of $5,449.27, a "small fraction" of the Provider's over-$100,000 invoice. As reported, the Provider, apparently unsatisfied with the initially-adjusted payment (and, likely, the appeals process), now "hopes to collect the remaining balance from UnitedHealthcare in an ongoing case."  April 9, 2024 *the New York Times,* "Insurers Reap Hidden Fees by Slashing Payments.  You May Get the Bill."

323.     Plaintiff PIMG and members of the Class have suffered harm and have experienced damages by receiving collusively-determined and suppressed payments in amounts less than what they would have received for competitively-priced OON healthcare services

payments.  MultiPlan, the Defendant Payors, and the Insurer Co-Conspirators have directly and proximately caused Plaintiff PIMG and members of the Class harm and damages resulting from the repricing conspiracy.  By receiving collusively-determined and suppressed payments in amounts less than what they would have received for competitively-priced OON healthcare services, Plaintiff PIMG and members of the Class have suffered Article III damages and have been harmed precisely in the ways the antitrust laws seek to avoid.  As such, in addition to Article III standing, Plaintiff PIMG and the members of the Class possess antitrust standing.

324.     Although the dates, associated medical procedures, and adjusted payment amounts might differ as between members of the Class and as suffered by the same entity or individual, such differences in damages do not matter for purposes of certification of the Class, as proposed herein.

### O.     In Addition to the Direct Evidence of the MultiPlan Cartel, There Is Abundant Circumstantial Evidence Supporting Its Existence

325.     The direct evidence of the MultiPlan Cartel already described is alone sufficient to prove the alleged antitrust violations. Nevertheless, there also exists compelling circumstantial evidence that dictates the same conclusion. These facts consist of the parallel conduct of MultiPlan and the other Payors coupled with "plus factors" that make the OON services market susceptible to collusion.

326.     This circumstantial evidence consists of motives to conspire, actions against interest, and traditional conspiracy evidence. First, the members of the MultiPlan Cartel had the motive to conspire given the market's structural features and a traditional pricing method that they considered too high. Second, abandoning that method would have been against each member's individual self-interest had they not conspired to fix prices.  Third, various forms of traditional conspiracy evidence are further probative of price-fixing. These forms include

radically changing the methodology for setting out-of-network prices; exchanging real-time, confidential claims and pricing data with MultiPlan; opportunities for the conspirators to collude; a history of prior industry collusion in paying OON claims that was the subject of a government investigation, litigation, court findings that the collusion could have violated antitrust law, and hundreds of millions of dollars in settlements; and the knowing adoption of a common course of action, namely outsourcing the pricing of OON claims to MultiPlan.

327.     More specifically, the Multiplan Cartel is characterized by at least the following plus factors: (1) the high market concentration of conspiracy members; (2) high barriers to entry; (3) ample motive to participate in the conspiracy; (4) a history of prior collusion; (5) numerous opportunities to collude, including those directly facilitated by MultiPlan; (6) actions against self-interest that only make sense as part of a common plan; (7) evidence of conspiracy enforcement mechanisms; (8) pervasive and systematic information exchange between the conspiracy members and MultiPlan; and (9) the existence of customary patterns and courses of dealing that can only be explained by the existence of a conspiracy agreement. Assessed holistically, these factors evince an unlawful horizontal price-fixing agreement.

328.     **High Collective Market Concentration.** The relevant product market for Plaintiffs' claims is the market for payments by commercial insurers to healthcare providers for OON medical services. Within that market are submarkets for prices paid by each PPO Payor for the OON medical services provided to patients enrolled in that insurer's PPO. In this market, OON Providers like PIMG function as sellers of OON services and Payors like MultiPlan function as buyers of those services.

329.     OON Providers have no reasonable substitutes for the payments made by MultiPlan and other Payors for OON medical services. Under various federal and state laws, it

is illegal for healthcare providers to seek payments from insureds for most OON claims. MultiPlan and its co-conspirators, who dominate the market, force OON Providers to forego any payment from insureds as a condition of receiving any compensation at all, no matter how meager, for OON claims.

330.     Government sources offer payments to healthcare providers, but none of these sources—including Medicare, Medicaid, and Tricare—compete with commercial health insurance for payment of OON claims. These government sources service populations that are not typically served by commercial health insurance. For example, both Medicare and Medicaid have statutory age, income, and disability requirements, and Tricare is only available to current and former members of the United States military.

331.     For purposes of Plaintiff's claims, the relevant geographic market is the United States. Medical providers in the United States cannot practicably turn to payors in other countries, where private medical insurance is either uncommon or non-existent. The United States healthcare industry, including the market for payment of OON services, is universally recognized by industry participants as distinct from healthcare industries in foreign countries.

332.     The MultiPlan Cartel members, through their conspiratorial contracts, collectively exercise dominant power in the relevant market. Nearly every commercial insurer that participates in the relevant market has agreed with MultiPlan to curb OON payments. The members of the MultiPlan conspiracy collectively control at least 90% of the relevant market.

333.     MultiPlan faces only limited competition in the OON claims repricing business. MultiPlan processes claims through its patented repricing methodology and its large, proprietary database of historical claims, differentiating it from other claims repricing services, which base their methodologies on usual and customary rates or Medicare rates.

334.     MultiPlan's main competitor, Zelis, along with other claims repricing services,

are small-time players compared to MultiPlan. In 2022, Zelis processed approximately 2 million claims for repricing. According to a June 28, 2023 presentation, in 2022, MultiPlan processed 546 million claims, accounting for $155 billion in claims.

335.     The high concentration of the OON payment market is circumstantial evidence of agreements to conspire. This power has enabled the MultiPlan Cartel to flourish and impose anticompetitive effects throughout the relevant market.

336.     Further, healthcare providers have no choice when seeking payment for OON services they provided to a patient. Typically, their only option for payment is submitting a claim to the patient's PPO Payor. If that insurance company is a member of the MultiPlan conspiracy, the healthcare provider has no choice but to seek payment from a MultiPlan repriced claim.

337.     **Barriers to Entry into the Market.** Entrance into the OON payment market is hindered by high barriers. New entrants must be able to bear the extreme expenditures of time and money required to develop a network of healthcare providers large enough to compete as a commercial healthcare insurer. Even without developing an insurance network, there are significant capital outlays required to operate as a commercial healthcare payor. Entrants then face the challenge of contending with the staggering economies of scale that large incumbent insurers possess. Obtaining name recognition in an industry occupied by longstanding and well-recognized major players presents an additional hurdle.

338.     There is also an actuarial risk for new health insurance networks. If they cannot balance claims paid and revenue generated through premiums or network access fees, their capital reserves can quickly deplete.

339.     Even if a new entrant to the market is initially successful, it may not be able to survive long enough to see a return and develop a base of business to allow it to effectively

maintain its insureds.

340.     These barriers to entry further entrench the dominance of the MultiPlan Cartel members by ensuring that any entity which attempts to enter the market but rejects MultiPlan's price-fixing scheme cannot undermine the conspiracy members' collective ability to impose repriced payments for OON services.

341.     The repricing services themselves also present a high barrier to entry. To develop a third-party repricing service, a new entrant would need to make enormous cash outlays to develop source code and algorithms that effectively reprice OON claims—all without infringing MultiPlan's patents, develop contractual relationships with the hundreds of commercial insurance networks, and commit significant resources to consistently improving its repricing algorithms and software. As a result, it is unlikely that any company could effectively displace or disturb MultiPlan's repricing scheme.

342.     These numerous high barriers effectively prevent new entrants from impeding the MultiPlan Cartel's control of the market. Therefore, these barriers to entry circumstantially support a conspiracy's existence.

343.     **Motive to Conspire**. MultiPlan and its co-conspirators have a strong financial incentive to suppress payments for OON services. MultiPlan receives a percentage of the underpayment to healthcare providers, profiting only if the PPO Payors members successfully curbing OON payments. And the more they do so, the more MultiPlan is paid.

344.     The other PPO Payors are also financially motivated to restrict payments to OON Providers to increase their own profits. Just as MultiPlan charges Payors a percentage of the difference between the provider's billed amount and the amount actually paid, Payors charge their customers—often employers who provide coverage to employees through self-funded plans administered by the insurance company—a percentage of the same difference as a "shared

savings fee" or "processing fee."

345.     As explained above, these processing fees can result in big revenue for PPO Payors and enormous expenses for their subscriber patients. For example, one union health plan covering some 1,500 Arizona electricians paid $2.6 million in fees to Cigna in 2019. And Cigna charged Arlington Count, Virginia, $261,000 in such fees one year.

346.     UnitedHealthcare executives testified that these fees generate about $1 billion annually for the company, all derived from exploiting its insureds. For example, a New Jersey-based trucking company, New England Motor Freight, was charged $50,650 as a processing fee for one hospital bill. Moreover, when New England Motor Freight questioned the fee, UnitedHealthcare executive William T. Raha pushed back against the idea of providing a partial refund because of "concern[] about setting precedent" adverse to exorbitant processing fees on gross underpayments for OON healthcare claims, impacting "not only all of Key Accounts, but National Accounts as well." Not surprisingly, given the gigantic revenue reaped by these fees, UnitedHealthcare has encouraged employers to cease using FAIR Health (which charges a flat fee) to determine prices and to instead use MultiPlan's claim repricing tools.

347.     Thus, the motives driving MultiPlan and the other OOP Payors align: the less they pay to PPO Providers, the more revenue and profits they get to keep and apportion according to their anticompetitive agreements.

348.     Indeed, sometimes MultiPlan and the other PPO Payors suppress payments to healthcare providers so much that the fees they charge for these "savings" exceed the amount the PPO Provider receives for its medical services. For instance, when an outpatient substance abuse treatment clinic received $134.13 on an OON claim, Cigna, the Payor, received $658.75—almost five times as much—as a processing fee. And, MultiPlan received $167.48— also more than the OON Provider—for its role in suppressing the claim. Court records reveal

that this pattern frequently repeats itself. Ultimately, while Cigna received $4.47 million in processing fees from employers related to addiction treatment claims in California, the providers received only $2.56 million. MultiPlan received $1.22 million for repricing those claims.

349. The PPO Payors are also motived to conspire with MultiPlan to avoid legal issues like those created by their use of Ingenix. For instance, in an internal email, Cigna Chief Risk Officer Eva Borden explained that Cigna "cannot develop these charges internally (think of when Ingenix was sued for creating out-of-network reimbursements "—i.e., payments. Instead, it "need[ed] someone (external to Cigna) to develop acceptable" payment prices. MultiPlan filled this need.

350. **Prior Collusion**. It is easier for competitors in the same market to conspire if they have done so before. They know one another and share a history of trusting each other to conceal a conspiracy.

351. Because PPO networks cannot collectively control OON payment prices through legally enforceable contracts, the way they controlled in-network prices, they have resorted to illegal agreements to curb OON payments on multiple occasions.

352. An investigation of UnitedHealth's subsidiary, Ingenix, by the New York Attorney General's Office revealed a conspiratorial scheme in which competing OON Providers sent detailed information on their claims to Ingenix for input into a database it used to calculate payment prices. As a result, UnitedHealth and its co-conspirators, including Aetna and WellPoint, agreed to cease utilizing Ingenix and paid large sums toward the creation of the unbiased database, FAIR Health.

353. **Opportunities to Collude.** Defendants had, and continue to have, ample opportunities to conspire, including MultiPlan's facilitation of private communications among

competing PPO networks.

354. MultiPlan's road shows, for example, provide numerous opportunities for collusion. In one instance, in 2019, major health insurance executives, including those from the PPO Payors, met in Laguna Beach, California. At this gathering, MultiPlan executive Dale White professed that "MultiPlan is Magic" and discussed "a few things up [its] sleeve" that might benefit the insurers.

355. Other opportunities to collude through industry connections include industry associations of which PPO Payors are members. A prime example is AHIP (formerly America's Health Insurance Plans), whose membership boasts Aetna, Centene, Cigna, Elevance, HCSC, Humana, and many others.

356. AHIP represents that it "plays an important role in bringing together member companies and facilitating dialogues to advocate on shared interests."

357. Numerous executives of PPO Payors hold positions on AHIP's Board of Directors, including Gail K. Boudreaux, President and CEO of Elevance; David Cordani, Chairman and CEO of Cigna; and Maurice Smith, President, CEO, and Vice Chair of HCSC.

358. AHIP hosts conferences, committee meetings, and board meetings multiple times a year, where its members participate in closed-door meetings.

359. A federal court in California found that PPO Payors' overlapping membership in AHIP and participation in AHIP events presented sufficient opportunities to support existence of a *per se* horizontal price-fixing agreement.

360. **Acts Against Self-Interest**. Members of the MultiPlan Cartel have taken innumerable actions against their own self-interest. The agreements between MultiPlan and the other PPO Payors are examples themselves. If any single insurance provider chose to abandon tradition and enter into an agreement with MultiPlan to drastically underpay OON

claims, other OON Providers would refuse en masse to treat patients covered by that provider whenever possible—i.e., in non-emergency situations. It follows that the trailblazing PPO Payor would suffer a serious loss of subscribers. Further, the PPO Payor would be less likely to bring healthcare providers into its network, further reducing its network's value and earnings.

361. Notably, due to the artificial suppression of OON healthcare payment prices caused by MultiPlan's repricing tools, some healthcare providers have already stopped treating patients with certain healthcare plans. For instance, a rural Virginia provider of behavioral therapy for children with autism now refuses to accept patients insured by Aetna because its use of MultiPlan's repricing cut the Medicaid payment rate for her services by more than half. She explained that the artificial suppression of payments for OON healthcare services "puts [her] in a tough position" where she must decide whether "to pay [her]self a salary or be able to help people."

362. These deleterious effects are negated when numerous PPO Payors enter the conspiracy to reprice claims. OON Providers lose their leverage to negotiate more favorable prices.

363. The MultiPlan Cartel members also refrain from self-interested behavior that risks impeding or destabilizing their conspiracy. For example, some PPO Payors have abandoned any efforts to keep repricing in-house despite the substantial savings such efforts would produce. In at least one case, a PPO Payor did so despite having spent a considerable amount of money developing its own repricing product.

364. A cardinal example of defeating self-interest is UnitedHealth, the nation's largest commercial health insurance provider. UnitedHealth's financial stature would easily enable it to analyze its own historical claims database to ascertain the most efficient pricing for

OON services. Bringing its repricing decisions in-house, thus eliminating MultiPlan as an intermediary, would save UnitedHealth as much as 9.75% on each repriced OON claim, saving the company hundreds of millions of dollars each year.

365. In 2021, UnitedHealth created Naviguard to replace MultiPlan, adopting a "roadmap" to terminate its repricing contract with MultiPlan in 2023. But UnitedHealth scrapped the plan and renewed its agreement with MultiPlan. That decision made no economic sense from UnitedHealth's perspective. UnitedHealth subordinated a competitive edge to the collective interest of the MultiPlan Cartel members.

366. **Enforcement Mechanisms**. Members of the MultiPlan Cartel are effectively foreclosed from judicial enforcement of their price-setting—illegal—agreements. The conspiracy members have thus been forced to fashion informal internal mechanisms to enforce the MultiPlan Cartel agreements.

367. Naviguard is again an object lesson. Supplanting MultiPlan with Naviguard would have destabilized and posed an existential threat to the conspiracy. To preserve the conspiracy, MultiPlan responded by offering UnitedHealth a sweetheart deal. Upon information and belief, in 2022, the two companies negotiated a new contract for MultiPlan's repricing services that treated UnitedHealth to extremely favorable terms.

368. As a result, MultiPlan experienced a 20.6% drop in revenues between the first quarter of 2022 and the first quarter of 2023. MultiPlan was willing to sacrifice short-term revenues and profits to stabilize the conspiracy and keep its largest members in tow. This decision defies economic sense absent the MultiPlan Cartel.

369. **Information Exchange**. As discussed above, MultiPlan's roster of PPO Payors agreed to submit to MultiPlan voluminous records containing competitively sensitive claims and pricing data. Their willingness to do that served their individual interests only because

they knew the others had agreed to do the same.

370.     The Supreme Court and other courts have recognized that this type of information exchange is likely to have anticompetitive consequences. *See, e.g., United States v. U.S. Gypsum Co.*, 438 U.S. 441, n.16 (1978) ("Exchanges of current price information, of course, have the greatest potential for generating anti-competitive effects and, although not per se unlawful, have consistently been held to violate the Sherman Act.").

371.     The PPO Payors are continuously sharing real-time granular and non-anonymized pricing data by electronically transmitting it to MultiPlan. MultiPlan openly acknowledges that its analytics-based pricing services are driven by "[p]roprietary and public data sources."

372.     MultiPlan is using this pricing data to share confidential pricing information between members of the conspiracy to fix prices. For example, when seeking to establish UnitedHealth's OON payment rates, MultiPlan told UnitedHealth that prices set at 350% of Medicare rates would "be in line with another competitor" and "leading the pack along with another competitor."

373.     Competing companies would not ordinarily risk sharing competitively sensitive pricing information with their rivals. Moreover, they would not simultaneously pay those rivals—in this case MultiPlan—millions of dollars absent an agreement to restrain competition. The information exchange with MultiPlan is more indicative of an agreement to restrain trade than competition.

374.     **Pattern and Course of Dealing**. MultiPlan has an established history of forming, maintaining, and stabilizing its cartel, boasting that it is "deeply embedded into [its co-conspirators'] claims platforms."

375.     MultiPlan proudly emphasizes the long-term nature of its relationships with

its PPO Payor counterparties. For instance, in a June 28, 2023, investor presentation, MultiPlan announced that its "Average Length of Large Customer Relationships" was over 25 years.

376.     By trumpeting its high level of market participation and OON Provider acceptance rates of its payment prices, MultiPlan furthers the conspiracy by encouraging and reassuring the other members of its conspiracy.

377.     MultiPlan has also effectively taken the lead in recruiting new members to its conspiracy, espousing the advantages of collusive pricing to them, warning they will suffer a drastic financial disadvantage if they do not participate in the cartel, and enforcing price discipline by encouraging members to match their competitors' repricing standards.

378.     These customary patterns, formulas, leadership, and other courses of dealing are well-recognized circumstantial evidence of agreements and a conspiracy to suppress payment prices.

## VII.    MULTIPLAN AND ITS CARTEL MEMBERS HAVE ENGAGED IN CONTINUING ANTITRUST VIOLATIONS AND HAVE FRAUDULENTLY CONCEALED THEIR CONDUCT TO TOLL THE STATUTE OF LIMITATIONS

### A.    MultiPlan and the Other Payors Are Engaging in A Continuing Antitrust Violation by Renewing Their Conspiracy with New and Independent Acts

379.     A continuing violation of the Sherman Act, alleged here, restarts the statute of limitations period each time a defendant commits an overt act. Here, during the Class Period, MultiPlan and the other PPO Payors continued to underpay PIMG and the class members, adjusting its price-fixing agreement to reflect fluctuating economic and market conditions. Meetings (whether bilateral or multi-lateral), communications, episodes of information sharing, and efforts to "reprice" OON healthcare service payments were each overt acts that began a new statute of limitations because these events advanced the objectives of Defendants' conspiracy. Indeed, every statement involved different facts and suggestions but sprang from the same

seed—Defendants' conspiracy to artificially suppress payment amounts for OON healthcare services.

**B.** **MultiPlan, the Defendant Payors, And the Insurer Co-Conspirators Committed Fraudulent Concealment by Engaging in Efforts To Conceal The Conspiracy To Artificially Suppress Payments for Out-of-Network Healthcare Services, Which Have Tolled The Statute of Limitations**

380.    MultiPlan, the Defendant Payors, and the Insurer Co-Conspirators are engaging in efforts to surreptitiously reprice OON healthcare services such that hidden costs are pushed on to employees and patients.  In an April 8, 2024 letter to the Antitrust Division of the DOJ and the FTC, Senator Klobuchar described in part the problem MultiPlan and its conspiring Payors pose to employees and patients:  "I am concerned that – rather than competing for business from employers by reducing these costs to employees – algorithmic tools are processing data gathered across numerous competitors to subvert competition among insurance companies.  The result is that – instead of competing with each other – insurance companies are pushing additional hidden costs on to employees and patients."  April 8, 2024 Sen. Klobuchar Letter to Antitrust Div. of DOJ and FTC, at 1.

381.    Rather than promote their repricing partner, the insurance company payors downplay their relationship and use of MultiPlan, and hide from the public and Providers MultiPlan's repricing methodologies, processes, and procedures for paying OON Providers at artificially suppressed levels.  As described by *The New York Times,* "[l]arge health insurers are working with a little-known company to boost their profits, often at the expense of patients and doctors, a *New York Times* investigation found," and that MultiPlan's services occupy a "largely hidden facet of the healthcare industry . . . ."  April 7, 2024 *The New York Times,* "Health Insurers' Lucrative, Little-Known Alliance:  5 Takeaways" by Chris Hamby.  Further, according to *The New York Times,* "[t]he evolution of Data iSight, which recommends how much of each

medical bill should be paid, is an untold chapter in the story of private equity's influence on American health care," and how "patients . . . are mostly in the dark.  If they encounter Data iSight's name, it is typically in the fine print of dense paperwork.  Those who have complained said they got little more than assurances that the calculations were rigorous and fair."  April 7, 2024 *The New York Times,* "In Battle Over Health Care Costs, Private Equity Plays Both Sides" by Chris Hamby.  As *The New York Times* reported, "[a]s patients and providers have demanded an explanation for declining payments, MultiPlan has fought to keep details about Data iSight confidential, contending in lawsuits that the information is proprietary."  *Id.  The New York Times* further reported on April 9, 2024 that "[a] little-known data firm helps health insurers make more when less of an OON claim gets paid."  April 9, 2024 *The New York Times,* "Insurers Reap Hidden Fees by Slashing Payments.  You May Get the Bill" by Chris Hamby.  Further, according to "a *New York Times* investigation, based on interviews and confidential documents, . . .MultiPlan and the insurance companies have a large and mostly hidden financial incentive to cut those reimbursements as much as possible . . . ."  *Id.*  This article further revealed that even employers that use healthcare insurance companies to administer self-funded plans have been on the hook to pay mysteriously calculated savings fees:  "Other employers have also questioned increased fees and complained about being kept in the dark," leaving insurance company payors scrambling for ways to respond.  *Id.*  For example, "[a] UnitedHealthcare account executive emailed colleagues for help explaining the $50,650 fee charged to New England Motor Freight," which "grew out of a $152,594 bill, of which just $7,879 was covered."  *Id.*  When pressed for the basis of such a fee, as reported by *The New York Times,* "UnitedHealthcare initially refused to provide the trucking company with the full underlying data," and "Cigna refused a similar request from auditors for Arlington County, Va., which it had charged $261,000 in one year.  'There is no process for verifying the accuracy of any of these amounts,' the auditors wrote."  *Id.*

According to *The New York Time,* "[l]arge employers also have trouble getting data from insurers, said James Gelfand, head of the ERISA Industry Committee, which represents big companies with employee benefit plans." *Id.*

382.    The legitimacy of "secretive arrangements" between MultiPlan and Payors, as well as MultiPlan's dominance in OON healthcare services repricing has been publicly questioned.  In an April 9, 2024 letter from the American Hospital Association to Acting Secretary Su of the U.S. Department of Labor wrote:  "As a result of these secretive arrangements [between MultiPlan and Payors], America's employees are forced to pay increasing out-of-pocket amounts – even though they already pay hundreds of dollars each month for employer-funded health insurance."   April 9, 2024 AHA Letter to U.S. Department of Labor Acting Secretary Su, at 2.  As the AHA further stated:  "Health care providers are forced to endure these below-cost reimbursements, and employers with self-funded plans report that insurance companies are charging them unpredictable and frequently large processing fees **without transparency** about claims practices or data analytics, making it difficult for them to police or understand these inappropriate practices." *Id.* (emphasis added).  *The New York Times* reported that MultiPlan maintains a "dominant role in this secretive world . . . ."  April 9, 2024 *The New York Times,* "Insurers Reap Hiden Fees by Slashing Payments.  You May Get the Bill" by Chris Hamby.

383.    Both MultiPlan, the Defendant Payors, and the Insurer Co-Conspirators have exerted efforts to keep the specifics of their relationships, the ways that repricing amounts are calculated, and the conspiracy to artificially suppress payments for OON healthcare services out of view of patients and Providers.

384. Because the conspiracy to artificially suppress payments to OON Providers has been such a fantastic success (from the viewpoints of MultiPlan and the Payors), there are substantial differences between the amounts paid and the amounts originally billed.

385. Further, because Providers do not want to absorb the costs of their heretofore valuable services, they often seek to obtain the "balance" of their original bills from patients.

386. Two outcomes occur as a result of "balance billing": First, patients question the entire reason for having healthcare insurance. Secondly, stories about surprised patients receiving bankrupt-able medical bills (while insurance companies remain incredibly profitable) enter into the press. As a result, such press jeopardizes the continued success of the conspiracy.

387. For example, *The New York Times* ran a piece entitled "Insurers Reap Hidden Fees by Slashing Payments. You May Get the Bill," which included the recounting of a patient undergoing heart surgery from an OON surgeon: "Once back on her feet, [the patient] received a letter from the insurer, UnitedHealthcare, advising that [the doctor] would be paid $5,449.27 – a small fraction of what he had billed the insurance company. That left [the patient] with a bill of more than $100,000." Quite correctly, the patient thought: "'But this is why I had insurance' . . . . 'They take out, what, $300 or $400 a month? Well, why aren't you people [the insurance company personnel] paying these bills?'" In other words, "balance billing" places the entire value proposition of health insurance (and therefore the willingness of people to pay health insurance premiums) into question.

388. Further, such articles place such otherwise obscure OON healthcare service issues into the nation's collective conscious and understanding. It doesn't take a lot of sleuthing to compare the enormous profitability of healthcare insurance companies with the plainly avoidable risk of patients receiving sizable medical bills.

389.     Educated from a previous attempt by others to artificially suppress payment for OON healthcare services using a repricing tool called "Ingenix," MultiPlan realized that critical to the success of the conspiracy to artificially suppress OON healthcare payments was keeping patients from having responsibility to pay the large gap between what practitioners invoice for OON services and the adjusted OON healthcare service payment amounts, as calculated and shared by MultiPlan.

390.     As a result, MultiPlan made a repeated and concerted effort to prohibit OON Providers from "balance billing" their patients.  For example, in its November 19, 2020 Non-Deal Roadshow Presentation, MultiPlan explains that its "[a]cquisition of HST . . . [*p*]*revents consumer balance billing* by engaging member and provider *before service is rendered*[.]" November 19, 2020 Non-Deal Roadshow Presentation, at 17 (first emphasis in original; second eemphasis added).  Note that this compares with "[t]raditional [Reference-Based Pricing] services [that] engage consumer only *after balance bill is received*[.]"  *Id.* (emphasis in original).

391.     By working with Payors to prevent balance billing by Providers, MultiPlan has worked to limit public scrutiny of its pricing-related conduct and the revelation of the secret conspiracy to artificially suppress payments to OON Providers.

392.     Payors engage in another method of concealing their conspiracy – by reframing the OON payment scheme as one based on "'allowed'" and "'reasonable' amount[s]."  For example, Aetna explains that some of its health plans "pay for OON services based on an 'allowed' amount.  Most Aetna health insurance plans determine the allowed amount based on what Medicare would pay, or a 'reasonable' amount."  Aetna:  "Cost of OON doctors and hospitals."  As discussed herein, the conspiratorial payment thresholds are plainly not "reasonable."  Moreover, Aetna fails to disclose who or what determines the amounts "allowed,"

or the payment levels at issue.  In other words, Payors obscure just how cheap such OON payments are.

393.    MultiPlan and Payors engage in further efforts to conceal their conspiracy by falsely characterizing their repricing efforts as "[d]elivering affordability, efficiency and fairness to the US Healthcare system," as "[i]ndependent," and as "[d]elivering on the promise of healthcare price transparency[.]"  As MultiPlan's website landing page states, "[o]ur team strives to make healthcare more transparent, fair, and affordable for all. . . .  [MultiPlan] [i]dentif[ies] and negotiate[s] fair reimbursement for OON claims[.]"  Within a June 2024 two-page "Background on MultiPlan" document, the company describes itself as "help[ing] patients as well as employers who provide healthcare benefits, navigate this complexity by making healthcare more transparent, fair, and affordable for all and lowering costs for patients and employers."  As reported by *The New York Times,* MultiPlan "promises to help contain medical costs using fair and independent analysis."  April 9, 2024 *The New York Times,* "Insurers Reap Hidden Fees by Slashing Payments.  You May Get the Bill" by Chris Hamby.  Such assertions are not only false, but serve to further conceal and delay the revelation of the price suppression conspiracy at issue.

394.    As discussed by *The Capitol Forum,* MultiPlan "touts its prices for OON healthcare services as independent, fair, reasonable, analytics-based, transparent, and defensible."  *The Capitol Forum* quoted then-MultiPlan CEO, Mark Tabak:  "the company is 'recognized as a truly independent source of trusted information to the U.S. health care industry.'  A company video says Multiplan's tools allow for healthcare payors to pay providers what is fair for OON services with full transparency."  However, with respect to independence, as its investigation revealed, "Multiplan's prices are not always independent, as the prices can effectively be set by Multiplan's customers, which include the nation's top health insurers" by

"overriding the prices algorithmically generated by the Multiplan's Data iSight and Viant tools, the sources said. Evidence in a Nevada jury trial also showed insurers' ability to manipulate or override Multiplan's prices." As indicated by *The Capitol Forum,* "[b]eginning around 2015, insurers could go beyond just capping prices for services and could effectively set their own prices via a concept known as 'meet or beat' target pricing, the sources said. [¶] With target pricing, Multiplan's tools effectively allow insurers to set the price they want to pay for services, the sources said." The same publication concluded in a subsequent article that "[p]revious reporting showed that Multiplan's pricing is not independent, as it can be manipulated by insurers."

395.    Similarly, as reported by *The New York Times,* "MultiPlan, which makes nearly all its revenue from such [repricing-related] fees, markets its calculations as 'defensible, repeatable and completely transparent' and independent of insurance company influence." April 9, 2024 *The New York Times,* "Insurers Reap Hidden Fees by Slashing Payments. You May Get the Bill" by Chris Hamby. Its reporting further indicated that although MultiPlan "did not respond to detailed questions from The Times," in a (non-responsive) "statement, [MultiPlan] said it uses 'well-recognized and widely accepted solutions' to promote 'affordability, efficiency and fairness,' by recommending a 'reimbursement that is fair and that providers are willing to accept in lieu of billing plan members for the balance.'"

396.    At least one Defendant Payor and one Insurer Co-Conspirator furthered the ruse that the pricing policies are "transparent," while actually or nearly admitting the conspiratorial nature of the repricing scheme. As reported by *The New York Times,* "[a] Cigna spokeswoman also said the fee 'aligns with industry standards,' adding that 'it is fully transparent to our client' and has no influence on payouts to medical providers." Further, it also reported that "[a] United Healthcare spokesman said that the repricing "arrangement" concerns "'an industry-standard

approach.'"  Such "industry standards" appear to mean the application and sharing of claims and pricing information, repricing methodologies, and pricing overrides.

397.    Also, as reported by *The New York Times,* MultiPlan's services are not provided independent from insurer influence, but that "[i]nsurers can influence MultiPlan's purportedly independent payment recommendations, according to MultiPlan documents made public by a federal judge after a petition from The Times.  That generally means paying even less to doctors and making more in fees."  April 9, 2024 *The New York Times,* "Insurers Reap Hidden Fees by Slashing Payments.  You May Get the Bill" by Chris Hamby.  The assertion that MultiPlan's pricing methodologies are "independent" from the influence of its healthcare insurance company clients is both false and serves to hide and delay the revelation of this OON healthcare services price suppression conspiracy, which specifically involves and concerns the participation of the Payors.

398.    Further, with respect to MultiPlan's self-promoting characterization of its repricing services as "fair," its own employees reveal the opposite.  According to *The New York Times,* "[f]ormer employees at MultiPlan, which has annual revenues of about a billion dollars, described a numbers-driven culture that encouraged locking in unreasonably low payments and tied their bonuses to reductions.  'I knew they were not fair,' said one former MultiPlan negotiator, Kajuana Young."  April 9, 2024 *The New York Times,* "Insurers Reap Hidden Fees by Slashing Payments.  You May Get the Bill" by Chris Hamby.  By at least one of MultiPlan's own employees' admission, such payments were known to be set at unfairly low levels.

399.    Further engaging in fraudulent concealment of the true nature of the repricing scheme, rather than engaging in good faith negotiations and re-negotiations when necessary, *The New York Times* reported that "[i]n theory, many of MultiPlan's recommendations are negotiable.  But documents and interviews revealed tactics meant to pressure medical practices

to accept low payments.  Some offers came with all-caps admonitions and deadlines just hours away.  Accept and receipt prompt payment; refuse and risk an even lower payout."  Further, "'[i]t's not a real negotiation,' said Tammie Farkas, who handles billing for her husband's small New York-area practice focused on repairing blood vessels in the brain.  [¶] Insurers can set negotiation parameters for MultiPlan including not negotiating at all, records and interviews show.  Multiple providers and billing specialists said that in recent years they had increasingly been told their claims weren't eligible for negotiation."  Further confirming the negotiation process as biased, unfair, and devoid of good faith, as reported by *The New York Times,* "[f]ormer MultiPlan negotiators said their bonuses had been linked to their success at reducing payments, incentivizing a hard-line approach."  Also, as reported by *The New York Times,* "Ms. Young, the former negotiator critical of the process, said she had occasionally called a provider from a cellphone – knowing that her work line was recorded – and advised against accepting her own offer."  As she described the tilted negotiation process to be leveled against Providers, "the pressure to get bigger discounts had made her physically ill."  By making an appeals process at least facially available, such a process suggests fairness, but serves to hide the conspiracy at issue, while also serving in practice to deprive Providers of fair payment.

400.    In contrast to claims of fairness, reasonability, defensibility and transparency, as reported by *The Capitol Forum,* after "experienc[ing] sudden, significant, and inexplicable drops in payment," Providers have been left in the dark by MultiPlan and the Payors as to the reasons behind the decreases in payment.  Healthcare providers recount that "neither they nor their patients have been able to get clarity from Multiplan or insurers about why payment amounts dropped or what data was used to justify the new rates."  The same publication quoted a "biller" for a Provider in a subsequent article, who noted that "'[w]e have asked on multiple occasions how [Multiplan and Viant] determine what gets sent out for pricing,' she said.  'They will not

divulge what their methodology is. Typically, we get a representative who says they have no control over what gets sent out for Multiplan pricing.'" By preventing the disclosure of the ways by which payments to OON Providers are set, MultiPlan, the Defendant Payors, and the Insurer Co-Conspirators work together to further the clandestine nature of the price-suppression conspiracy and to prevent its public revelation.

401. Further, *The Capitol Forum* noted that "despite tampering with the rates generated by Data iSight, UnitedHealth uses descriptors such as 'independent,' 'transparent,' and 'third-party' in legal disclosures about OON rates generated by Multiplan's Viant and Data iSight tools." By using such omissive and misleading "legal disclosures," MultiPlan and its Payor clients work together to prevent revelation of the OON healthcare price suppression conspiracy.

402. MultiPlan, the Defendant Payors, and the Insurer Co-Conspirators have embraced the argument that one of the bases for its repricing scheme was, as reported by *The New York Times,* "to combat . . . billing and other charges they considered egregious." April 9, 2024 *The New York Times,* "Insurers Reap Hidden Fees by Slashing Payments. You May Get the Bill" by Chris Hamby. *The New York Times* reported that following the cessation of the insurers' obligation to use the FAIR Health pricing database, Cigna "was particularly concerned with what it considered overbilling and fraud by substance abuse treatment centers," and, in response, "[i]t halted some payments, opened investigations and met with a public relations firm '***to precondition public support*** for any next steps we may need to take[.]'" (Emphasis added). *The New York Times* also reported that the insurer sought "to combat . . . billing and other charges they considered egregious." Similarly, as reported by *The New York Times,* "UnitedHealthcare ***developed talking points*** to 'position UnitedHealthcare as an advocate that is helping consumers push back on excessively high physician and facility bills,' a 2016 internal memo said." *Id.* (emphasis added). In a June 2024 MultiPlan backgrounder, MultiPlan self-servingly notes that

"[w]ithout MultiPlan, many patients would not be able to obtain affordable out-of-network care and instead would face exorbitant medical bills for healthcare services." However, conduct that includes developing "talking points" and working with a PR agency "to precondition public support" does not suggest tackling an actual problem in the industry (even assuming it exists), but, rather, working together to provide justification for the severe underpayments that have resulted from implementation of the actual or near industry-wide conspiracy. Such PR-related efforts have also served to conceal the existence of the conspiracy to suppress payment amounts for OON healthcare services.

403.    MultiPlan further conceals the true reason as to why for nearly every "repricing" episode, the harmed Provider "accepts" the proposed payment. As discussed in *The Capitol Forum,* Multiplan claims that repricing acceptance occurs as "providers are less likely to appeal and less successful when they do because Multiplan and payors insist Multiplan's methodologies are transparent, defensible, and hard to argue against." Further, its Payor customers "are not keen to set up their own pricing systems because payors see value in Multiplan's position as an independent third-party with data-driven pricing systems. 'If a payor decides to [generate their own rates in-house], their ability to go back to providers and push for savings is fundamentally different than ours,' said Multiplan's president of new market during the 2020 analyst day presentation. 'We are the third-party independent source, the global standard, if you will, of that data that we capture and analyze.'" Of course, what is fraudulently concealed is the fact that they have agreements to share claims and pricing information with over 700 insurance company payors, representing nearly or actually the entire industry; that Multiplan explains how its repricing tools functions; that it gives such companies specific pricing guidance, including "typical" percentages-of-Medicare used by direct competitors; that it entices companies not to leave the conspiracy by delivering at least one board seat and other valuable consideration for

remaining within the conspiracy; and by the simple lack of competitive alternatives due to having the entire payor industry locked up. Nowhere does MultiPlan inform Providers about its industry-wide conspiracy to suppress prices for OON healthcare services.

404. Also, misleadingly, in certain policies issued by UnitedHealth, the payor explains that "usual and customary charges" are those that are "the maximum amount the Policy is obligated to pay for services." However, in an extreme revision of the words "usual" and "customary," UnitedHealth implies that its use of MultiPlan's "Data iSight" will return "usual" and "customary" payment amounts to OON Providers; rather than their conspiratorially-derived fractional amounts of usual and customary thresholds. UnitedHealth discloses that "[t]he Company uses data from FAIR Health, Inc. and/or Data iSight to determine Usual and Customary Charges." 2017-2018 UnitedHealthcare Insurance Company Student Injury and Sickness Insurance Plan for Mississippi State University, at 14. *See also* UnitedHealthcare Insurance Company Student Injury and Sickness Insurance Plan: Certificate of Coverage: University of Mississippi: 2021-2022, at 18 ("USUAL AND CUSTOMARY CHARGES means the maximum amount the Policy is obligated to pay for services . . . . The company uses data from FAIR Health, Inc. and/or Data iSight to determined Usual and Customary Charges. No payment will be made under the Policy for any expenses incurred which in the judgment of the Company are in excess of Usual and Customary Charges."). UnitedHealthcare does not disclose that such "usual and customary charges" are based on claims and data sharing by directly-competing Payors, or that MultiPlan itself provides specific guidance or direction as to "[t]ypical" pricing overrides for OON healthcare service payments. Although it discloses that "usual and customary" charges serve to limit payments, UnitedHealthcare does not disclose to students that it is involved in a long-running and devastating MultiPlan-hubbed conspiracy to

120

artificially suppress payments for OON Providers at levels are far lower than actual "usual and customary" charges.

405. This indication that "FAIR Health, Inc. and/or Data iSight . . . determine[s] Usual and Customary Charges" is belied by MultiPlan's presentation, which itself separates MultiPlan from the process of determining usual and customary ("U&C") charges. As indicated in its November 19, 2020 Non-Deal Roadshow Presentation, MultiPlan provides an "[i]llustrative process flow WITHOUT Multiplan, which notes that "Payor tries to negotiate with Dr. Smith, then reduces charge [from a $1,000 bill] to OON U&C of $800" and "[p]ays Dr. Smith the payor portion totaling $480" (under the "[a]ssum[ption] [of a] 60%/40% co-insurance for OON claims"). November 19, 2020 Non-Deal Roadshow Presentation, at 19. The next page describes an example when the payor uses MultiPlan and ends up "paying Dr. Smith [the] payor portion totaling $360" (based on the same "[a]ssum[ption] [of a] 60%/40% co-insurance for OON claims"). *Id.* at 20. Thus, using MultiPlan results in the Payor paying $360, while *not using MultiPlan* and relying, instead, on "U&C" results in the Payor paying $480. A June 2024 backgrounder on MultiPlan also emphasizes this difference: "[a]pplying national benchmarking, regional wage indexing, and geographic adjustment, among other methods, allows for a fair reimbursement *compared to* Usual and Customary and Medicare-Based pricing." In contradiction of UnitedHealthcare's representation, MultiPlan is *not* the determiner of usual and customary healthcare charges. Further, asserting that MultiPlan-calculated rates and "U&C" charges are the same serves to further conceal the existence of a conspiracy to artificially suppress payments for OON healthcare services at levels far below "U&C" levels.

406. Another method used by the conspirators to conceal the scheme is to use percentage-of-Medicare as a way to reference payment amounts for OON healthcare services. In an article apparently written by MultiPlan, "A Better Reference for Reference-Based Pricing,

MultiPlan Data iSight," MultiPlan itself explains that when referencing price as "X% of Medicare," the "Medicare-based reference point is misleading. The average consumer doesn't understand how low Medicare rates are. On its surface, a policy to reimburse at a level well above what Medicare pays sounds fair, even generous when compared to the traditional methodology that reimburses at a percentage below U&C. However, when a provider anticipating low reimbursements from payers increases the charges to compensate, the gap between an elevated charge and the bare-bones Medicare reimbursement can be significant." March 21, 2018 Health Plan Alliance: "A Better Reference for Reference-Based Pricing, MultiPlan Data iSight" by MultiPlan. As reported by *The New York Times,* "MultiPlan has pitched Data iSight as an alternative to simply paying marked-up Medicare rates . . . . Paying around 120 percent of the government-set rate 'sounds fair, maybe even generous,' one MultiPlan document said, but this is 'inherently misleading' because 'the average consumer does not understand just how low Medicare rates are.'" April 7, 2024, *The New York Times,* "In Battle Over Health Care Costs, Private Equity Plays Both Sides" by Chris Hamby. Although even MultiPlan recognizes use of Medicare as "misleading," use of this reference, which has served to replace "UCR" (usual, customary, and reasonable) charges since the implementation of the conspiracy, appears now to be, per MultiPlan, the norm.

407. MultiPlan's reliance on high percentages of "accept[ing]" providers as a justification for its conspiracy is further revealed to be an effort to fraudulently conceal the meaning of Provider repricing acceptance. As indicated in MultiPlan's November 19, 2020 Non-Deal Roadshow Presentation, MultiPlan acknowledges that the "Impact to Consumer" includes "[s]teering to providers with . . . reference price acceptance . . . ." In other words, MultiPlan acknowledges that its acceptance rate is artificially inflated as MultiPlan's program has the effect of steering patients to providers already willing to "accept[]" its low level,

repricing approach. Of course, even more importantly, MultiPlan, the Defendant Payors, and its Insurer Co-Conspirators fail to disclose that because nearly or actually the entire industry is involved in the pricing suppression conspiracy, Providers have nowhere else to turn for better OON healthcare services pricing. Its acceptance is about controlling the entire waterfront; not Providers' implied satisfaction with the conspiracy's payment levels.

408.    Healthcare insurance company payors also engage in efforts to assert that the repricing efforts by MultiPlan's subsidiaries are simply recommendations, and that its repricing recommendations are "organize[d]" into "percentiles." As UnitedHealthcare asserts: "one or more of the following reimbursement databases, benchmarks, or methodologies may be used to establish the reimbursement amount for OON claims. . . . • Viant. A rate recommended by Viant, an independent third-party vendor that collects and maintains a database of health insurance claims for facilities, then applies proprietary logic to arrive at a recommended rate. Viant also organizes its data by percentiles." 2024 UnitedHealthcare Legal: "Information on payment of OON benefits: Out-of-network providers." This set of representations is incorrect on multiple levels. First, based on MultiPlan's own assertions that between 94% and 99% of repricing episodes are "accept[ed]" by Providers, these price "tampering" efforts are not simply recommendations; they are conspiratorially-derived, payment-level directives. Further, the "Legal" explanation is inherently contradictory where it first indicates that "one or more of the following reimbursement databases, benchmarks, or methodologies may be used *to establish* the reimbursement amount for OON claims," but then indicates that Viant merely provides "[a] rate recommended by Viant . . . ." *Id.* The Viant-provided rate is no recommendation, but an "establish[ed]" payment limit. Further, UnitedHealthcare characterizes Viant as "an independent third-party vendor" when UnitedHealthcare holds or held a seat on MultiPlan's board of directors (as a payment for returning to the conspiracy). Viant, as a MultiPlan-owned and

controlled subsidiary, cannot be considered to be independent.  The information on this website is further misleading as it indicates that Viant "applies proprietary logic to arrive at a recommended rate" when MultiPlan's own methodology white papers provide "typical" percentage-of-Medicare pricing overrides, which, of course, eliminate the purpose of any "proprietary logic." *Id.*  Further, any "organiz[ation] [of] its data by percentiles" is besides the point. *Id.*  Whether data is organized in a certain fashion fails to disclose the pricing guidance and directives issued by MultiPlan and Viant.  For example, MultiPlan fails to disclose the specific percentage-of-Medicare pricing thresholds that are shared by MultiPlan and which are typically applied by directly competing Payors.  Finally, this "Legal" information about "Out-of-Network providers" says nothing about the creation, implementation, continuation, and enforcement of the pricing-suppression conspiracy engaged in by MultiPlan, the Defendant Payors, and the Insurer Co-Conspirators.

## VIII.   EFFECTS ON INTERSTATE COMMERCE

409.    The collusive conduct of MultiPlan and the other PPO Payors have substantially affected and occurred within the flow of interstate commerce of the United States. As intended, that conduct has and continues to have a substantial effect on the flow of interstate commerce.

410.    This conduct includes the Providers' performance and sale of healthcare services and products; the receipt of claims for OON healthcare by the Defendant Payors and the Insurer Co-Conspirators; the processing of such claims by MultiPlan; and the payment of claims to the Providers (albeit at downwards-adjusted levels).  Further, the claims submitted by PIMG and other Providers include charges for services, goods, and facilities supplied to persons who reside in states other than those where MultiPlan or its co-conspirators reside. In addition, MultiPlan itself operates PPO networks throughout the United States.  Further, patients who receive OON healthcare from PIMG for which PIMG submits a claim to MultiPlan or any of the Defendant

Payors or Insurer Co-Conspirators (none of which are either entities organized under California law or who list California addresses as their principal places of business), and where PIMG's claim is then paid at a fraction of its submitted value, it is almost certainly the case that, in the process of receiving a claim and then providing fractional payment to PIMG, money flows from a state outside of California into California to PIMG's economic detriment, harm, and damages.

411. The activities, conduct, statements, omissions, and agreements of MultiPlan, Defendant Payors, as well as that of the Insurer Co-Conspirators, relating to the payment of OON healthcare claims were intended to and did have direct, substantial, and reasonably foreseeable effects on the interstate commerce of the United States.

412. MultiPlan, the Defendant Payors, and the Insurer Co-Conspirators, both directly and through their agents, engaged in activities affecting all states of the United States and the District of Columbia.

413. The conspiracy, unlawful and wrongful anti-competitive conduct, and the substantial anti-competitive effects, further described within this complaint, proximately caused injury to PIMG and members of the Class, defined below.

414. MultiPlan's, the Defendant Payors, and the Insurer Co-Conspirators' activities, conduct, efforts, statements, and omissions have substantially affected and are and were within the flow of, and have been intended to and have a substantial effect on interstate commerce of the United States. Its insurance products and services are sold and marketed in the flow of interstate commerce. In addition, MultiPlan and the other Payors sell and market insurance products and services to persons who reside in states other than the ones where MultiPlan or Payors reside. In addition, MultiPlan itself operates PPO networks throughout the United States.

415. Additionally, for OON healthcare that PIMG provides, PIMG submits claims to MultiPlan and other Payors outside California for payment for their OON healthcare services,

which is intended to and does have a direct, substantial, and reasonably foreseeable effect on the interstate commerce of the United States. Further, in the process of paying such claims, MultiPlan and other Payors move substantial amounts of money flows from a state other than California to PIMG in California.

## IX.   CLASS ACTION ALLEGATIONS

368.    PIMG invokes Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3) on behalf of the following Class:

> All persons and entities who received one or more downwardly-adjusted payments from Defendant MultiPlan or from Payors for out-of-network healthcare services in the United States, including in all of its States, the District of Columbia and U.S. territories, from July 1, 2017 to the present (the "Class Period").

Excluded from this Class are MultiPlan, its officers, directors and employees; any entity in which a MultiPlan has a controlling interest; and any affiliate, legal representative, heir, or assign of a MultiPlan. Also excluded are any federal, state, or local governmental entities; any judicial officer presiding over this action; the members of the judicial officer's immediate family and staff; and any juror assigned to this action.

416.    Class membership. During the Class Period, PIMG provided healthcare services for patients who maintained insurance, but which did not include PIMG or PIMG's staff, among its in-network providers.

417.    **Ascertainability**. The class is readily identifiable and one for which adequate electronic records exist.

418.    **Numerosity**. Due to the nature of the trade and commerce involved, PIMG believes thousands of class members exist. Defendant knows the exact number of class members and their identities.

419.    **Typicality**. PIMG's claims are typical of class members' claims because their claims invoke the same theory of liability, arise from the same course of unlawful conduct, and

injure out-of-state health providers in same way: paying them less for payment for their claims than they would have paid absent the MultiPlan Cartel.

420. **Predominance of common legal and factual questions**. Common legal and factual questions predominate over individual questions. These predominating common legal and factual questions, which generate common answers, include the following:

a. Whether MultiPlan, the Defendant Payors, and the Insurer Co-Conspirators engaged in an agreement, combination, or conspiracy to suppress, maintain, or stabilize payments for OON healthcare as paid as part of interstate commerce in the United States;

b. The identity of the conspiracy's participants;

c. The conspiracy's duration;

d. The acts performed by MultiPlan, the Defendant Payors, and the Insurer Co-Conspirators in furtherance of their conspiracy;

e. Whether the conspiracy violated Section 1 of the Sherman Act, 15 U.S.C. §1;

f. The effect of the conspiracy on the price of OON healthcare services provided in the United States during the Class Period;

g. Whether PIMG and the class members suffered antitrust injury as a result of the MultiPlan Cartel's conspiracy;

h. The appropriate measure of damages for injury suffered by PIMG and class members; and

i. Whether PIMG and the class members are entitled to injunctive relief and the nature and extent of injunctive relief.

421. **Adequacy**. PIMG will fairly and adequately protect class members' interests because PIMG's interests are aligned with, and not antagonistic to, the Class members' interests.

PIMG has retained counsel competent and experienced in prosecuting class actions and antitrust litigation.

422. **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of this controversy for the following reasons: (a) individual joinder of all class members is impractical; (b) prosecution as a class action will eliminate the possibility of duplicative litigation; (c) prosecution of separate actions by individual class members would create the risk of inconsistent or varying decisions and adjudications, creating uncertain and potentially incompatible standards for adjudicating the claims and defenses asserted in this action; (d) the relatively small amount of damages suffered by individual class members, when compared to the expense and burden of individual prosecution of their individual claims, preclude feasible and practical individual actions to seek redress for the violations alleged; and (e) individual litigation would greatly magnify the delay and expense to all parties and to the court system. For these reasons, a class action will reduce case management difficulties and provide the benefits of unitary adjudication, economy of scale, and comprehensive supervision by a single court.

423. The members of the MultiPlan Cartel have also acted on grounds generally applicable to the Class, making final injunctive relief appropriate for the Class as a whole.

## X. CAUSES OF ACTION

### COUNT ONE
### Horizontal Conspiracy in Restraint of Trade in Violation
### of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1)

424. PIMG incorporates and realleges every allegation set forth in the preceding paragraphs of this Complaint.

425. Beginning no later than July 1, 2017, MultiPlan the Defendant Payors, and the Insurer Co-Conspirators created and executed a continuing contract, combination, or conspiracy

to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman

Antitrust Act, 15 U.S.C. § 1.

426.    The contract, combination, or conspiracy alleged herein has consisted of a

continuing horizontal agreement between and among MultiPlan and all of its co-conspirators to

knowingly and collectively use MultiPlan's repricing tools to collusively fix payment amounts for

medical services performed by OON Providers in the United States for OON healthcare services.

This conspiracy has caused PIMG to accept artificially suppressed payments for OON healthcare

services during the Class Period.

427.    The contract, combination, or conspiracy alleged herein constitutes a horizontal

conspiracy between competitors in the United States commercial health insurance market.

428.    In the alternative, the contract, combination, or conspiracy to unreasonably

restrain trade and commerce alleged herein has taken the form of a hub-and-spoke conspiracy in

which MultiPlan served as the hub, the agreements between MultiPlan, the Defendant Payors, and

the Insurer Co-Conspirators to use MultiPlan's claim repricing tools served as spokes, and the

agreement between the spokes to use MultiPlan's repricing tools to reprice payment rates for

OON healthcare services claims serve as the rim.

429.    The unlawful acts and omissions of MultiPlan, the Defendant Payors, and the

Insurer Co-Conspirators furthering their conspiracy and its objects include but are not limited to

the following:

a.    MultiPlan sold and operated its proprietary analytical tools to determine the

amounts of payment for medical services performed by OON Providers;

b.    MultiPlan's co-conspirators facilitated the use of its analytical pricing tools by

submitting their confidential and detailed internal claims data to MultiPlan in real

time;

c.   MultiPlan's co-conspirators outsourced the processing of OON claims to MultiPlan knowing that it would use their claims data to set payment prices for out-of-network healthcare claims;

d.   MultiPlan and its co-conspirators paid for OON healthcare services claims at the rates determined by MultiPlan's pricing tools;

e.   MultiPlan and its co-conspirators used many methods of bilateral and multilateral communication about payment for OON healthcare services claims, including their use of MultiPlan's repricing tools, all having the purpose and effect of maintaining and reinforcing their anticompetitive scheme; and

f.   Concealing the MultiPlan Cartel and the identities of its participants;

430.   The acts and omissions by MultiPlan, the Defendant Payors, and the Insurer Co-Conspirators in furtherance of their conspiracy to restrain trade were authorized, ordered, and performed by their respective officers, agents, employees, or representatives while actively engaged in managing their interstate operations.

431.   MultiPlan, the Defendant Payors, and the Insurer Co-conspirators possess market power in the relevant antitrust market for payments of healthcare services claims by Payors. The relevant product market is the payment of OON healthcare services claims by Payors.

432.   The relevant geographic market is the United States, as well as its District and Territories. The MultiPlan Cartel has caused continuous anticompetitive effects in the form of artificially suppressed payment rates for OON healthcare services claims that fall below the traditional and competitive rates for such claims.

433.   As a direct and proximate result of past and continuing violations of Section 1 of the Sherman Antitrust Act by the members of the MultiPlan Cartel, PIMG and members of the

Class have been injured in their business or property and will continue to be injured in its business and property by receiving lower payments for out- of-network healthcare services claims than what it would have received absent the conspiracy.

434.     There are no procompetitive justifications for the MultiPlan Cartel, and to the extent any proffered procompetitive justifications exist, they could have been achieved through less restrictive means. The MultiPlan Cartel is a per se violation of Section 1 of the Sherman Antitrust Act.

435.     In the alternative, the MultiPlan Cartel's conspiracy violates Section 1 of the Sherman Antitrust Act under either a quick look or full Rule of Reason analysis. The combination and conspiracy alleged had these effects, among others:

- Price competition in the payment for OON services has been restrained, suppressed, and eliminated in the United States;

- PIMG and the class members who directly received payment for OON services from MultiPlan, the Defendant Payors, or the Insurer Co-Conspirators, including their respective divisions, subsidiaries, and affiliates, and co-conspirators, were deprived of the benefits of free and open competition in the prices paid for those services.

436.     Defendants' anticompetitive acts had a direct, substantial, and foreseeable effect on interstate commerce by suppressing and fixing beef prices throughout the United States because Defendants sell their beef in every state.

437.     The conspiratorial acts and combinations have caused unreasonable restraints in the beef market.

438.     PIMG and the Class members have been injured and will continue to be injured in their businesses and property by receiving smaller payments for OON healthcare from

MultiPlan, the Defendant Payors, and the Insurer Co-Conspirators than they would have been paid absent the conspiracy.

439.   The alleged contract, combination, understanding, agreement, or conspiracy is a *per se* violation of the federal antitrust laws.

440.   PIMG and the Class members are entitled to an injunction against all members of the MultiPlan Cartel, including MultiPlan, the Defendant Payors, and the Insurer Co-Conspirators, to prevent and restrain their unlawful conduct.

## XI.   REQUEST FOR RELIEF

WHEREFORE, PIMG, on its own behalf and on behalf of absent Class members, requests that the Court grant the following relief:

1.   Determining that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appointing PIMG as the Class representative and its counsel of record as Class counsel, and directing that notice of this action as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure be given to the Class, once certified;

2.   Adjudging that the conspiracy among MultiPlan and its co-conspirators, and all acts or omissions by MultiPlan or its co-conspirators in furtherance of the conspiracy, violate Section 1 of the Sherman Act, 15 U.S.C. § 1;

3.   Entering judgment for PIMG and the Class members against MultiPlan for treble the damages sustained by PIMG and the Class members in the form of claim underpayments, lost revenue and profits, and all other economic harm to PIMG as a result of MultiPlan's violations of the Sherman Act;

4.   Awarding PIMG the costs of prosecuting this action, including reasonable attorneys' fees permitted by Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26;

5.      Awarding PIMG and the Class members prejudgment and post- judgment interest to the fullest extent allowed by law from no later than the commencement of this action;

6.      Permanently enjoining MultiPlan and its co-conspirators, affiliates, successors, transferees, assignees, officers, directors, partners, agents and employees, and all other persons acting or claiming to act on its behalf or in concert with it, from continuing, maintaining or renewing the conduct, conspiracy, or combination and from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect caused by any further violation of the Sherman laws;

5.   Such other and further relief as the Court may deem just and proper.

## XII.   JURY TRIAL DEMANDED

PIMG demands a trial by jury according to Rule 38(b) of the Federal Rules of Civil Procedure of all issues so triable.

Dated:  August 28, 2024                                 Respectfully submitted,


                                                        *s/Katrina Carroll*
                                                        Katrina Carroll
                                                        LYNCH CARPENTER
                                                        111 W. Washington Street
                                                        Suite 1240
                                                        Chicago, IL 60602
                                                        Tel: (312) 750-1265
                                                        *katrina@lcllp*

                                                        Jason S. Hartley
                                                        HARTLEY LLP
                                                        101 W. Broadway, Suite 820
                                                        San Diego, CA 92101
                                                        Tel: (619) 400-5822
                                                        *hartley@hartleyllp.com*

Richard M. Paul III
PAUL LLP
601 Walnut Street, Suite 300
Kansas City, Missouri 64106
(816) 984-8100
*Rick@PaulLLP.com*

Joseph R. Saveri
JOSEPH SAVERI LAW FIRM, INC.
601 California Street, Suite 1505
San Francisco, CA 94108
(415) 500-6800
*jsaveri@saverilawfirm.com*

*Counsel for Plaintiff and Plaintiff Class*